Jerome B. Rosenthal and Ruth Rosenthal [1] v. Commissioner. Rosenthal v. Commissioner
Docket Nos. 67848, 77923-77925, 93832, 1986-62, 1392-64, 1393-64.
United States Tax Court
T.C. Memo 1970-332; 1970 Tax Ct. Memo LEXIS 28; 29 T.C.M. (CCH) 1521; T.C.M. (RIA) 70332; November 30, 1970, Filed. *28 Issue 1: Government Bonds Transactions. (a) Held, upon the facts: That in each one of the four transactions involving $1,000,000 Federal Land Bank bonds, $100,000 U.S. Treasury bonds, $100,000 Treasury bonds, and $750,000 Treasury notes, respectively, the petitioner, Jerome B. Rosenthal, did not enter into a bona fide transaction in each instance on February 17, 1953, February 26, 1954, March 1, 1954, and December 23, 1955, respectively, for the purchase of the securities which purportedly were involved; that each transaction was without substance and reality and was a sham transaction; that none of the transactions can be recognized for tax purposes; that in reality petitioner did not puchase the securities referred to in each transaction; that petitioner did not borrow and was not indebted for, in the respective transactions, $1,052,000, $105,000, $105,000, $712,500 (note to Gibraltar), and $37,500 (note to CHK); and that the amounts paid by petitioner during the years involved in each transaction, pursuant to his several "notes", were not interest paid on indebtedness and, therefore, the payments were not deductible under section 23(b), 1939 Code, and section 163(a), 1954 Code. *29 (b) Held: That since each transaction was a sham, there shall be excluded from taxable income, under Rule 50, for the taxable years before theCourt, the respective amounts included in income as "interest received" on the Government securities, and the so-called "capital gains" from the purported sales of the securities. deductions are not allowable for petitioner's out-of-pocket costs as losses from transactions entered into for profit under section 117(g)(2), or as losses from failures to exercise options under section 1234, 1954 Code. Issue 2: Income in 1953 from BRNM Law Partnership. Held, upon the facts: That Rosenthal did not realize unreported income in 1953 from the BRNM law partnership in the amount of $4,134.81, and that his share thereof did not exceed $25,222.29; respondent's determinations were incorrect. Issue 3: Deductions for Legal Expenses. Held: That deductions are not allowable under section 212 for legal fees and costs paid in 1960 and 1061; held, further, that the expenditures were personal expenses of Jerome B. Rosenthal and are not deductible under section 262. Issue 4: Docket Nos. 77923, 77925, Increased Deficiencies for 1955. Held: That the assessment and collection *30 of increases in the deficiencies for 1955, claimed by the respondent, are not barred by the statute of limitations, section 6214(a). Jerome B. Rosenthal, pro se, * Los Angeles, Calif. Eli Blumenfeld and Myron Weiss, 1522 *10 INDEX
Page Numbers
1. Preliminary Matters
1522-1523
2. Findings of Fact
1523-1555
Issue 1 - Interest Deductions
1523-1550
(a) Transaction 1
1525-1534
(b) Transaction 2
1534-1540
(c) Transaction 3
1540-1544
(d) Transaction 4
1544-1550
Issue 2 - Income, BRNM Law Partnership
1550-1553
Issue 3 - Expenditures, 1960, 1961, Divorce
1553-1554
Issue 4 - Statute of Limita- tions
1554-1555
3. Ultimate Findings of Fact
1555-1558
4. Opinion
Issue 1 - Interest Deductions
1558-1580
Issue 1 - Alternative Deduc- tions
1558-1580
Issue 2 - Income, BRNM Law Partnership
1580-1581
Issue 3 - Deductions, Legal Expenses, Divorce
1581-1589
General Matters
1589
Issue 4 - Statute of Limita- tions
1589-1590
HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income taxes in the *31 total amount of $122,896.84 for the years of 1953, 1955-1958, 1960, and 1961; (the years 1954 and 1959 are not before the Court). For 1955, in his amended pleading (the amended answers), he made a determination denying a deduction of $7,723.67 claimed as an interest deduction, and he made claims for increased deficiencies under section 6214 (a). For 1960, with respect to the separate return in the name of Ruth Rosenthal, he determined a 25 percent penalty, an addition to tax, of $866.38 under section 6651(a). The determinations are as follows (J.R. refers to the petitioner, Jerome B. Rosenthal, and R.R. refers to Ruth Rosenthal): Year
Docket No.
Deficiency
Section6651(a)
1953
67848
$ 26,385.43
1955
77923
R.R.
17,434.80
Increase
2,780.52
77925
J.R.
17,302.80
Increase
2,780.52
1956
77924
21,795.89
1957
93832
18,527.07
1958
1986-62
3,759.04
1960
1392-64
R.R.
3,309.57
$866.38
1393-64
J.R.
3,273.58
1961
1392-64
R.R.
2,782.80
1393-64
J.R.
2,764.82
$122,896.84
$866.38
The taxable years 1954 and 1959 are not before the Court. The issues are: 1. Whether there was a real and bona fide indebtedness owed by the petitioner, Jerome B. Rosenthal, in each one of four transactions involving Government bonds; or whether each transaction lacked *32 substance or was a sham, so that payments in each of the taxable years were not interest on indebtedness within the meaning of section 23(b), 1939 Code, and section 163(a), 1954 Code. The petitioner made payments, ostensibly as interest, in the taxable years in the following total amounts, for which he took deductions, which were disallowed by respondent: Year
Sum Paid and De- ducted as Interest
1953
$ 39,111.01
1955
63,464.62
1956
34,921.41
1957
36,063.61
1958
19,689.77
1960
5,625.00
Total
$198,875.42
Because separate returns were filed for 1955 and 1960, deductions of one-half of the payments made in each of those years were deducted on the returns of the petitioner, Ruth B. Rosenthal. Whether, in the alternative, deductions are allowable for the cost or net out-of-pocket expense, if any, spent in connection with each transaction (a) as losses from transactions entered into for profit, under section 23(e)(2), 1939 Code, or section 117(g)(2), 1954 Code; or (b) as losses resulting from the failure to exercise privileges or options to buy or sell property, under section 165(c), 1939 Code, or section 1234, 1954 Code. 2. Whether Rosenthal's income for 1953 from a former law partnership was more than *33 $25,222.29, as reported in his return. 3. Whether deductions for 1960 and 1961 are allowable under section 212 for legal fees and costs paid in connection with the divorce in 1964 of the petitioners. 1523 4. Whether respondent's claim for increased deficiencies for 1955 is barred by the statute of limitations. In Docket No. 1392-64, the respondent has conceded that there should not be a 25 percent addition to the tax for 1960 under section 6651(a). Recomputations of the amounts of the deficiencies for all or some of the taxable years, under Rule 50, are required. Findings of Fact Petitioners were residents of Los Angeles and Beverly Hills, California, when their tax returns were filed and their petitions in these cases were filed. All of the returns were filed with the district director of internal revenue at Los Angeles. They were prepared on the cash basis, for calendar years. Joint returns were filed for 1953, 1956, 1957, and 1958; separate returns were filed for 1955, 1960, and 1961. Jerome B. Rosenthal is referred to herein as the petitioner because all of the income reported in the tax returns resulted from his activities, and the issues involve his transactions. Ruth B. Rosenthal, *34 petitioner's spouse during the taxable years, is a petitioner only because joint returns and separate returns in her name were filed. Petitioner has practiced law since 1946, and he also engaged in various business activities. He is a member of the Bar of California. In connection with his law practice he advised some of his clients about their business matters and investments. Petitioner, in the taxable years, did not regularly engage in purchasing and selling securities, on his own account or as an occupation or business. Issue 1: Federal Land Bank Bonds and Treasury Bonds and Notes: Deductions for Payments of Alleged Interest During the period of years involved in these cases, petitioner entered into four separate transactions and arrangements. The ostensible purpose of each transaction was the purchase and sale of Government bonds or notes. Petitioner claims that in each transaction he borrowed a large amount of money to finance his claimed purchase of securities. He executed an interest-bearing note in each transaction, which purportedly was security for the claimed borrowing of money, and he made payments of money ostensibly as interest on each note. A schedule of the total *35 sums paid each year, of the alleged interest payments, the deductions of which are in issue, have been set forth in the above statement of the issues to be decided. That schedule is incorporated here instead of repeating it. Rosenthal's law firm, Rosenthal and Norton, was located at 242 North Canon Drive, Beverly Hills, during the earlier years involved, and later at 250 North Canon Drive. That law firm no longer exists. Cantor, Fitzgerald Co., referred to herein as Cantor-F, or as C-F, is a firm in Beverly Hills which was engaged in the taxable years as a broker and dealer in securities. Its president was B. Gerald Cantor. John Fitzgerald was a vice-president of C-F from 1947 to 1953. Jack Bernstein was employed by C-F prior to January 1953 when he became employed by Gibraltar Financial Corporation located in New York City. Petitioner, Jerome Rosenthal, was acquainted with B. Gerald Cantor. Gibraltar was incorporated in New York State in about December 1952. The initial capital invested in Gibraltar was $2,000. From the time of its organization up to 1956, no additional funds were invested in Gibraltar. Jack Bernstein received the capital stock of Gibraltar in exchange for $2,000. *36 He was an employee of Gibraltar from January 1953 to April 1956; he was a director and vice president of Gibraltar; and he directed its operations. Having been employed by Cantor-F before going to Gibraltar, he was re-employed by C-F in Beverly Hills after leaving Gibraltar in about April 1956. Later he became a vice president of Cantor-F, and he was in charge of its New York office when it was opened. John Fitzgerald became the vice president of Gibraltar in 1953, and he held that office until the business of Gibraltar was terminated, which was at some time in 1959 or 1960. Thereupon, Fitzgerald returned to Cantor-F as a vice president. Gibraltar had only three or four employees during the period 1952-1956. Included in its business were the type of transactions involved in these cases. It was not subject to any regulatory control. During the years of at least 1953-1956, Cantor-F was Gibraltar's correspondent, and as such C-F was Gibraltar's agent. B. Gerald Cantor discussed the organization of Gibraltar with Bernstein. A major part of Gibraltar's transactions were referred to it by Cantor-F, and B. Gerald Cantor arranged or referred the transactions to Gibraltar. 1524 All of the *37 transactions of Rosenthal with Gibraltar which are in issue in these cases were arranged and referred by B. Gerald Cantor. Gerald Cantor arranged numerous transactions of other individuals which were referred to Gibraltar. Gibraltar received more business from Cantor-F than from other sources. Cantor-F, at its California office, received money from clients for Gibraltar and transferred it to Gibraltar's account. Gerald Cantor discussed with Bernstein the rate of the charge to be made by Gibraltar, as "interest", at the time transactions were arranged for clients, which were referred to Gibraltar; and that was done with respect to each one of the four transactions of Rosenthal, involved here. Also, Rosenthal discussed with Gerald Cantor, or some one else, the rate of "interest" to be charged by Gibraltar in each transaction. Irving Trust Company was Gibraltar's clearance agent in New York City. Ordinarily a clearance agent's services include receiving or delivering securities for a client "against payment" of funds provided by the clearance agent, for which service a fee is charged to the client, who maintains an account with the clearance agent. In its services as a clearance agent *38 of Gibraltar, in the transactions in issue here, Irving made charges on its books, and credits, in a reciprocal account between Gibraltar and Irving, and except for amounts to balance this account, no monies ever went from Gibraltar to Irving. In the transactions of Rosenthal with Gibraltar, there is not evidence that Rosenthal had sufficient funds of his own to actually purchase the total amount of securities involved in the particular transactions in issue. Gibraltar did not have sufficient money to actually "loan" the money to Rosenthal which might have been involved in the transactions in issue. Irving Trust Co. acted as Gibraltar's clearance agent in the Rosenthal transactions in issue, and as such Irving utilized the reciprocal account on its books in the name of Gibraltar. Gibraltar's method of handling transactions, such as those in issue, was such (with the services of its clearance agent) that Gibraltar did not physically receive securities involved; so that in the Rosenthal transactions, Gibraltar did not physically receive the securities referred to in the written records and documents. Also, Rosenthal never had physical possession of any of the securities referred to in *39 each of the transactions. In its operations, in general, Gibraltar required that Government securities would be the "collateral" to secure every "loan". In the trade, the term "equivalent securities" means that different items of same issue and same amount are used having different serial numbers than an original lot of securities. It was provided in the form of each note executed by Rosenthal, made "payable" to Gibraltar, that Gibraltar had the right to borrow, use, and rehypothecate securities "pledged" as collateral for the note. Rosenthal was not acquainted with Gibraltar's financial condition at any time during the periods of his transactions with Gibraltar. Rosenthal did not recall ever submitting a loan application to Gibraltar for any of the alleged "loans", or his financial statement. C.F. Childs & Co. was considered to be one of the largest dealers in United States Government securities. Arthur Ehlenberger & Co. was a broker dealing in U.S. Government securities. B. Gerald Cantor, Irving Hoffstein, and Burt Kleiner at one time formed a partnership, for which the initials of their last names provided the partnership's name, CHK Company. All of these men were connected with *40 the Cantor, Fitzgerald office. Their partnership was formed and used for the purpose of making investments of their own money. CHK was involved in one of the Rosenthal transactions, Transaction 4. There were 4 transactions which purportedly involved "purchases and sales" of Government securities. The following is a list of the transactions, the security "involved", and the dates of the beginning and end of each transaction: Transaction 1: $1,000,000 Federal Land Bank bonds, bearing 1 3/4 percent interest, due October 1, 1957. This transaction began on February 11, 1953, and was concluded on September 6, 1957. Transaction 2: $100,000 U.S. Treasury bonds bearing 2 3/4 percent interest, due September 15, 1961. This transaction began on February 25, 1954, and ended on September 14, 1961. Transaction 3: $100,000 U.S. Treasury bonds bearing 2 3/4 percent interest, due September 15, 1961. The transaction began 1525 on Feb. 26, 1954, and ended September 14, 1961. Transaction 4: $750,000 U.S. Treasury notes, bearing 1 1/2 percent interest, due April 1, 1960. The transaction began on December 23, 1955, and ended April 1, 1960. Transaction 1: $1,000,000 Federal Land Bank Bonds 1. The first *41 transaction involved, purportedly, $1,000,000 Federal Land Bank bonds, 1 3/4 percent interest, due October 1, 1957, with interest payable April 1 and October 1, amounting to $17,500 a year, or $8,750 semi-annually. The evidence about steps followed by Gibraltar with respect to the "purchase" of $1,000,000 of bonds on February 11, 1953, and Gibraltar's handling of the beginning of this transaction is incomplete because the custodian of Gibraltar's records for 1953 could not produce in compliance with respondent's requests the copies of instructions of Gibraltar to its clearance agent, Irving Trust Co., relating to the particular item, of $1,000,000 Land Bank bonds handled on February 11, 1953. Respondent called Jack Bernstein as his witness to testify about Gibraltar's customary procedures, and many matters relating to the four transactions attributed to the petitioner, Rosenthal, in issue here. Also, Gibraltar's records were impounded and held by a custodian, for the purposes of the trial of these cases, pursuant to a motion of respondent which was granted by this Court. Bernstein, vice president and a director of Gibraltar from January 1953 to April 1956, directed and managed the *42 operations of Gibraltar, and he was personally acquainted with the letters and instructions sent out by Gibraltar in its operations. Respondent subpoenaed him to appear and give testimony in these cases. His testimony established general and specific facts about Gibraltar's customary procedures in transactions of the kind which are involved here in which Rosenthal was a client of Cantor, Fitzgerald Co., and through it, of Gibraltar. For example: The initial and only capital of Gibraltar was the $2,000 paid in when it was organized and no additional amount of money was paid in to Gibraltar thereafter. On or about February 11, 1953, Gibraltar did not have funds of its own against which it could write a check for $1,000,000, or $961,611. Accordingly, it did not have in February 1953 its own funds with which to pay for a "purchase" of $1,000,000 Land Bank bonds. Bernstein testified that in general, in a transaction such as the one purportedly involving $1,000,000 Land Bank bonds for its account, for the account of Rosenthal, Gibraltar did not physically take possession of and hold such securities. Instead, its clearance agent, Irving Trust, would receive the securities from a dealer against *43 payment and would debit Gibraltar's bank account with Irving, upon receiving instructions from Gibraltar; and then Irving Trust would redeliver the securities, on the same or next day, to a dealer to whom Gibraltar had sold the securities, against payment, crediting Gibraltar's account with the amount of the proceeds of the sale. Gibraltar would instruct Irving to redeliver against payment by a dealer to cover the first step when the securities were received and taken "In" for Gibraltar's account. No funds would be borrowed by Gibraltar from Irving because the sale, almost simultaneously, of the securities to a dealer who would pay the proceeds to Irving when the securities went "Out", under the redelivery, would provide a credit to Gibraltar's acount which would cover and offset all, or substantially all, of the debit to the account. This procedure can be described as an "In and Out" mechanics handled by Irving as clearance agent, upon instructions from Gibraltar. Although Bernstein could not produce, under respondent's subpoena, any copies of Gibraltar's instructions to Irving Trust relating to $1,000,000 of Land Bank bonds attributed to a transaction in February 1953, by Gibraltar *44 and Cantor, Fitzgerald for the account of Rosenthal, he testified that in every transaction in which Rosenthal was the client, namely in the transactions in issue here, there was a sale of Government securities "purchased" for the account of Rosenthal, and described in a promissory note of Rosenthal to Gibraltar as the collateral "pledged" to secure the note. He testified that the customary procedure of Irving was that when Irving received (against payment) some securities for Gibraltar's account, and charged the account and notified Gibraltar of the receipt of the securities, Gibraltar then would instruct Irving to redeliver the same or equivalent securities (against payment) to a dealer to whom Gibraltar would immediately sell the securities which had just been received by Irving for Gibraltar's account. This "In" and "Out" mechanics 1526 handled by Irving as clearance agent for Gibraltar resembled a "short sale" procedure, although strictly speaking the mechanics represented simply Irving's taking securities "In", in Gibraltar's account, and almost at once sending securities "Out" of the account to a dealer to whom Gibraltar had sold them. The foregoing explains the mechanics employed *45 with respect to $1,000,000 Land Bank bonds, purportedly involved in the first transaction in issue here, if there was in fact an actual purchase thereof by Cantor, Fitzgerald as was represented in C-F's slip to confirm a "purchase". There is no evidence establishing that C-F in fact made a purchase of the bonds apart from its slip. 2. Cantor, Fitzgerald sent Rosenthal its confirmation slip dated February 11, 1953, stating that it had purchased for his account $1,000,000 Land Bank bonds, 1 3/4 percent, due October 1, 1957, at 95 1/2, for $955,000, with $6,611.11 accrued interest, for the total charge of $961,611.11; no commission was charged. Rosenthal did not make any payment to C-F, and he did not receive delivery of the bonds. He signed letters to C-F, directing it to "deliver" the bonds to Gibraltar against payment of the above charge, and to Gibraltar to "receive" the bonds from C-F and make payment. Gibraltar sent Rosenthal a letter acknowledging "receipt" of the bonds, listing bond numbers. There is no evidence that C-F actually purchased the bonds; there is not in evidence any slip of a dealer in Land Bank bonds showing a purchase thereof by C-F; and there is no evidence that *46 C-F held any Land Bank bonds in an inventory which it could sell to Rosenthal. If C-F in fact did purchase the bonds, as represented by C-F's slip, then they were delivered to Irving for Gibraltar's account, against payment; and Gibraltar sold them to a dealer on or about February 17, 1953, and Irving delivered them to the dealer against payment; and Gibraltar's account with Irving was debited and credited, accordingly. 3. If in fact any Land Bank bonds were involved, no money was borrowed by Gibraltar to pay for the bonds as the procedures of Irving, and the book debits and credits to Gibraltar's account with Irving, in an "In" and "Out" transaction on about the same day covered the matter. No money was in fact loaned by Gibraltar to Rosenthal, and none was borrowed for his account. 4. Rosenthal sent Gibraltar, with his letter dated February 11, a note executed by Rosenthal, dated February 17, 1953, in the amount of $1,052,000, payable to Gibraltar on October 1, 1955. The provisions of the note are set forth later, some of which stated that Rosenthal had "pledged" $1,000,000 Land Bank bonds with Gibraltar, and that Gibraltar had "withheld and reserved" $90,388.90 as security for the *47 payment of interest on the note. The amount of the note, $1,052,000, represented the total of $961,611.11, plus the so-called "reserve" of $90,388.90, less one cent. No part of $961,611.10 was paid to Rosenthal, and Gibraltar did not pay that amount to any payee, out of its own funds, for Rosenthal. As set forth above, the money to pay for the charge for the bonds was derived from funds from the sale on the market of the same bonds. Facts about the reserve of $90,388.90 are set forth later. 5. Under date of February 17, 1953, Gibraltar opened on its books, in the name of Rosenthal, a "Secured Account" in which a debit entry was made of $1,052,000, described as a "Secured Loan", with the explanation that Gibraltar had "Bought or Received" the $1,000,000 Land Bank bonds due October 1, 1957, which bonds were held "Long". This charge to Rosenthal's account reflected Gibraltar's receipt of Rosenthal's note in the amount of $1,052,000, payable to Gibraltar. 6. Rosenthal executed a printed note of Gibraltar dated February 17, 1953, in the amount of $1,052,000, payable to Gibraltar on October 1, 1955, bearing 3 1/2 percent interest, payable in monthly installments on the dates and in the amounts *48 typed on the note. This note was security for the purported "loan" by Gibraltar to Rosenthal of the above amount, and it was stated on the note that the note was secured by the pledge to Gibraltar of the $1,000,000 Land Bank bonds. The provisions of the note included the following: That Gibraltar had the right to borrow, re-hypothecate, use, or transfer the pledged bonds for any purpose whatsoever, and to use the pledged bonds "to cover delivery of any securities of similar kind which may have been sold to others by the Gibraltar Financial Corporation, as 1527 principal and for its own account." The note provides further that at the option of Gibraltar, the pledged bonds or collateral "of like kind" can be turned over to the signer of the note upon the payment of the principal of the note, together with interest due on October 1, 1955. In addition, the note provided that petitioner could obtain the return of the collateral (the bonds) or collateral of like kind prior to September 1, 1955, but only upon payment of a penalty, in addition to payment of the principal amount of the note. The penalty was a payment of 1 1/2 percent per year on $1,052,000 from the date of prepayment of the *49 note until October 1, 1955, the due date of the note. Notice of 10 days was required for such prepayment of the note and such prepayment could not be made after September 1, 1955. The note provides that the bond interest due on the pledged bonds shall be applied to the principal amount of the note; and that the signer of the note shall not be entitled to a refund of any interest paid arising from the reduction of the principal. The note was renewable for the unpaid balance of principal on October 1, 1955, and could be extended to October 1, 1957. The renewal note was to bear interest for the additional period of time of 1 3/4 percent, payable on the first day of April and October. It was stated on the original note of February 17, 1953, that the 3 1/2 percent interest was to be paid in installments of specified amounts on the dates and in the amounts typed on the note, namely, $19,555.51 on February 17, 1953, and $9,777.75 on August 17 and October 19, 1953, a total sum of $39,111.01 in 1953; $9,777.75 on January 18, 1954, and $2,444.44 per month beginning on February 15, 1954, through December 15, 1954, a total of $36,666.59 for 1954; and $2,444.44 monthly on January 15, 1955, through *50 August 15, 1955, and on September 15, 1955, $2,444.39, or a total of $21,999.91 for 1955. The sum of all of the periodic payments of "interest" on the original note, as typed on the note, was $97,777.51. However, the note also provided that Gibraltar would pay $90,388.90, to be paid in equal installments to Rosenthal on the dates when Rosenthal was to pay the stated "interest" to Gibraltar, upon the condition that the interest payments were made by Rosenthal. The way in which this provision of the note was carried out is set forth hereinafter. The total charge by C-F for the bonds was $961,611.11, but the note of Rosenthal to Gibraltar was for $1,052,000, which was $90,388.89 more than the charge for the bonds. The printed note executed by Rosenthal states that as "security" for the payment of interest on the note Gibraltar had withheld $90,388.90 of the principal amount of the note as a "reserve", and that Gibraltar would release and pay to Rosenthal the "reserve" in equal installments on the interest due dates set forth in the note upon the condition that the interest payments would be paid by Rosenthal. The terms of Rosenthal's note to Gibraltar specifying Rosenthal's periodic payments *51 to Rosenthal out of the so-called "reserve", were carried out by Rosenthal and Gibraltar, respectively. Gibraltar mailed notices to Rosenthal stating that the payment of an installment of "interest" would be due, as provided in the note. Rosenthal wrote checks payable to Gibraltar for each installment of "interest". Gibraltar, in turn, mailed its checks Rosenthal in amounts representing Gibraltar's "release" of parts of the "reserve". During the period February 17, 1953, to September 14, 1955, Rosenthal's checks to Gibraltar for note "interest" totaled $97,777.56. Gibraltar's checks to Rosenthal totaled the amount of the reserve, $90,388.85, leaving a balance of 5 cents in the "reserve". Gibraltar credited the 5 cents to Rosenthal so that it paid him the $90,388.90. (See p. 15 [page 1529], infra.) In effect, Gibraltar refunded $90,388.90 to Rosenthal, so that he paid Gibraltar from his own funds only the net sum of $7,388.66, but he took deductions for $97,777.56. The following schedules for 1953-1955 set forth the respective amounts of Rosenthal's payments to Gibraltar, and Gibraltar's payments to Rosenthal in their exchange of checks: 1528 PAYMENTS OF ROSENTHAL (R) TO GIBRALTAR (G); PAYMENTS OF GIBRALTAR TO
ROSENTHAL; AND NET SUM PAID BY ROSENTHAL
* 10
1953
Check Dates
Net Paid
byRosenthal
2/11/53
R to C-F
$ 19,555.51
2/21/53
G to R
18,077.78
Net paid by R
$ 1,477.73
8/12/53
R to C-F
9,777.75
8/16/53
G to R
9,038.89
Net paid by R
738.86
10/ 9/53
R to C-F
9,777.75
10/13/53
G to N
9,038.89
Net paid by R
738.86
Summary - 1953
Total paid Rosenthal to
$39,111.01
Gibraltar
Total paid Gibraltar to
36,155.56
Rosenthal
Net paid Rosenthal to
$ 2,955.45
Gibraltar
1954
1/13/54
R to G
$ 9,777.75
1/18/54
G to R
9,038.89
Net paid by R
$ 738.86
2/12/54
R to G
2,444.44
2/16/54
G to R
2,259.72
Net paid by R
184.72
3/12/54
R to G
2,444.44
3/16/54
G to R
2,259.72
Net paid by R
184.72
4/11/54
R to G
2,444.44
4/18/54
G to R
2,259.72
Net paid by R
184.72
5/12/54
R to G
2,444.44
5/19/54
G to R
2,259.72
Net paid by R
184.72
6/11/54
R to G
2,444.44
6/19/54
G to R
2,259.72
Net paid by R
184.72
7/12/54
R to G
2,444.44
7/18/54
G to R
2,259.72
Net paid by R
184.72
8/13/54
R to G
2,444.44
8/20/54
G to R
2,259.72
Net paid by R
184.72
9/10/54
R to G
2,444.44
9/18/54
G to R
2,259.72
Net paid by R
184.72
10/15/54
R to G
2,444. 44
10/19/54
G to R
2,259.72
Net paid by R
184.72
11/15/54
R to G
2,444.44
11/19/54
G to R
2,259.72
Net paid by R
184.72
12/10/54
R to G
2,444.44
12/19/54
G to R
2,259.72
Net paid by R
184.72
Summary - 1954
Total paid Rosenthal to
$36,666.59
Gibraltar
Total paid Gibraltar to
33,895.81
Rosenthal
Net paid Rosenthal to
$ 2,770.78
Gibraltar
1955
Check Dates
Net Paid
byRosenthal
1/15/55
R to G
$ 2,444.44
1/15/55
G to R
2,259.72
Net paid by R
$ 184.72
2/11/55
R to G
2,444.44
2/19/55
G to R
2,259.72
Net paid by R
184.72
3/11/55
R to G
2,444.44
3/20/55
G to R
2,259.72
Net paid by R
184.72
4/ 8/55
R to G
2,444.44
4/18/55
G to R
2,259.72
Net paid by R
184.72
5/13/55
R to G
2,444.44
5/20/55
G to R
2,259.72
Net paid by R
184.72
6/10/55
R to G
2,444.44
6/20/55
G to R
2,259.72
Net paid by R
184.72
7/15/55
R to G
2,444.44
7/19/55
G to R
2,259.72
Net paid by R
184.72
8/15/55
R to G
2,444.44
8/30/55
G to R
2,259.72
Net paid by R
184.72
9/12/55
R to G
2,444.44
9/15/55
G to R
2,259.72
Net paid by R
184.72
Summary - 1955
Total paid Rosenthal to
$21,999.96
Gibraltar
Total paid Gibraltar to
20,337.53
Rosenthal
Net paid Rosenthal to
$ 1,662.43
Gibraltar
Summary - 1953-1955
Total paid Rosenthal to
$97,777.56
Gibraltar
Total paid Gibraltar to
* 90,388.90
Rosenthal
Net paid by Rosenthal,
$ 7,388.66
own funds
*52 1529 7. Rosenthal took deductions for "interest" on his income tax returns for the years 1953-1955 in the sum of his payments to Gibraltar under Transaction 1, as set forth above, namely: 1953, $39,111.01; 1954, $36,666.59; 1955, $21,999.96; total deductions $97,777.56. 8. Although the Land Bank bonds had been sold by Gibraltar on or about February 17, 1953, Gibraltar treated that step as a "borrowing" of the bonds, and Gibraltar credited the accrued bond interest to Rosenthal's account, as the bond interest became due, during the period February 17, 1953, to September 5, 1957. During 1956 and 1957, Gibraltar paid accrued bond interest to Rosenthal at the same time as Rosenthal paid "interest" on his second note to Gibraltar, as is set forth later. Rosenthal reported the accrued interest on the bonds as income on his income tax returns for the years 1953-1957, as is set forth later. As of February 11, 1953, the accrued interest on the bonds was $6,611.11. Since this amount was part of the total charge 1530 for the bonds, Rosenthal did not report this amount of bond interest in his 1953 income. The accrued interest on the bonds *53 in 1953 was $17,500, which amount, less $6,611.11, was $10,888.89. 9. Gibraltar credited the principal amount of Rosenthal's note with the annual bond interest, $17,500, for 1953, 1954, and 1955. The sum of the credits was $52,500. They reduced the principal amount of the note from $1,052,000 to $999,500, as of October 1, 1955, when the note became due. The credits to the principal amount of the note were made pursuant to a provision in the note. The note also provided that the note, referred to hereinafter as the first note, could be renewed for a period ending October 1, 1957. 10. Rosenthal executed a second note, dated October 1, 1955, in the principal amount of $999,500, payable to Gibraltar on October 1, 1957, bearing 1 3/4 percent interest (instead of 3 1/2 perecnt, as on the first note). This note is referred to hereinafter as the second note. The note stated that it was secured by the $1,000,000 Federal Land Bank bonds due October 1, 1957. Some of the provisions of the second note were the same as those of the first note, but there was no provision that part of the principal amount was to be retained by Gibraltar as a "reserve" to secure the payment of interest, and there was *54 no provision for applying any amount, collected by Gibraltar with respect to the pledged collateral, to reduce the principal amount of the note. The note provided that Gibraltar could borrow, rehypothecate, and use the pledged securities. The second note was a different printed note of Gibraltar than the first note, in several respects. In Rosenthal's account on Gibraltar's books the amount of the purported "loan" of $1,052,000, a debit, was reduced when the credits for the accrued bond interest were entered, so that as of the date of the second note the purported "loan" had been reduced by the credits to $999,500. The amount and due dates of the "interest" on the second note, as stated thereon, were April 1 and October 1, 1956, $8,891.38 on each date; April 1, 1957, $8,842.80; and October 1, 1957, $8,891.38; total, $35,516.94. The last installment of interest was subsequently reduced by $1,360.38 as of September 5, 1957, to $7,530.93, which reduced the total charge for "interest" to $34,156.49. 11. Rosenthal made payments by check to Gibraltar for the interest on the second note, as prescribed for 1956 and for April 1, 1957. He received a credit for note interest accrued to September *55 5, 1957, as stated later. The renewal note provided that petitioner could not obtain return of the "pledged" bonds prior to 30 days before October 1, 1957, the due date of the note. Petitioner could "apply the market value of the securities pledged herein * * * to the payment of the note" by giving written notice, but the right could be exercised no earlier than 30 days before the due date of the note and no later than 10 days before the due date. With respect to the Land Bank bonds (purportedly involved) the above-described privilege was not of any real significance or benefit because the bonds were to mature on October 1, 1957, which also was the due date of the note, and they were to be redeemed at par. Gibraltar's payments to petitioner (and credits) in the guise of "interest earned" by the Land Bank bonds represented amounts which would have been earned as interest on the bonds if either Gibraltar or petitioner had possession of them. Since no bonds were in fact held by Gibraltar during the entire period of this transaction for petitioner's account, and since none were in fact pledged as collateral with Gibraltar, Gibraltar did not receive any interest paid on any Land Bank bonds. *56 Petitioner reported in his income on his tax returns amounts which allegedly represented "interest earned" on the bonds. The payments described as "interest" in the second note were slightly more than the amount of the interest on the Land Bank bonds which Gibraltar would have received if it held the bonds. In fact, Gibraltar simply refunded to petitioner most of his payments of "interest" on the note. Thus, on April 2, 1956, petitioner paid Gibraltar $8,891.38 as "interest" on the note, and Gibraltar paid petitioner $8,750 ostensibly as interest earned on the Land Bank bonds, but the $8,750 was in substance a refund of the $8,891.38, except $141.38, petitioner's net payment. He took deductions for "interest" on the second note on his income tax returns, $17,782.76 for 1956, and $16,373.73 for 1957. 1531 The total sum of the "interest" charged on the second note was $34,156.49, which was deducted. Gibraltar paid the accrued bond interest to Rosenthal for 1956, $8,750 due April 1 and October 1; and $8,750 due on April 1, 1957; total $26,250. Rosenthal reported the bond interest in his tax returns for 1956 and 1957. For 1956 and April 1, 1957, Rosenthal paid a total sum to Gibraltar, *57 as note "interest", of $26,625.56; and Gibraltar paid Rosenthal $26,250, as bond interest, so that the net amount paid by Rosenthal from his own funds was $375.56. 12. As of September 5, 1957, Gibraltar purportedly sold $1,000,000 Land Bank bonds, for Rosenthal's account of the same issue of the 1 3/4 percent bonds due October 1, 1957, as set forth hereinafter. The amount of the accrued bond interest to September 5 was $7,534.72. The amount of the "interest" on the second note, accrued to September 5, 1957, was $7,530.93, which was a charge, or debit, to Rosenthal's account on Gibraltar's books. The credit to Rosenthal's account as of September 5 of the entire proceeds of the sale of bonds had the effect of providing a credit of accrued bond interest, $7,534.72, to the charge for accrued note "interest" of $7,530.93, leaving a net credit of $3.79 in Rosenthal's favor. That balance was credited to Rosenthal's account reducing a debit balance from $1,562.45 to $1,558.66, which Rosenthal paid to Gibraltar on October 2, 1957, the amount constituting the balance owing to Gibraltar after bonds were sold on September 5. The net amount of Rosenthal's cash payments of "interest" on the second *58 note from his own funds was $375.56, as follows: *10 Summary of Net Cash "Interest" Payments on Second Note,
1956-1957
Total "interest" payments by Rosenthal
$26,625.56
Total bond interest paid by Gibraltar
26,250.00
Net payments by Rosenthal from our funds
$ 375.56
13. The following schedule shows Rosenthal's cash payments of "interest" on the second note; Gibraltar's payments to him of accrued bond interest; the net expense to Rosenthal (from his own funds) of note "interest"; and the credit to Rosenthal's account for accrued bond interest on September 5, 1957, which credit on the books was a part of the credit for the proceeds from the sale of bonds. *10 Rosenthal's Second Note, and Gibraltar's Payments to Rosenthal Cash
for Note "Interest"; Cash for Bond "Interest"; Credit
*10 Cash Accounting
Dates
Paid by Rosenthal as
Paid by Gibraltar as
Net Expenseof
Note"Interest"
Bond"Interest"
Rosenthal
4/2/56
$ 8,891.38
$ 8,750.00
$141.38
10/1/56
8,891.38
8,750.00
141.38
4/1/57
8,842.80
8,750.00
92.80
$26,625.56
$26,250.00
$375.56
*109/6/57
7,530.93
Credit of Bond Interest
to Rosenthal
*10
$34,156.49
Total Interest on
Secondnote of Rosenthal The net expense to Rosenthal, in cash, with respect to "interest" on his two notes, was *59 $7,764.22, after receiving cash payments from Gibraltar: Note 1 Net cash expense
$7,388.66
Note 2 Net cash expense
375.56
Total net cash expense
$7,764.22
With respect to Transaction 1, Rosenthal's deductions on his income tax returns for the years 1953-1957 totaled $131,934.05, which represented his cash payments to Gibraltar of purported interest on his two notes, $124,403.12, and Gibraltar's credit on its books to Rosenthal's account of $7,530.93 for accrued bond interest credited to Rosenthal's account when the bonds were sold on September 5, 1957. 14. As of September 5, 1957, the transaction was concluded by a purported sale of $1,000,000 of Land Bank bonds of the same issue as those bought and sold on or about February 11, 1953, namely, 1 3/4 percent bonds due October 1, 1957. Cantor-F (C-F) handled the sale of these bonds on September 5, 1957. The bonds were sold by 1532 Cantor-F as broker, for Rosenthal's account, at the market price of 99-27/32, or $998,437.50, less $500 commission, plus accrued interest of $7,534.72. The Rosenthal transaction was closed about 25 days before the date when the particular issue of Land Bank bonds would become due and would be redeemed at 100, on October *60 1. The mechanics followed to close the transaction were the same as those followed on February 11, 1953, when bonds were "purchased" for Rosenthal's account. Cantor-Fitzgerald sold on September 5 a new lot of $1,000,000 of the same issue of Land Bank bonds, Gibraltar "purchasing" $1,000,000 of Land Bank bonds on or about September 5 to cover the sale. Gibraltar's clearance agent, Irving, "received" the bonds on September 5 "against payment" and "redelivered" the bonds to Chemical, clearance agent for Cantor-Fitzgerald "against payment" of $1,005,472.22. Irving debited Gibraltar's account when it "received" the bonds "against payment" for Gibraltar, and credited Gibraltar's account $1,005,472.22 when it "delivered" the bonds to Chemical "against payment" of that amount. No money was borrowed. The "sale" of the bonds, on the same date as the "purchase" of bonds to cover the sale, provided the funds to pay for the charges for the bonds. The mechanics made the "purchase" by Gibraltar to cover C-F's "sale" a wash-out. Cantor-Fitzgerald issued its statement confirming a sale of the bonds for Rosenthal's account for $1,005,972.22. Cantor charged a commission of $500. Rosenthal's account on *61 Gibraltar's books was credited $1,005,472.22, which represented the following: Sold $1,000,000 bonds at 99-27/32
$ 998,437.50
Less commission of C-F
500.00
Net selling price
$ 997,937.50
Plus bond interest to Sept. 5
7,534.72
Total net proceeds
$1,005,472.22
15. In Rosenthal's account on the books of Gibraltar, an adjustment was made of five cents, reducing the amount of Rosenthal's second note from $999,500 to $999,499.95. As of September 6, a debit to his account was made for "interest" accrued on the note to September 6 in the amount of $7,530.93, so that as of September 6, there was purportedly owing to Gibraltar $1,007,030.88. His account was credited with $1,005,472.22, the sale proceeds, which left a balance due of $1,558.66. Gibraltar sent Rosenthal a letter stating the balance due, which Rosenthal paid by check on October 2, 1957, which closed the account in Rosenthal's name. 16. On his 1957 tax return, Rosenthal reported a long-term capital gain from the sale of the Federal Land Bank bonds of $42,937.50, of which 50 percent was taken in account in reporting income from capital gains: 9/ 6/57 Proceeds from sale
$997,937.50
2/17/53 Cost
955,000.00
Capital gain
$ 42,937.50
17. In fact, the *62 arrangements and the transaction for Rosenthal by Cantor-F and Gibraltar did not yield a real and true gain of $42,937.50. Rather, the whole transaction, apart from the anticipated tax benefits, resulted in a deficit in the account on Gibraltar's books of $1,558.66. The deficit resulted from the fact that the purported "loan" of Gibraltar to Rosenthal included a purported "loan" of $90,388.90, to cover part of the note interest, so that the total purported "loan" of $1,052,000, plus all of the charges for note interest, less all of the credits to principal and note interest, for bond interest, was not fully satisfied by sale of the bonds in 1957, and the account showed an amount still "owing" by Rosenthal of $1,558.66 on the principal amount of the "loan." 18. The schedule set forth later is a summary of the account on Gibraltar's books in the name of Rosenthal which was the book-keeping record of the purported loan in 1953 of $1,052,000. This schedule reflects Gibraltar's charges on its books, in the total amounts, respectively, for interest on each one of the two notes, and the total sum of the credits to the account for bond interest, and note interest. As of September 6, 1957, *63 the debits exceeded credits by $1,558.66, so that the entire transaction, after the sale on September 5, 1957, of $1,000,000 Land Bank bonds (to close the transaction) showed a loss instead of a gain to Rosenthal of $1,558.66, apart from anticipated tax benefits, which was the balance due to Gibraltar, which was paid by Rosenthal. In his 1957 income tax return, Rosenthal reported a capital gain of $42,937.50 from the sale of the bonds. However, the initial note to Gibraltar was for $1,052,000, and that figure incorporated the "reserve" for note interest of $90,388.89, and bond interest accrued to February 11, 1953, 1533 $6,611.11, or $97,000. Thus, the initial debit to Rosenthal's account included $97,000 more than the "cost" of the bonds in 1953, ($955,000), used in computing "gain" upon the sale of a like amount of bonds in 1957. The credits, direct or part of some larger credit figure, in the account which offset the debits of $97,000 were credits to capital (rather than to the charges for interest). They totaled $95,441.34, which was $1,558.66 less than the above-described debits. Those credits were the five cents ($0.05) adjustment in reduction of the principal amount of the second *64 note; the credit to the principal of the first note of $52,500 for accrued bond interest for three years, 1953-1955, inclusive; the reported capital gain of $42,937.50; and the credit of $3.79, the excess of accrued bond interest over accrued note interest for the period April 1, 1957, to September 5, 1957. Excluding expected tax benefits, petitioner could not have made a profit in this transaction, purportedly involving $1,000,000 Land Bank bonds, on the basis of purportedly "borrowing" $1,052,000 from Gibraltar to fund the purchase. to fund the purchase. 19. The following schedule summarizes the debits and credits to petitioner's account on Gibraltar's books and shows the net results: Debits to Rosenthal's Account
2/17/53
Charge for $1,000,000 bonds
$ 955,000.00
Accrued bond interest
6,611.11
$ 961,611.11
The "Reserve"
90,388.90
Rosenthal's note less.01
$1,052,000,00
"Interest" charged, Note 1
97,777.56
"Interest" charged, Note 2
34,156.49
Total charges
$1,183,934.05
Credits to Rosenthal's Account
1953-1955
"Bond Interest", credit to note
$ 52,500.00
Pd., Gibraltar to R, "Reserve"
90,388.90
Net "Interest" pd. by R
7,388.66
1955-1957
"Bond Interest" pd. G to R
26,250.00
Net "Interest" pd. by R
375.56
9/5/57
"Bond Interest" credited by G
7,534.72
1955-1957
Cash and credits, total
$ 184,437.84
9/5/57
Credit for "Sale" of bonds
997,937.50
Credit to principal of note
.05
Credits
$1,182,375.39
Balance owing by R, paid
1,558.66
Total credits
$1,183,934.05
*65 20. Rosenthal reported in income on the income tax returns filed for 1953-1957 the following amounts for each year as "interest received" on the Land Bank bonds, in the total amount of $79,673.61. Also, in the return for 1957 he reported capital gain from the "sale" of the bonds of $42,937.50, one-half of which, $21,468.75, was taken into account in reporting taxable income: *10 "Bond
Interest"
Reported
as Income
1953
Credited by G to note
$10,888.89
1954
Credited by G to note
17,500.00
1955
Credited by G to note
17,500.00
1956
Paid by G to Rosenthal
17,500.00
1957
Paid by G to Rosenthal
$8,750.00
Sales proceeds credit
7,534.72
16,284.72
$79,673.61
21. Respondent conceded at the trial of these cases that if the transaction is held to have been a paper transaction, a sham, then under Rule 50 the "bond interest" and the "capital gain" shall be excluded from taxable income.
22. Net out-of-pocket expense means the excess of cash paid over cash received, without any consideration of possible tax benefits. Rosenthal's net out-of-pocket expense in this transaction was $9,322.88, which was the total sum of his payments from his own funds as "interest" on his notes to Gibraltar, $7,764.22, plus the amount paid as *66 the balance owing to Gibraltar on the note when the account was closed, $1,558.66. 23. There was a net economic loss to Rosenthal in this transaction of $9,322.94 computed as follows: *10 Net Economic Loss
Interest charged on notes
$131,934.05
Capital gain
$42,937.50
Bond interest reported in income
79,673.61
122,611.11
Rosenthal's net economic loss
$ 9,322.94
24. The range of the high and low bid prices for the Land Bank bonds between 1953 and 1957 was: Low
* *67 *68 *69 *70 *71 *72 *73 *74 *75 *76 *77 *78 94-16/32 to 99-26/32
High
* 95.0 to 99-26/32
7. Although *79 no bonds were held and no earned bond interest was paid to and received by Gibraltar for 1954 and 1955 for coupons attached to the bonds, Gibraltar, on its books, credited to petitioner's account the bond interest which would have been received if the bonds had effectively been purchased and held for his account in the amount of $2,332.18 for 1954, and $2,750 for 1955, a total of $5,082.18. The credits were to note principal reducing it from $105,000 to $99,917.82. (The figure of $2,332.18 for "earned bond interest" for 1954 is $417.82 less than $2,750.00. The adjustment is not explained by the record.) Petitioner did not receive any earned interest on the bonds. 8. As of September 15, 1961, the maturity date of the bonds, Gibraltar credited $100,000 to petitioner's account, which was $82.18 more than the debit balance of $99,917.82. Gibraltar sent petitioner a slip confirming a "purchase" of the bonds from him on Sept. 14, 1961, "X-coupons", for $100,000. Gibraltar paid petitioner $82.18, which closed the account. The "purchase" by Gibraltar as principal was merely a paper transaction consisting of the book credit to petitioner's account which cancelled petitioner's note to Gibraltar *80 and the purported "loan" of $105,000. 9. The following schedule is a summary and explanation of the book debits and credits to petitioner's account: *10 Debits
to R's
Account
2/25/54
Charged for bonds X coupons
$ 86,812.50
Charged for accrued interest
828.04
Gibraltar's "reserve"
17,359.46
R's note to G
$105,000.00
Note "interest"
21,111.11
Total charges
$126,111.11
Credits to R's Account
1954-55
Bond "interest" credited
$ 5,082.18
1954-58
G's payments to R
17,359.46
1954-58
Net pd. by R, "interest"
3,751.65
$ 26,193.29
9/15/61
Credit for "purchase" by G
100,000.00
Total credits
$126,193.29
9/15/61
Less bal. pd. to R
82.18
$126,111.11
10. On the 1961 tax return, petitioner reported long-term capital gain of $13,187.50: 9/14/61
Sale of bonds
$100,000.00
2/25/54
Cost
86,812.50
Long term capital gain
$ 13,187.50
11. Petitioner's net out-of-pocket expense in this transaction was $3,669.47: Net amount pd. as note "interest"
$3,751.65
Less receipt from G
82,18
Net cost
$3,669.47 1539 There was a net economic loss to petitioner in the transaction of $3,669.47 computed as follows: Net Economic Loss
"Interest" charged on note
$21,111.11
Less: Capital gain
$13,187.50
"Bond interest"
4,254.14
17,441.64
Net economic loss
$ 3,669.47
12. Petitioner reported *81 as income in the returns for 1954, 1955, and 1961, bond "interest" of $4,254.14, and the capital gain. There was reported as bond "interest" for 1954, $1,504.14 which was $2,332.18 less $828.04 charged as accrued interest to Feb. 25, 1954. Bond "interest" reported was $1,504.14 plus $2,750.00, $4,254.14. Respondent agrees that upon our determination that this transaction cannot be recognized for tax purposes, there shall be excluded from the taxable income of the years before the Court here the reported bond interest and capital gain. 13. On the returns filed for 1954-1958, petitioner took deductions for the "interest" set forth on his note to Gibraltar as the amounts to be paid in each year, as follows: 1954
$ 4,222.22
1955
4,222.24
1956
4,222.24
1957
4,222.24
1958 4,222.17
$21,111.11 All of the "interest" charged on the note, which was due Sept. 15, 1961, was prepaid by petitioner by October 13, 1958. 14. Apart from expected tax benefits, petitioner could not have realized or expected to realize a profit from this transaction involving a purported loan of $105,000. 15. The following is a list of the bid prices for Treasury bonds due September 15, 1961, during the period March 31, 1954, to *82 Sept. 1, 1960. The fractions represent the denominator of "32", such as 26/32. The bid prices approached 100 as the dates came closer to Sept. 15, 1961: *10 UNITED STATES
TREASURY BONDS
*10 2 3/4% DUE
9/15/61
*10 WITH COUPONS
ATTACHED
*10 LOW BID PRICES
Year
Date
Low BidPrice
1954
Mar. 31
103-26
Apr. 1
103-26
May 26
102-30
June 2
103-2
July 27
103-26
Aug. 9
103-18
Sept. 28
103-11
Oct. 25
103-0
Nov. 29
102-19
Dec. 28
102-7
1955
Jan. 17
101-7
Feb. 28
100-25
Mar. 1
100-23
Apr. 26
100-22
May 6
100-19
June 27
99-31
July 29
99-4
Aug. 1
98-29
Sept. 1
99-2
Oct. 5
99-21
Nov. 21
99-10
Dec. 22
99-1
1956
Jan. 3
98-31
Feb. 23
99-28
Mar. 28
98-22
Apr. 16
97-26
May 9
98-7
June 26
98-28
July 31
97-30
Aug. 21
96-24
Sept. 5
96-15
Oct. 29
96-28
Nov. 27
96-4
Dec. 17
95-24
1957
Jan. 2
96-9
Feb. 18
97-8
Mar. 7
97-6
Apr. 30
96-22
May 27
96-2
June 21
95-12
July 22
95-2
Aug. 12
95-4
Sept. 25
95-10
Oct. 31
95-0
Nov. 1
95-6
Dec. 2
98-16
1958
Jan. 6
99-24
Feb. 3
99-30
Mar. 11
100-22
Apr. 2
101-6
May 1
101-22
June 27
101-8
July 29
100-14
Aug. 29
98-0
Sept. 29
97-20
Oct. 1
97-14
Nov. 3
97-30
Dec. 22
97-14
1959
Jan. 19
96-24
Feb. 2
97-2
Mar. 9
97-0
Apr. 21
96-30
May 13
96-26
June 4
96-12
July 28
96-6
Aug. 31
95-28
Sept. 15
95-22
Oct. 2
95-30
Nov. 30
96-10
Dec. 3
95-30
1960
Jan. 6
96-6
Feb. 19
96-24
Mar. 1
97-16
Apr. 12
97-30
May 19
97-28
June 1
98-8
July 8
99-10
Aug. 16
99-24
Sept. 12
99-23
Oct. 10
99-25
Nov. 21
99-25
Dec. 1
99-27
1961
Jan. 9
10 0-0
Feb. 28
99-30
Mar. 1
99-30
Apr. 3
100-0
May 24
100-1
June 2
100-0
July 31
100-1
Aug. 8
100-0
Sept. 1
100-0
*83 1540 Transaction 3: $100,000 U.S. Treasury Bonds 1. On February 26, 1954, settlement date March 1, $100,000 United States Treasury bonds, 2 3/4 percent interest, due September 15, 1961, with the interest coupons payable on March 15, 1956, detached, and also with the subsequent interest coupons detached, were purchased through Joseph Faroll & Co., a dealer in New York City, to be delivered to Irving Trust Co., for the account of Gibraltar, for the account of Rosenthal. The coupon interest on the Treasury bonds was payable on March 15 and September 15, $1,375 on each date, $2,750 annually. The charge for the bonds, with coupons detached, was 86-30/32. The total charge was $87,788.33, including accrued bond interest of $850.83 to February 26, as follows: Purchase price, 86-30/32
$86,937.50
Dealer's commission
0
Accrued bond interest to Feb. 26
850.83
Total purchase price
$87,788.33
The bonds were located in New York City. Rosenthal did not make any payment on account of the above charge. 2. On March 1, Faroll delivered the bonds to Irving Trust, clearance agent for Gibraltar, for the account of Gibraltar, against payment of $87,788.33. Irving debited Gibraltar's account for $87,790.83, which *84 included a clearance fee of $2.50. 3. Gibraltar instructed Irving to re-deliver the $100,000 Treasury bonds upon receipt thereof, to C. J. Devine, a dealer, against payment, March 1, because on or about February 26 Gibraltar had placed an order to sell the bonds to Devine. Irving's receipt from Devine of the proceeds from the sale of the bonds covered and paid for Faroll's charge for them. Gibraltar sold the bonds to Devine with all of the coupons attached, for March 15, 1954 and thereafter including those "detached" coupons for March 15, 1956, and thereafter, which was necessary because coupons had to be attached in order to make a good delivery of the bonds. It was unusual to purchase Treasury bonds with some of the coupons detached, as was done in the order to Faroll. Devine bought the bonds, with all of the coupons attached, at 103-10/32. The sum paid by Devine to Irving Trust was $104,170.92, which included accrued interest to March 1, 1954, of about $1,139.67, assuming that the price of 103-10/32 represented $103,031.25. The price of 103-10/32 was 16-12/32 more than was charged by Faroll for the bonds, with certain coupons "detached. " Faroll's charge of 86-30/32 was a price *85 discounted for the detached coupons. Gibraltar evidently was charged separately (at some point) by Irving for the detached coupons. When Irving delivered the bonds to Devine the detached coupons were "re-attached" to the bonds, if in fact they had been detached. Irving received the bonds from Faroll on March 1, 1954, against payment, and redelivered them to Devine against payment on March 1, 1954. This was an "In" and "Out" transaction in which no funds were borrowed as the sale to Devine substantially covered the charge of Faroll, and a charge for detached coupons. The immediate sale to Devine cancelled the purchase from Faroll in a wash-out. There was not a real "short sale" although the mechanics used resembled one. In Gibraltar's account with Irving, the proceeds of the sale to Devine were credited, $104,170.92, which exceeded the debit of $87,790.83 by $16,380.09. The difference between Faroll's charge and Devine's payment was $16,382.59. The evidence does not show the details. Presumably the excess amount of the credit covered a charge at some point for the "detached" coupons, presumably a debit to the account, also. If on Irving's books the debits exceeded the credit for the *86 receipt from Devine, that fact is not shown by the evidence but, if so, it was presumably a relatively small amount. Since this transaction involved a promissory note of petitioner to Gibraltar to mature on September 15, 1961, the same date as the maturity of the Treasury bonds, a profit could be figured on bonds redeemed at 100 only by fixing in advance a "cost" at 1541 a discounted charge, such as 86-30/32 (which was done). Such discounted "purchase price" could be fixed in advance on the basis of purchasing the bonds from Faroll with 12 coupons detached (which was done). This transaction was, therefore arranged so that as of September 14, 1961, there would appear to be a capital gain of $13,062.50, which was the gain reported by petitioner. In this transaction no money was borrowed by Gibraltar for petitioner, and no funds were loaned to him to fund the purchase of bonds. 4. Rosenthal executed a note dated March 1, 1954, payable to Gibraltar September 15, 1961, the due date of the Treasury bonds, in the amount of $105,000, which represented the sum of the purported "cost" of the bonds, $87,788.33 (Faroll) plus a socalled "reserve" of $17,211.67, to be paid by Gibraltar to Rosenthal. *87 The note carried 2 5/8 interest to be paid in installments, quarterly, to October 15, 1958, only, and no "interest" was to be paid after October 15, 1958. The total amount of the "interest" installments typed on the note was $21,088.15, about $4,217.64 a year to be paid to Gibraltar. Since Gibraltar was to pay $17,211.67 to Rosenthal, his net payments to Gibraltar were to be the difference of $3,876.48. As is shown in schedules hereafter, petitioner and Gibraltar made the reciprocal cash payments to each other, periodically. The "exchanged" checks, and in fact and substance Gibraltar's payments were refunds to petitioner of most of his payments of "interest" on his note. The note stated that $100,000 Treasury bonds, 2 3/4 percent, due September 15, 1961, with the coupons detached for March 15, 1956, and subsequent coupons, were "pledged" as collateral with Gibraltar. The note provisions included the following: That the "reserve" of $17,211.67 "with-held" by Gibraltar was to secure the payments of "interest", and that Gibraltar would "release and pay" petitioner the reserve in equal installments on the dates when the note "interest" was due, if paid. After 1954, petitioner's "interest" *88 installments were $1,054.41, and Gibraltar's "reserve" installments were $860.58, so that petitioner's net installments quarterly from his own funds were $193.83, or $775.32 a year (4 quarters). The note provided that Gibraltar could borrow and re-pledge, use, or transfer the collateral (the Treasury bonds) for any purpose, and to use the collateral to cover delivery of any securities of similar kind. The note provided for a penalty for prepayment of the principal amount; petitioner could obtain the return of the collateral, or collateral of like kind, upon full payment of the principal on the due date of the note, September 15, 1961, with interest. The "right of prepayment granted" could be exercised on 30 days notice up to March 15, 1961, but only upon payment of 1 1/2 percent per year (the penalty) on $105,000, principal, from the date of prepayment until Sept. 15, 1961. Since the "collateral" consisted, purportedly of government bonds to be redeemed for $100,000 on Sept. 15, 1961, the "prepayment" right had little significance in this instance. The principal amount of the note was $105,000, or $5,000 more than the principal amount of the Treasury bonds, and it would not have been *89 economical for petitioner to have obtained "the return" of the bonds (even if they had been held by Gibraltar) at the cost of the premium, or penalty, for prepayment. Also, the market prices of the bonds never went higher than 103-26/32 on and after March 31, 1954. Moreover, the purpose of the penalty was to help to avoid prepayment of the note before its due date. The note provided that interest on the "pledged" bonds would be applied to reduce the principal of the note, but the signer of the note would not be entitled to any refund of note "interest." Gibraltar did not borrow or pay to petitioner the principal amount of the note, $105,000, and no part thereof was paid, in substance to him. As noted above, Gibraltar's payments of the so-called reserve to petitioner were, in substance, refunds to him of his installment payments of "interest" on his note. 5. As of March 1, 1954, Gibraltar opened on its books a "secured" account in petitioner's name with a debit of $105,000, with the entry that Gibraltar had "bought or received" $100,000 Treasury bonds, which were "held" "long." The debit reflected no more than the receipt of petitioner's note. In fact and substance, the debit entry *90 did not reflect an actual loan to petitioner of $105,000. 6. The following schedules list the reciprocal payments made by petitioner and Gibraltar during 1954-1958 as note "interest", and as releases of the "reserve", respectively: 1542 * 10 PAYMENTS OF
ROSENTHAL (R) TO
GIBRALTAR (G);
PAYMENTS OF
GIBRALTAR TO
ROSENTHAL AND NET
SUM PAID BY
ROSENTHAL
* 10 1954
Check Dates
Net Paid
by Rosenthal
3/ 1/54
R to G
$4,217.63
3/ 4/54
G to R
3,442.33
Net paid by R
$ 775.30
1955
1/19/55
R to G
$1,054.41
1/22/55
G to R
860.58
Net paid by R
193.83
4/ 8/55
R to G
1,054.41
4/17/55
G to R
860.58
Net paid by R
193.83
7/15/55
R to G
1,054.41
7/18/55
G to R
860.58
Net paid by R
193.83
10/ 7/55
R to G
1,054.41
10/10/55
G to R
860.58
Net paid by R
193.83
Summary - 1954 and 1955
Total paid Rosenthal to Gibraltar
$4,217.64
Total paid Gibraltar to Rosenthal
3,442.32
Net paid Rosenthal to Gibraltar, 1955
$ 775.32
Net paid Rosenthal to Gibraltar, 1954
$ 775.30
1956
1/10/56
R to G
$1,054.41
1/14/56
G to R
860.58
Net paid by R
$ 193.83
3/31/56
R to G
1,054.41
4/21/56
G to R
860.58
Net paid by R
193.83
7/ 9/56
R to G
1,054.41
7/16/56
G to R
860.58
Net paid by R
193.83
10/15/56
R to G
1,054.41
10/19/56
G to R
860.58
Net paid by R
193.83
Summary - 1956
Total paid Rosenthal to Gibraltar
$4,217.64
Total paid Gibraltar to Rosenthal
3,442.32
Net paid Rosenthal to Gibraltar
$ 775.32
* 10 1957
1/14/57
R to G
$1,054.41
1/18/57
G to R
860.58
Net paid by R
$ 193.83
4/ 8/57
R to G
1,054.41
4/12/57
G to R
860.58
Net paid by R
193.83
7/15/57
R to G
1,054.41
7/22/57
G to R
860.58
Net paid by R
193.83
10/14/57
R to G
1,054.41
10/16/57
G to R
860.58
Net paid by R
193.83
Summary - 1957
Total paid Rosenthal to Gibraltar
$4,217.64
Total paid Gibraltar to Rosenthal
3,442.32
Net paid Rosenthal to Gibraltar
$ 775.32
* 10 1958
1/13/58
R to G
$1,054.41
1/17/58
G to R
860.58
Net paid by R
$ 193.83
4/ 7/58
R to G
1,054.41
4/11/58
G to R
860.58
Net paid by R
193.83
7/23/58
R to G
1,054.41
7/30/58
G to R
860.58
Net paid by R
193.83
10/13/58
R to G
1,054.37
10/14/58
G to R
860.56
Net paid by R
193.81
Summary - 1958
Total paid Rosenthal to Gibraltar
$4,217.60
Total paid Gibraltar to Rosenthal
3,442.30
Net paid Rosenthal to Gibraltar
$ 775.30
Summary - 1954-1958
Total paid Rosenthal to Gibraltar
$21,088.15
Total paid Gibraltar to Rosenthal
* 17,211.59
Net paid by Rosenthal, own funds
$ 3,876.56
*91 7. Rosenthal took deductions for "interest" on his income tax returns for the years 1954-1958 and on his wife's return for 1955 in the sum of his payments to Gibraltar under Transaction 3, as set forth above, namely: 1954, $4,217.63; 1955, $4,217.64; 1956, $4,217.64; 1957, $4,217.64; 1958, $4,217.60; total deductions, $21,088.15. 8. Although the Treasury bonds had been sold by Gibraltar on or about February 26, 1954, and no earned interest was received by Gibraltar for 1954 and 1955 for coupons "attached", nevertheless Gibraltar, on its books, credited petitioner's account the bond interest which would have been received if the bonds had been purchased effectively and held. The credits were $2,332.18 for 1954, and $2,750 for 1955, a total of $5,082.18. Petitioner's note to Gibraltar was in the principal amount of $105,000. The credits 1543 for bond interest of $5,082.18, reduced the amount owing on the note, first by $5,000.00 to $100,000, leaving $82.18 of the credit to be applied to the account. As is stated hereafter, Gibraltar paid petitioner $82.18 in closing the account. 9. On September 14, 1961, Gibraltar *92 sent to petitioner a slip to confirm its "purchase" from him of $100,000 Treasury bonds, 2 3/4 percent, due September 15, 1961. The amount of the credit to petitioner was $100,000, which was credited on the books to petitioner. This credit was represented by the confirmation slip of Gibraltar, only. No bonds were bought and sold. On the books, the debit balance for the note of petitioner $105,000, had been reduced by the credits for bond interest $5,082.18, to $99,917.82. The credit as of September 15, 1961 (the closing date) of $100,000 left a credit balance due petitioner of $82.18. Gibraltar wrote a check for $82.18 to clear and close the account, which also contributed to the cancellation of petitioner's note. 10. Petitioner reported a long term capital gain of $13,062.50 for 1961 from the transaction, on the separate returns filed for 1961: 9/14/61
Sale of bonds
$100,000.00
2/25/54
"Cost"
86,937.50
Capital gain
$ 13,062.50
11. Petitioner's out-of-pocket expense in this transaction was $3,794.38; Net sum paid to G as note interest
$3,876.56
Less payment by G to R
82.18
$3,794.38
His out-of-pocket expense may have been $3,794.30. The difference of 8 cents was involved because Gibraltar's payments *93 of the "reserve" to petitioner, the refunds, were $17,211.59, which was 8 cents less than the "reserve" stated in the note of $17,211.67. Gibraltar may have given petitioner a credit for 8 cents. 12. Petitioner's net economic loss from the transaction was $3,794.30: *10 Net Economic Loss
Interest charged by G on note
$21,088.15
Capital gain
$13,062.50
Bond interest
4,231.35
17,293.85
Net economic loss
$ 3,794.30
13. Petitioner reported on his tax returns as income from bond interest the net amount of $4,231.35, which represented accrued bond interest for 1954, $2,332.18; less $850.83, bond interest accrued to Feb. 26, 1954, part of "cost"; leaving $1,481.35 as "interest income" for 1954. He reported as bond-interest-income for 1955, $2,750; which made a total for bond "interest" of $4,231.35. 14. Respondent has agreed that if it is held that this transaction was a sham and is not to be recognized for tax purposes, there shall be eliminated from taxable income, the "capital gain" and the bond "interest" reported in income. 15. The following schedule is a summary of the debits and credits to petitioner's account on Gibraltar's books for this transaction: *10 Debits to
Account
3/1/54
Charge for bonds
$ 86,937.50
3/1/54
Bond interest accrued to 2/26/54
850.83
$ 87,788.33
3/1/54
"Reserve" included in note of R
17,211.67
Total amount of Rosenthal's note $ 105,000.00
Total of charges by Gibraltar, "interest"
21,088.15
Total debits
$126,088.15
*10 Credits to Account
Bond "interest" '54 credited by G to note principal
$ 2,332.18
Bond "interest" '55 credited by G to note principal
2,750.00
Payments to R by Gibraltar, "Re- serve" (with.08)
17,211.67
Net cash paid by R to G as "in- terest"
3,876.48
Credit "purchase" of bonds by G
100,000.00
Total amount of credits
$126,170.33
Excess of credits pd. to R to balance
82.18
$126,088.15
16. *94 The following is a list of the market bid prices for Treasury bonds, due Sept. 15, 1961, with all coupons attached. Fractions have the denominator, 32. Apart from considerations of tax benefits, petitioner could not have realized an actual gain from this transaction. *10 UNITED STATES TREASURY
BONDS
*10 2 3/4% DUE 9/15/61
*10 WITH COUPONS ATTACHED
*10 LOW BID PRICES
Year
Date
Low Bid Price
1954
Mar. 31
103-26
Apr. 1
103-26
May 26
102-30
June 2
103-2
July 27
103-26
Aug. 9
103-18
Sept. 28
103-11
Oct. 25
103-0
Nov. 29
102-19
Dec. 28
102-7
1955
Jan. 17
101-7
Feb. 28
100-25
Mar. 1
100-23
Apr. 26
100-22
May 6
100-19
June 27
99-31
July 29
99-4
Aug. 1
98-29
Sept. 1
99-2
Oct. 5
99-21
Nov. 21
99-10
Dec. 22
99-1
1956
Jan. 3
98-31
Feb. 23
99-28
Mar. 28
98-22
Apr. 16
97-26
May 9
98-7
May 9
98-7
June 26
98-28
July 31
97-30
Aug. 21
96-24
Sept. 5
96-15
Oct. 29
96-28
Nov. 27
96-4
Dec. 17
95-24
1957
Jan. 2
96-9
Feb. 18
97-8
Mar. 7
97-6
Apr. 30
96-22
May 27
96-2
June 21
95-12
July 22
95-2
Aug. 12
95-4
Sept. 25
95-10
Oct. 31
95-0
Nov. 1
95-6
Dec. 2
98-16
1958
Jan. 6
99-24
Feb. 3
99-30
Mar. 11
100-22
Apr. 2
101-6
May 1
101-22
June 27
101-8
July 29
100-14
Aug. 29
98-0
Sept. 29
97-20
Oct. 1
97-14
Nov. 3
97-30
Dec. 22
97-14
1959
Jan. 19
96-24
Feb. 2
97-2
Mar. 9
97-0
Apr. 21
96-30
May 13
96-26
June 4
96-12
July 28
96-6
Aug. 31
95-28
Sept. 15
95-22
Oct. 2
95-30
Nov. 30
96-10
Dec. 3
95-30
1960
Jan. 6
96-6
Feb. 19
96-24
Mar. 1
97-16
Apr. 12
97-30
May 19
97-28
June 1
98-8
July 8
99-10
Aug. 16
99-24
Sept. 12
99-23
Oct. 10
99-25
Nov. 21
99-25
Dec. 1
99-27
1961
Jan. 9
100-0
Feb. 28
99-30
Mar. 1
99-30
Apr. 3
100-0
May 24
100-1
June 2
100-0
July 31
100-1
Aug. 8
100-0
Sept. 1
100-0
*95 1544 Transaction 4: $750,000 U.S. Treasury Notes 1. This transaction involved $750,000 U.S. Treasury notes bearing 1 1/2 percent interest due April 1, 1960. It was initiated by Gibraltar December 23, 1955, by a purchase on that date through Joseph Faroll & Co., a dealer in New York City. On December 23, 1955, the same day, Gibraltar sold the securities to or through Arthur Ehlenberger, a dealer in Government securities in New York City. Neither Gibraltar nor Rosenthal took possession, as the customary procedure was used by Gibraltar whereby the purchase and sale on the same date were handled by Irving Trust Co., Gibraltar's clearance agent, and the appropriate debits and credits were made by Irving Trust in Gibraltar's account. These securities are referred to hereafter as "bonds" so as to avoid confusing them with "notes" executed by Rosenthal as part of the transaction. This transaction was closed on Gibraltar's books as of the maturity date of the Treasury bonds, April 1, 1960, by a purported "purchase" of the bonds from Rosenthal by Gibraltar at par, $750,000, the bonds having been sold to Ehlenberger & Co. on December 23, 1955, without any "replacement". The pattern and mechanics *96 of this transaction were such that Gibraltar did not "borrow" or "lend" any funds to "purchase" the Treasury bonds, which had a cost of $715,546.88. No loan was made to Rosenthal to finance the "purchase" of the bonds. He did not use funds provided by Gibraltar to purchase the Government bonds. As one of the steps followed, Rosenthal executed a note payable to Gibraltar in the amount of $712,500, due April 1, 1960, the maturity date of the Government bonds. The note-form used was one of Gibraltar's printed notes. The note provided for periodic payments of "interest" 1545 on the note to Gibraltar. Most of the duedates for those "interest" payments were the first day of April and October of 1956 to 1960, the same dates as earned coupon interest on the Treasury notes would have been paid if those securities had been effectively purchased and held for petitioner's account with Gibraltar. As is shown hereieafter, by paying purported coupon interest on the purportedly held Treasury notes to petitioner in the same amount as his payments of "interest" on his note to Gibraltar, Gibraltar in effect refunded the "interest" payments to petitioner. In this transaction, there was a different procedure *97 which was not involved in the other three transactions. It consisted of a purported "loan" of $37,500 to petitioner by the partnership known as CHK. This step was in fact related to and was part of the transaction with Gibraltar as is shown hereinafter. 2. Petitioner reported as income the payments which Gibraltar made to him ostensibly as earned interest on the Treasury notes, in the joint or separate tax returns filed for himself and his then wife, and he reported capital gain from this transaction for 1960 in the amount of $34,453.12. Respondent conceded at the trial that if it is held that the transaction cannot be recognized for tax purposes and the claimed deductions for "interest" are not allowed, then it will follow that no income was realized from interest on the Treasury notes or from capital gain, and such income as was reported will be eliminated from taxable income in the Rule 50 computations to be made after the decision of these cases. It is noted, also, that in his original determinations, respondent did not "discover" the deduction taken on the separate tax returns for 1955 for "interest" paid to CHK, and so he did not disallow that claimed deduction. However, respondent, *98 in amendments to his pleadings in Docket Nos. 77923 and 77925 has made claims for increases in the deficiencies on the ground that the payment to CHK is not deductible. 3. On December 23, 1955, a purchase was made through Faroll & Co., settlement date the same, of $750,000 U.S. Treasury notes, 1 1/2 percent, due April 1, 1960, at the market price of 95-12/32, for "cash", or $715,312.50. Faroll charged a commission of $234.38. The total charge included accrued interest on the Treasury notes of $2,551.23; and the total charge was $718,098.11, as follows: $750,000 Treasury notes, 95-12/32
$715,312.50
Faroll's commission
234.38
Cost
$715,546.88
Accrued interest to 12/23/55
2,551.23
Faroll's total charge
$718,098.11
This purchase was entered on Faroll's records as one "in an account with" Jerome B. Rosenthal. However, Faroll issued a statement in that account showing that there were on December 23, 1955, a purchase of $750,000 U.S. Treasury notes due April 1, 1960, and on the same date, delivery of those securities to Irving Trust Co. against payment of $712,500 which was credited to Rosenthal's account; and that on the same date, $5,598.11, cash, was also credited to Rosenthal's account being a *99 deposit of that amount in a bank account of Faroll in Los Angeles in Farmers Merchants National Bank. The credit of the latter amount closed the account with Faroll; it is explained hereinafter. 4. On December 23, 1955, Gibraltar instructed its clearance agent in New York City, Irving Trust, to receive against payment of $712,500, the $750,000 Treasury notes from Faroll, in New York City, account of J. B. Rosenthal. Gibraltar also instructed Irving Trust on the same date to deliver the securities to another clearance agent, Chemical Corn Exchange Bank, for the account of another dealer in Government securities, Arthur Ehlenberger Co., against payment by Chemical Bank. Irving Trust made that delivery of the securities and received $717,554.36. Both instructions to Irving Trust had the same office record number, 188. Irving charged Gibraltar a fee of $18.75 for the receipt of the securities from Faroll and the redelivery of them on the same date to Chemical Bank for Ehlenberger. Irving debited and credited Gibraltar's account on its books on December 23, 1955, as follows: Credit (Ehlenberger)
$717,554.36
Debit (Faroll)
712,518.75
Credit balance to Gibraltar
$ 5,035.61 The Treasury notes, *100 with their accrued interest, cost $717,863.73, without Faroll's commission of $234.38. The record does not explain the difference between Faroll's charge and Ehlenberger's payment for the Treasury notes but the difference of $309.37 probably represented Ehlenberger's commission. 1546 There was a cash payment to Faroll, to its bank correspondent in Los Angeles, on December 23, 1955, of $5,598.11 (explained hereinafter). The credit balance in Gibraltar's favor in its account with Irving Trust ($5,035.61) was $562.50 less than that cash payment to Faroll. The credit balance in the Irving Trust account is accounted for by the cash payment to Faroll's account which was made by Rosenthal, as is later explained. 5. The transaction on December 23, 1955, in $750,000 Treasury notes, was an "In" and "Out" transaction on the same day in which no money was borrowed by Gibraltar, or by Rosenthal, or for Rosenthal. There was a very short use of Gibraltar's clearance account with Irving Trust, for which $18.75 was paid by Gibraltar. The sale to Ehlenberger off-set the purchase on the same day from Faroll and provided the funds which were paid to Faroll. As is shown hereinafter, Gibraltar provided, *101 in shown hereinafter, Gibraltar provided, in effect, the cash paid by Rosenthal to Faroll's account in Los Angeles, $5,598.11. And Gibraltar received back substantially all of that cash advance on the same date in the form of the credit balance in its account with Irving Trust of $5,035.61. Except, therefore, for the small "service" charge to Gibraltar of $18.75, and the broker's commissions noted above, and a cash advance from Gibraltar, through CHK, of the net amount of $562.50 (described above), no money was used in the transaction on December 23, 1955, involving $750,000 face amount of Treasury notes. There was not an actual and bona fide indebtedness owing by anyone for the $750,000 Treasury notes, such as $712,500 or any other amount, and Gibraltar did not make a loan of $712,500, or any other amount to Rosenthal. In form, and as part of the mechanics used, Rosenthal sent telegrams on December 23, 1955, to Faroll to deliver $750,000 Treasury notes to Gibraltar against payment of $712,500; and to Gibraltar to receive the securities from Faroll against payment of the same amount. Gibraltar sent Rosenthal a confirmation slip with the same date "confirming" its "receipt" for his *102 account, from Faroll, of the Treasury notes against payment of the same amount. The confirmation slip listed the serial numbers of Treasury notes, and their denominations, which had been "received" from Faroll. 6. Rosenthal executed a note dated December 23, 1955, in the amount of $712,500 payable to Gibraltar, due on April 1, 1960, bearing 2 3/8 percent interest payable in installments on the first of April and October from October 1, 1956, to April 1, 1960, in the amount of $5,625 on each date, or $11,250 per year. Also, the note provided for a prepayment of interest on December 23, 1955, of $25,301.11, and $3,073.77 on April 1, 1956, making the total payments $73,374.88. In the case of this note to Gibraltar, it was not provided that Gibraltar would make payments to Rosenthal of a so-called "reserve" fund, as had been done in other notes to Gibraltar. However, as is stated hereinafter, Gibraltar advanced to Rosenthal, through the CHK partnership, as a "loan", $37,500 on December 23, 1955, for which advance Rosenthal signed a note payable to CHK for $37,500. The amounts of the two notes of Rosenthal totaled $750,000, the principal amount of the Treasury notes which purportedly were *103 involved in this transaction with Gibraltar. On December 23, 1955, Gibraltar opened a "loan" account on its books in Rosenthal's name charging $712,500 as a "loan secured" by $750,000 Treasury notes, held "Long". That debit entry reflected Rosenthal's note to Gibraltar. The main provisions of the note to Gibraltar were as follows: That $750,000 Treasury notes, 1 1/2 percent, due April 1, 1960, were pledged by Rosenthal to secure payment of the note and interest; that Gibraltar was given the right to borrow and hypothecate or use the pledged securities for any purpose, including the right to use them to cover delivery of any similar securities "which may have been sold to others by" Gibraltar "as principal and for its own account"; that Rosenthal was entitled to the "return of" the pledged securities or securities of like kind "upon the full payment of the principal and interest at maturity.' The note further provided that Rosenthal could elect to have the "market value of the securities pledged" applied to the payment of the note, but this election could be made no earlier than 30 days prior to April 1, 1960, the date of the maturity of the note to Gibraltar, and no later than 10 days *104 before April 1, 1960. Under that provision, Rosenthal could not obtain a return of the purportedly pledged Treasury notes 1547 any earlier than April 1, 1960. The note also provided that Gibraltar could collect the interest on the pledged securities and apply it in reduction of the principal amount of the note to Gibraltar. Rosenthal's note was a "full recourse" note binding upon his legal representatives and assigns. 7. It has been noted (p. 7-(c)) that Gerald Cantor, president of Cantor-Fitzgerald, Irving Hofstein, and Burt Kleiner were the members of a partnership called C.H.K. Company, and that Hofstein and Kleiner also were associated with Cantor-Fitzgerald. Gerald Cantor referred to Gibraltar and arranged the four transactions with Rosenthal at issue in these cases, and Cantor Fitzgerald was the correspondent for Gibraltar during the years involved here. All of the "interest" rates which were to be charged petitioner by Gibraltar were discussed by Gerald Cantor and Jack Bernstein, who then was the vice-president and director of Gibraltar and, later, became a vice-president of Cantor-Fitzgerald. Betty Young was employed by Cantor-Fitzgerald (when these cases were tried) as a stocks *105 cashier; at one time she was one of its bookkeepers; and at another time she was in charge of its accounting department. Before the above employments, she was employed by Gibraltar as a bookkeeper. She testified in these cases about various bookkeeping records of Gibraltar including a loan of Gibraltar to CHK. CHK borrowed $106,250 from Gibraltar on December 23, 1955, which was entered in a loan account on Gibraltar's books in the name of CHK. Entries were made in CHK's loan account on Gibraltar's books with respect to the loan of $106,250 charging 5 individuals, respectively, with portions thereof, with a notation of a date in December 1955 as follows: 12/23/55
Jerome B. Rosenthal
$ 37,500
12/23/55
Samuel P. Norton
25,000
12/23/55
Frank De Vol
12,500
12/23/55
Marvin Miller
12,500
12/23/55
Henry C. Rogers
18,750
$106,250
On December 23, 1955, therefore, CHK borrowed $37,500 from Gibraltar to loan to Rosenthal, which was a part of an advance of $106,250 by Gibraltar to CHK. 8. By its check dated December 23, 1955, the CHK Company paid $37,500, to Rosenthal. Rosenthal signed an unsecured promissory note having the same date, payable to CHK, in the amount of $37,500, due April 1, 1960, bearing 4 3/4 *106 percent interest. 9. Rosenthal made payments on December 23, 1955, totaling $38,622.89, as follows: (a)
To Faroll & Co
$ 5,598.11
(b)
To CHK, prepaid note "interest"
7,723.67
(c)
To Gibraltar note "interest" due 12/23/55
25,301.11
$38,622.89
Since Rosenthal had received $37,500 from CHK on the same date as the above payments, it is evident that he provided the difference, $1,122.89, out of his own funds. However, as is shown later, Rosenthal received a payment from Gibraltar on April 1, 1956, of $5,625.00 for purported coupon interest on Treasury notes, which exceeded Rosenthal's payment on March 31, 1956, to Gibraltar for interest on his note to Gibraltar, $3,073.77, by $2,551.23. Therefore, Rosenthal received cash from Gibraltar which more than repaid the $1,122.89 which he had advanced from his own funds on December 23, 1955. Rosenthal's payments of $38,622.89 were directly related to his transaction with Gibraltar purportedly involving $750,000 Treasury notes, as follows: (1) He paid $5,598.11 to Faroll & Co. on December 23, 1955, by a deposit to its account with Farmers Merchants National Bank in Los Angeles. His cash payment reduced the amount to be paid by Gibraltar (through Irving Trust) *107 from $718,098.11 to $712,500 (See pages 57-58, supra). Since Irving Trust received $717,554.36 from Ehlenberger, which was credited to Gibraltar's account, and since Irving's debit to that account for its payment to Faroll included only the net amount of $712,500, Gibraltar received back $5,035.61, (via Ehlenberger and Irving Trust) which was the credit balance due Gibraltar in its account with Irving. (See p. 58, supra.) (2) Rosenthal's note to Gibraltar required an "interest" payment on December 23, 1955, to Gibraltar of $25,301.11. Rosenthal made that payment to Gibraltar, not from his own funds but out of the cash received from CHK, which it had borrowed from Gibraltar. Thus, through CHK, Gibraltar had in fact provided a "reserve" which provided petitioner with cash with which to make the payment of $25,301.11 to Gibraltar. There was, in those steps, a round-robin of cash from and back to Gibraltar, using CHK as a conduit. Petitioner did not have to use his own funds to make the payment of $25,301.11 to 1548 Gibraltar. All of these steps occurred on the same day. (3) The note for $37,500 payable to CHK was for a period of about 4 years and 3 months, to April 1, 1960. At 4 3/4 *108 percent, the charge for "interest" on that note was $7,723.67. Petitioner paid that amount to CHK on December 23, 1955, as a prepayment of all of the interest on that note. There is no evidence that CHK retained the payment of $7,723.67, or that CHK did not transfer that amount to Gibraltar, which had provided the $37,500 which CHK had paid to Rosenthal. 10. The coupon interest on $750,000 Treasury notes at 1 1/2 percent would have amounted to $11,250 annually, payable $5,625 on April 1 and October 1, if those securities had been purchased and held for Rosenthal's account by Gibraltar. Since the securities were sold on the same day as the purchase, and were not "replaced" by Gibraltar, it did not receive any coupon interest on Treasury notes. In the book account in Rosenthal's name, Gibraltar made credits to the account for interest on the Treasury notes, nevertheless, in the amounts which would have been received if they had been bought and held. Gibraltar mailed to petitioner credit advices for Treasury note interest to petitioner; and Gibraltar made cash payments to petitioner in the same amounts as the coupon interest on Treasury notes for the years 1956, 1957, 1958, and 1959. *109 Gibraltar gave petitioner a book credit for interest on the Treasury notes which would have been paid on April 1, 1960, in the amount of $5,625, as is set forth later. Gibraltar's cash payments to petitioner of the purported interest on Treasury notes was $11,250 for each of the 4 years, 1956-1959, and the sum of those payments was $45,000. For the 4 years, 1956-1959, Rosenthal's payments to Gibraltar for the prescribed "interest" on his note to Gibraltar, beginning April 1, 1956, totaled $42,448.77. Gibraltar's cash payments to petitioner were $2,551.23 more than petitioner's cash payments to Gibraltar. In fact, Gibraltar refunded to petitioner all of his purported note-interest payments for the 4 years 1956-1959. It has been stated above that petitioner's payments on December 23, 1955, totaling $38,622.89, exceeded the cash received from CHK, $37,500.00 by $1,122.89; and that Gibraltar's cash payment to petitioner of $5,625 on or about April 1, 1956, exceeded his payment to Gibraltar of $3,073.77, the "interest" on his note by $2,551.23. Petitioner's receipt of $2,551.23 over and above his payment to Gibraltar served to repay the $1,122.89 to him, and he realized a net receipt from *110 Gibraltar of $1,428.34 more than he expended: 4/ 1/56
Rec'd from G,T. note "in- terest"
$5,625.00
3/31/56
Pd. to G, "interest"
3,073.77
Surplus rec'd by R
$2,551.23
12/23/55
Net pd. by R, own funds
1,122.89
4/ 1/56
Surplus rec'd by R
$1,428.34
11. The following schedule shows the cash payments made by Rosenthal as "interest" on his note to Gibraltar; the cash payments received by Rosenthal from Gibraltar as coupon "interest" on Treasury notes; the cash received from Gibraltar through CHK on December 23, 1955; and the excess of Rosenthal's cash receipts over and above his cash payments to Gibraltar out of his own funds. In this transaction, Rosenthal did not make any net cash payments to Gibraltar out of his own funds. Pd. by Gibraltarto
Pd. by Rosenthalto
Excess pd.by G
Rosenthal
Gibraltar
to R
12/23/55
$25,301.11(CHK)
$25,301.11
4/ 1/56
5,625.00
3,073.77
$2,551.23
10/ 1/56
5,625.00
5,625.00
4/ 1/57
5,625.00
5,625.00
10/ 1/57
5,625.00
5,625.00
4/ 1/58
5,625.00
5,625.00
10/ 1/58
5,625.00
5,625.00
4/ 1/59
5,625.00
5,625.00
10/ 1/59
5,625.00
5,625.00 The note of petitioner to Gibraltar called for a payment by him, as note-interest, of $5,625 on April 1, 1960. On the book account in Rosenthal's name, a charge for that amount was made. *111 Rosenthal did not make a cash payment for that charge. Instead, Gibraltar entered a credit for $5,625, which represented accrued interest on the 1549 Treasury notes which Gibraltar purportedly purchased from petitioner on April 1, 1960, at par, for $755,625, including accrued interest on the Treasury notes. 12. On April 1, 1960, Gibraltar sent petitioner a confirmation slip stating that it had "purchased" $750,000 Treasury notes from him for $750,000, plus $5,625 for accrued interest, for the total sum of $755,625. In fact, Gibraltar did not make a purchase of $750,000 Treasury notes from petitioner. There was not any entry on Gibraltar's books showing a movement of securities as would have been shown if there had been an actual purchase of securities. The purported "purchase" by Gibraltar was only a bookkeeping entry crediting petitioner's account in the amount of $755,625. 13. The account on Gibraltar's books showed a debit balance owing to Gibraltar of $712,500, the principal amount of petitioner's note, and a charge of $5,625 for "interest" on the note due April 1, 1960. Gibraltar credited $755,625.00 to the account for the purported "purchase". The credit left a credit balance *112 in petitioner's favor of $37,500. On May 17, 1960, Gibraltar paid $37,500 to petitioner by its check, which closed the account, and petitioner's note for $712,500 was cancelled. The closing debits and credits were: 4/1/60
Balance on note of R
$712,500.00
4/1/60
Charge for "interest" on note
5,625.00
Total debits
$718,125.00
4/1/60
Credit, "purchase" of securi-ties
755,625.00
4/1/60
Credit balance due Rosenthal
$ 37,500.00
5/9/60
G. paid Rosenthal
37,500.00
0
14. On May 16, 1960, petitioner paid $37,500 by his check to CHK in payment of his note in that amount to CHK. 15. CHK paid to Gibraltar on May 13, 1960, $106,250.00, which was applied by Gibraltar in the loan account on its books with CHK as credits on May 13, 1960, to the following individuals shown in that account to have been charged with the same amounts on December 23, 1955, as shown in par. 7, supra: Jerome B. Rosenthal
$ 37,500
Samuel P. Norton
25,000
Frank De Vol
12,500
Marvin Miller
12,500
Henry C. Rogers
18,750
$106,250 The $37,500 received by Gibraltar from CHK, and designated as for Rosenthal's account, was applied as a credit to a loan dated December 23, 1955, to be made to Rosenthal. The $106,500 received by Gibraltar from CHK was posted to *113 the CHK loan account on Gibraltar's books as cancelling the loans to CHK on December 23, 1955, totaling $106,250. The amount of $37,500 was posted in that account to cancel a loan of $37,500 to Rosenthal dated December 23, 1955. 16. On the tax returns of Rosenthal, joint and separate, for 1955-1960, inclusive, deductions were taken for "interest" paid on the note to Gibraltar for $712,500, and on the note to CHK for $37,500, as shown in the following schedule. Also there were reported in income "interest" on Treasury notes, as shown in the schedule. On the separate tax returns for 1960, capital gain of $34,453.12 was reported as the gain from the transaction: 4/ 1/60
Proceeds, sale Treas. notes
$750,000.00
12/23/55
Cost
715,546.88
Capital gain
$ 34,453.12
The "interest" deductions and the "interest" income reported on the tax returns were: Year
"Interest"Deductions
Income,Treas, Note"Interest"
1955
$25,301.11 (G)
0
7,723.67(CHK)
1956
8,698.77
$ 8,698.77
1957
11,250.00
11,250.00
1958
11,250.00
11,250.00
1959
11,250.00
11,250.00
1960
5,625.00
5,625.00
$81,098.55
$48,073.77 The evidence does not explain the figure of $8,698.77 which was reported as "interest" income from Treasury notes for 1956 rather than the full *114 amount received from Gibraltar, $11,250. 17. Rosenthal's cash disbursements in this transaction totaled $81,071.66; his cash receipts totaled $82,500.00; and his net cash receipts, or gain, was $1,428.34: Cash Paid Out
1955-1959
"Interest" to Gibraltar
$67,749.88
1955
Pd. to Faroll
5,598.11
1955
"Interest" to CHK
7,723.67
$81,071.66
Cash Received
1956-1959
Treas. Note "interest"
$45,000.00
1960
Rec'd from G, "purchase" of note
37,500.00
$82,500.00
Net Receipts by Rosenthal $1,428.34 Rosenthal's net economic gain from this transaction was $1,428.34: 1550 *10
Net Economic Gain
Capital gain on "sale", Treas. notes
$34,453.12
Treas. notes "interest" rec'd
48,073.77
$82,526.89
"Interest" expense to G & CHK
81,098.55
Net economic gain
$ 1,428.34
18. Apart from expected tax benefits, petitioner could not have realized a gain from this transaction of any more than $1,428.34, which gain was realizable only by purportedly holding the Treasury notes for more than 4 years, until maturity, April 1, 1960. 19. The following schedule is a summary of the charges and credits to Rosenthal in the transaction: Charged to Rosenthal's Account
Treas. notes, Faroll
$ 5,598.11
Note to Gibraltar
712,500.00
Note to CHK, "reserve"
37,500.00
$755,598.11
Interest, note to G
73,374.88
Interest, note to CHK
7,723.67
$836,696.66
Credits to Rosenthal's Account
Cash pd. by G(CHK) to R
$ 37,500.00
Cash pd. by G to R, Treas. notes in-terest
45,000.00
Credit by G, Treas. notes interest
5,625.00
$ 88,125.00
Credit by G, "purchase" Treas. notes
750,000.00
$838,125.00
Excess of credits over debits
1,428.34
$836,696.66
20. *115 The following is a list of the bid prices on the market, for U.S. Treasury notes due April 1, 1960, during the period December 30, 1955, to March 4, 1960. In the list, prices are stated with fractions having a denominator of "32", but the denominator is omitted. Since the Treasury notes were due on April 1, 1960, and were redeemable at par, the bid prices tended to approach 100 as the time before the due date became shorter: *10 UNITED
STATES
TREASURY NOTES
1 1/2% - DUE
4/1/60 - LOW
BID PRICES
Year
Date
Low BidPrice
1955
Dec. 30
95-8
1956
Jan. 6
95-4
Feb. 3
95-24
Mar. 16
95-6
Apr. 20
94-10
May 11
94-22
June 1
94-30
July 27
94-20
Aug. 31
93-20
Sept. 7
93-16
Oct. 5
94
Nov. 30
93-8
Dec. 7
93
1957
Jan. 4
93-20
Feb. 1
94-20
Mar. 1
94-12
Apr. 26
94-20
May 24
94-18
June 21
94-4
July 19
94
Aug. 16
94
Sept. 6
94-16
Oct. 4
94-20
Nov. 1
95
Dec. 6
97
1958
Jan. 3
97-24
Feb. 7
98-12
Mar. 7
99
Apr. 3
99-4
May 2
99-16
June 27
99-28
July 25
99-18
Aug. 29
97-28
Sept. 5
97-20
Oct. 3
97-20
Nov. 7
97-28
Dec. 19
98-2
1959
Jan. 23
98
Feb. 6
98
Mar. 13
98-4
Apr. 17
98-16
May 22
98-18
June 12
98-14
July 2
98-22
Aug. 7
98-24
Sept. 4
98-16
Oct. 2
98-20
Nov. 13
98-26
Dec. 4
98-30
1960
Jan. 8
99-8
Feb. 5
99-16
Mar. 4
99-18 Issue 2: Docket No. 67848, 1953 Income of BRNM Law Partnership Rosenthal and Samuel P. Norton were members *116 of a law partnership located in Beverly Hills, Calif., having four members, Brand, Rosenthal, Norton, and Miller, hereinafter called the partnership. There were disputes among the members which led to litigation and delayed the dissolution of the partnership. However, on February 23, 1953, the conduct of the business of the partnership was terminated. Rosenthal and Norton formed their own separate law partnership, but they undertook to watch the winding up of the affairs of the old partnership. One of the problems involved the collection of fees owing to the partnership for services performed before February 23, 1953, which was the cut-off date after which the business of that particular 1551 partnership ended except the procedure of collecting fees and ending the business. A special bank account was opened by Rosenthal and Norton at Union Bank and Trust Co., apparently located in Beverly Hills, soon after February 23, 1953, for the purpose of holding, receiving, and preserving funds of the partnership. Deposits were made in this bank account of moneys collected after February 23 of money owed to the partnership. The bank account was opened by Rosenthal and Norton as a kind of custodian *117 and trust account in which the four former law partners had an interest; it was called "Rosenthal and Norton Special Account." They transferred all of the remaining funds from the law partnership bank account at the Union Bank to the new Special Account. The law partnership had its own accounting records. A new accounting record was set up by Rosenthal and Norton for the BRNM partnership in connection with the termination of the business as of February 23, and in connection with the new special bank account at the Union Bank. Entries were made in the new accounting record of collections, receipts, and disbursements after February 23. The new bookkeeping record also was called "Rosenthal and Norton Special Account". One purpose of the new bookkeeping record and special bank account was to keep a record of collections of the billings of the BRNM partnership, and of the payments of the unpaid expenses of the old firm. Another purpose was to make an accounting record to be used in the litigation among the partners; and to preserve the assets; and to prevent improper withdrawals of partnership funds. One of the issues among the partners related to the amounts of income to which each partner *118 was entitled. As of February 23, 1953, the interest of each partner was as follows: Rosenthal 35 percent; Norton 25 percent; Brand 25 percent; and Miller 15 percent. The partnership kept its accounts and reported income on a cash basis for a fiscal year beginning November 1 and ending October 31. A partnership tax return for BRNM was filed for the fiscal year ended October 31, 1953. The net income of the partnership which was reported on the return was $72,011.63. There is no dispute about that figure as the net income involved. One of the problems in this case is whether all of the net income of $72,011.63 was earned prior to February 23, 1953, or whether part was attributable to the period February 24 to October 31, 1953. The respondent made determinations whereby he adjusted the dollar amounts, respectively, of the shares of Rosenthal and Norton in the partnership net income of $72,011.63. The dispute in this case involves respondent's determination of the dollar amount of Rosenthal's share of $72,011.63, the income from the law partnership which was includable in his income for his taxable year 1953. The same question is presented in a separate case, of Samuel P. Norton. In the *119 partnership tax return filed for the period ended October 31, 1953, the dollar amounts of the distributive shares of the four partners were reported as follows: Rosenthal
35%
$25,222.29
Norton
25%
17,989.44
Brand
25%
17,989.44
Miller
15%
10,810.46
Total
$72,011.63
In the income tax return of Rosenthal for 1953, he included the above amount, $25,222.29, as his distributive share of the 1953 income of the law partnership, BRNM. In making his determinations which are in issue here (which also involve Samuel P. Norton in a separate case pending in this Court) the respondent adopted the position that of the total sum of partnership earnings, $72,011.63, $36,215.16 was attributable to the period November 1, 1952, to February 23, 1953, and that the balance of $35,796.47 was attributable to the remaining period February 24 to October 31, 1953; and that with respect to the second period no part of the allocated amount of $35,796.47 represented shares of Brand and Miller, but rather all of that part represented shares of Rosenthal and Norton in equal amounts. On the above theory respondent determined that the earnings of $72,011.63 were allocable between the two periods before and after February 23, 1953, *120 and among the four individual taxpayers as follows: 11/1/52
2/24/53
Total
to2/23/53
to10/31/53
Rosenthal
$11,458.86
$17,898.24
$29,357.10
Norton
9,96 7.80
17,898.23
27,866.03
Brand
9,217.13
0
9,217.13
Miller
5,571.37
0
5,571.37
$36,215.16
$35,796.47
$72,011.63
Respondent's reallocations resulted in increasing the dollar amount of the 1552 partnership income reported by Rosenthal and Norton in their separate and respective income tax returns for 1953 as is shown in the following schedule, so that respondent increased the dollar amount shares of the partnership income attributable to Rosenthal and Norton, respectively, by $4,134.81 and $9,876.59. Respondent's allocations had the effect of reducing the dollar amount shares of the partnership income of Brand and Miller, respectively, by $8,772.31 and $5,239.09: Share
Share
Increase &Decrease
ofIncomeReported
R.Determined
Rosenthal
$25,222.29
$29,357.10
$4,134.81
Norto n
17,989.44
27,866.03
9,876.59
Brand
17,989.44
9,217.13
(8,772.31)
Miller
10,810.46
5,571.37
(5,239.09) The law partnership of BRNM concluded its business operations on February 23, 1953, but thereafter until the dispute among the four partners was settled, the partnership was in a period of winding up its affairs, *121 collecting bills due, and paying obligations. Those matters were handled by Rosenthal and Norton, but they were not engaged in continuing and carrying on the old partnership business. There was only one period to be accounted for, the fiscal period of the BRNM partnership, November 1, 1952, to October 31, 1953. The respondent's theory was incorrect in determining that two periods were involved for tax purposes, such as November 1, 1952, to February 23, 1953, and February 24, to October 31, 1953. On the other hand, Rosenthal and Norton formed a new and different law partnership after February 23, 1953. The business and earnings of their new partnership were not the business and earnings of the BRNM partnership. The earnings and receipts of the new partnership were accounted for in books and records started for the new partnership by Rosenthal and Norton. The earnings and receipts of the BRNM partnership collected after February 23, 1953, were deposited in the special account at the Union Bank and recorded in the special set of books started to record the receipts and disbursements during the winding up period. No part of Rosenthal and Norton's earnings from their new partnership were *122 deposited to the special account at the Union Bank or reflected in the books of the special account. Robert Brent, an independent Certified Public Accountant, who had been employed by Rosenthal and Norton as an accountant for several years prior to the trial of this case, testified about the accounting records of the BRNM partnership and the Rosenthal and Norton special account and about what those records reflected. The books and records of the old partnership were kept and reflected entries recorded until the partnership was terminated on February 23, 1953, after which date no entries were made in that set of books. The special account set up by Rosenthal and Norton reflected entries recorded during the winding up period from February 24, 1953, to October 31, 1953. Brent analyzed the two sets of books and records to determine which fees and income were received by the old partnership prior to February 23, and which fees were collected and deposited in the special bank account by Rosenthal and Norton after February 23, 1953. He also analyzed the books to determine whether the fees and income collected and deposited in the special account after February 23, 1953, were earned or attributable *123 to the services performed by the BRNM partnership prior to February 23. In his analysis, Brent referred to a trial balance sheet (Exhibit 55) to summarize his findings from his review and analysis of the partnership's books and the books of the special account. The trial balance sheet was a report on the earnings of the BRNM partnership for the fiscal year ended October 31, 1953, which showed net income of $72,011.63. Brent checked the amounts in the trial balance with the balances reflected in the accounts in the ledger of the BRNM partnership and in the ledger of the special account. Of the net income of $72,011.63 of the BRNM partnership for the fiscal year 1953, fees and income received and disbursements made by the old partnership prior to February 24, 1953, accounted for the net amount $47,222.24. The balance, $24,789.39, was accounted for by receipts and disbursements after February 23, 1953, while Rosenthal and Norton were winding up the accounts of the old partnership, which were deposited to and paid from the special account, and were recorded in the books of the special account by Rosenthal and Norton. The net amount of $24,789.39 resulted from gross receipts of approximately *124 $36,000 and disbursements of about $11,200, as reflected in the books of the special account. There were entries in the legal income and other income accounts in the ledger of 1553 the Rosenthal and Norton Special Account which indicated that amounts collected after February 23 and deposited to the special account were attributable to the period prior to February 23, such as notations describing the income or fee recorded, as "Hedy Lamar - Legal thru 2-23-53"; "Lewis Jaffa - Legal thru 2-23-53"; and "Soriano V. Colby, Legal in full to 2-24-53". Brent also checked the entries in the ledger accounts of the special account with the cash receipts and disbursements journal from which the entries to the ledger accounts were posted. For every entry in the ledger accounts recording income or fees deposited to the special account, he found a notation in the corresponding entry in the journal that the fees were earned prior to February 23, 1953. In addition, Brent checked the income and fees recorded in the ledger accounts with billings which were made in 1952 by the BRNM partnership, and in several instances he found that the amount of the entry in the ledger account for fees and income collected *125 after February 23, 1953, corresponded exactly with the amount of the billings to clients dated in 1952. All of the net income, $72,011.63, reported in the BRNM partnership return was earned by the old partnership prior to February 23, 1953. Only the sum of $24,789.39, out of $72,011.63, represented a net sum of items collected after February 23, which were deposited to and paid from the special account at the Union Bank after February 23 and were reflected in the books of the special account. Rosenthal's distributive share of the net income of the 1953 partnership income was $25,222.29, as reported in the BRNM partnership tax return and in his own return for 1953. Samuel P. Norton's distributive share of partnership net income was $17,989.44, which was correctly reported in his income tax return for 1953, and in the BRNM partnership return for 1953. The respondent made incorrect determinations in increasing the dollar amount shares, and the percentage shares, of Rosenthal and Norton in the income of the BRNM partnership for fiscal year 1953 so as to add to their reported shares $4,134.81 and $9,876.59, respectively, and each one is not taxable for such additional amounts, respectively. *126 Rosenthal and Norton did not carry on the business of the BRNM partnership after February 23, 1953; they only managed the winding up of that law business. They formed a new and different law partnership of their own after February 23, 1953. None of the $72,011.63, the earnings of the old partnership, represented or included earnings of the new and separate partnership of Rosenthal and Norton, organized by them after February 23, 1953. Issue 3: Docket Nos. 1392-64, 1393-64, Deductions for Expeditures in 1960 and 1961 Individual income tax returns were filed by Jerome Rosenthal for 1960 and 1961. Respondent issued one notice of deficiency for both years. For Rosenthal, the petition in Docket No. 1393-64 was filed on the basis of that deficiency notice. Rosenthal prepared individual income tax returns for 1960 and 1961 in the name of Ruth B. Rosenthal who was then his wife, although their divorce proceedings were instituted in March 1959, and were pending in a Superior Court of California during 1960 and 1961. Rosenthal and Ruth Rosenthal were separated during 1960, 1961, and thereafter. The respondent issued one notice of deficiency for both years on the basis of the two individual *127 returns filed in the name of Ruth. For Ruth Rosenthal, the petition in Docket No. 1392-64 was filed on the basis of the deficiency notice mailed to Ruth Rosenthal. Issue 3 involves expenditures made by Jerome Rosenthal, $5,867.17 in 1960, and $8,906.61 in 1961. One-half of the expenditures in issue was deducted in the separate returns of Rosenthal and of Ruth for each year. The deductions so taken in Rosenthal's separate returns were $2,933.59 for 1960, and $4,453.31 for 1961. Correspondingly, $2,933.58 was deducted in the return filed for 1960 in the name of Ruth Rosenthal, and $4,453.30 was deducted in the return for 1961 in her name. Ruth's attorneys in the divorce proceeding were Crowley and Rhoden; Rosenthal's attorneys were Horwin and Caruso. The expenses in issue, which were paid by Rosenthal in 1960 and 1961, were as follows: *10 Fees Paid by J. Rosenthal
1960
Legal fees paid to Crowley and Rhoden
$1,000.00
Fees paid for accounting services
50.00
Court costs
4,817.17
$5,867.17
1961
Legal fees paid to Horwin and Caruso
$6,500.00
Court costs
1,974.20
Bond for stay of execution
376.76
Messenger services
55.65
$8,906.61 1554 In the statutory notices of deficiencies, the reasons given by respondent *128 for his disallowances of the claimed deductions in the 1960 and 1961 individual returns were that "the deductions for professional fees and costs incurred in connection with divorce and settlement agreement, claimed as other deductions in your returns * * * are unallowable because you have not established that you are entitled to the deductions." Rosenthal's explanation in the tax returns for the deductions of the above-described expenditures was that they were for professional fees and costs "incurred in connection with divorce and property settlement agreement, incurred to conserve and maintain income-producing property (not including other legal fees and expenses in connection with divorce)." Prior to 1960, in connection with the suit for divorce filed by Ruth Rosenthal, a stipulation was executed by Rosenthal and Ruth Rosenthal that each party was entitled to a divorce. The stipulation was incorporated into the interlocutory decree of divorce which was entered by the court in the divorce proceedings at some time after 1961. The stipulation removed from the divorce case the issue of marital fault so that the issues in the divorce litigation related to property rights of the spouses *129 and ownership of separate and community property, the division of property, and alimony. The final decree of divorce was entered on April 3, 1964. The evidence does not show what award of alimony was made by the court to Ruth Rosenthal, if any award of alimony was made. If the court made an award of alimony to Ruth, the evidence does not show what it was, how it was to be paid, or of what it was to consist. No evidence was introduced relating to alimony, the amount thereof, or the way in which it was to be paid. It appears that Ruth was granted the divorce. The payment of $1,000 in 1960 by Rosenthal to Crowley and Rhoden, who were Ruth's attorneys, was paid pursuant to a court order. However, the evidence does not show what the charges of Crowley and Rhoden were, or what they were for; their statement, or bill, was not produced or offered in evidence. The evidence does not show or establish what relationship there was, if any, of the payment of $1,000 to the matter of alimony (if any). The payment in 1960 of $4,817.17 was paid pursuant to a court order for court costs in the divorce proceedings. In 1961, Rosenthal paid $6,000 to Leonard Horwin, and $500 to Paul Caruso, both being *130 his attorneys in the divorce proceedings. There is no evidence showing what the charges were of Horwin and Caruso, or the nature of the services for which their charges were made. No statements or bills of Horwin or Caruso for their respective services were offered or introduced into evidence. They were not called by the petitioner, Rosenthal, to give testimony. There is no proof establishing the nature of the legal services for which Rosenthal paid $6,000 to Horwin and $500 to Caruso. Ruth Rosenthal did not appear at the trial in this Court of these cases. As far as the record shows, she was not called to give testimony in these cases. The petitioner, Rosenthal, failed to establish and prove that any of the expenditures in issue were made or were related or attributable to the production or collection of alimony or of income, or that any of the expenditures in issue were ordinary and necessary expenses incurred or paid in connection with the determination, collection, or refund of any tax. The petitioner, Rosenthal, failed to prove that all of the expenditures in issue, which were paid in 1960 and 1961, were not such attorneys' fees, legal fees, court costs, and miscellaneous costs *131 incurred and paid in connection with the divorce proceedings, as are personal expenses connected with a divorce proceeding. Issue 4: Statute of Limitations Individual income tax returns for 1955 were filed by and for Rosenthal and Ruth Rosenthal. The taxable year 1955 is involved in Docket No. 77923, Ruth Rosenthal, and Docket No. 77925, Jerome Rosenthal. In the statements attached to the statutory deficiency notices covering the taxable year 1955, the respondent did not disallow deductions taken for payments made in 1955 to CHK as "interest" in connection with Transaction 4 under Issue 1. The total amount of the payment to CHK was $7,723.67. Respondent, by amendment to his answer in each case, made the determination that the 1555 payment of $7,723.67 to CHK was not interest on indebtedness within section 163(a); he disallowed the deductions for that item taken on the individual returns ($3,861.84 on the return in the name of Ruth Rosenthal, and $3,861.83 on the return of Rosenthal); and he made claims under section 6214(a) for increases in the tax deficiencies of $2,780.52 in Docket No. 77923, and $2,780.52 in Docket No. 77925. Respondent's amendments to his pleadings (answers) *132 and petitioner's replies thereto, were filed 4 years prior to the trial of these cases. Since respondent's claims for increases in the deficiencies were filed "before the hearing" of these cases, this Court has jurisdiction with respect thereto as part of its jurisdiction "to redetermine the correct amount of the deficiency [deficiencies]." Section 6214(a). Respondent's determinations in his amended answers, his claims for the increases in the deficiencies for 1955, and the assessment of the increased deficiencies were not barred by a statute of limitations. Ultimate Findings of Fact Issue 1: Transactions in Government Securities 1. Claimed "Interest" Deductions: The following findings relate to each one of the four purported transactions in Government securities. Each transaction was a paper transaction, and was a sham. In each transaction: No securities were purchased by or for Rosenthal or for his account, except for a day or so because if and when securities were ordered from a dealer, they were delivered to Irving for redelivery to a dealer to whom they were sold in an "In" and "Out" procedure almost immediately; none was held for his account; and no actual bond or note interest *133 on any of the securities purportedly involved was received by Gibraltar or Rosenthal. The closing of Rosenthal's four accounts on Gibraltar's books consisted only of bookkeeping entries; they did not reflect any bona fide sale at the end of any securities which had been "held" for his account under a "pledge" with Gibraltar. No securities were "pledged" with Gibraltar in spite of such statement in the promissory notes of Rosenthal. There were no bona fide and real "short sales" by Gibraltar of any securities "held" for Rosenthal and "pledged" with Gibraltar. The transactions of Cantor-Fitzgerald and of Gibraltar with securities dealers Faroll, Childs, Devine, and Ehlenberger involved sales of securities on or close to the same dates when the same securities had been purchased from a dealer, and they closed each transaction in an "In and Out" procedure almost immediately thereby canceling each purchase and providing the funds with which to pay for each purchase. The transactions were not in reality or in fact "short sales" of securities bought and paid for, and held for Rosenthal. Each "In and Out" transaction through Irving, with dealers, was handled in such way that money was not *134 borrowed by Gibraltar, or by Rosenthal, and no real and bona fide indebtedness was incurred by or for Rosenthal. The securities disposed of to nulify purchases at about the same time, through Irving Trust, were not replaced by Gibraltar. Each "In and Out" procedure involving the temporary delivery and redelivery by Irving Trust of Government securities was no more than a paper device which utilized the routine procedures of clearance agents for the purpose of providing brokers' confirmation slips which would give the appearance of a "purchase" of securities, and the appearance of a long term indebtedness which, in fact, did not come into existence. Each promissory note executed by Rosenthal, payable to Gibraltar and, in one instance to CHK, was merely a part of a subterfuge and paper transaction; and the promissory notes merely provided the basis for the respective entries on Gibraltar's books, and the appearance of purported "indebtedness" and "interest" payments. None of the promissory notes was evidence of actual indebtedness or of any obligation to make payments for the use of borrowed money. The payments described on each note as "interest" were not in fact and substance interest *135 on indebtedness. With respect to each note of petitioner, payable to Gibraltar, none was secured, and no securities were in fact "pledged" with Gibraltar. It was not the intention of the petitioner or Gibraltar that petitioner would or could obtain any "return" of the described securities by paying Gibraltar the stated principal amount of the note. The provision in each note that it was secured by "pledged" securities merely provided a basis for the appearance of collections by Gibraltar of coupon interest on such purportedly "pledged" securities, whereas, in fact, no coupon interest was received by Gibraltar, or "owed" by Gibraltar to petitioner. 1556 Each account in petitioner's name on Gibraltar's books was a paper account, and in each instance there was not an actual and bona fide indebtedness of petitioner to Gibraltar for a loan of funds or a bona fide purchase of Government securities for his account. The book entries in each account were part of a paper transaction which was lacking in substance. Although petitioner made payments to Gibraltar, as specified in each promissory note, and in the stated amounts, Gibraltar in fact refunded to petitioner a substantial part of each *136 payment (or all of it in some instances) under the guise of payments of a "reserve" fund or of coupon interest on purportedly "pledged" securities. The prescribed payments to Gibraltar of "interest" were part of each sham and paper transaction, and they merely provided the appearance for tax deductions in stated amounts. Petitioner's out-of-pocket expense in transactions 1, 2, and 3 constituted his payment of a charge and fee by Gibraltar for providing a facade for claiming tax deductions. Petitioner's expenses were $9,322.88, $3,669.47, and $3,794.38, respectively, in the first 3 transactions. In transaction 4, petitioner actually received from Gibraltar, in 1956, a cash payment in the net amount of $1,428.34, which represented taxable income for 1960, the end of the transaction. In transactions 1, 2, and 3, the so-called "reserve" referred to in each original promissory note of petitioner, $90,388.90, $17,359.46, and $17,211.67, respectively, was not in fact a reserve by Gibraltar of its own funds, and Gibraltar did not pay any of those amounts from its own funds. Instead, the payments by Gibraltar to petitioner, in the guise of payments out of a "reserve" fund, were in fact refunds *137 to petitioner of a substantial part of his payments of so-called "interest" on each note. The closing of each one of the 4 transactions did not involve any actual or bona fide sale of securities for petitioner's account, and no funds were in fact received by Gibraltar from such purported, closing sales. Each transaction was closed merely by a bookkeeping credit to petitioner's account which was part of each sham transaction. Gibraltar did not have sufficient cash on hand with which to loan petitioner the principal amount stated on each promissory note of petitioner, on or about the date of each note, or at any material date. Gibraltar did not borrow and then loan to petitioner the principal amount of each note in any of the transactions. Gibraltar did not in fact receive any coupon interest on any Government securities, in each transaction. Credits to the principal amount of a promissory note of petitioner, in the instances where such credits were entered on Gibraltar's books, were merely gratuitous reductions in the principal amount of the note by Gibraltar, and were merely bookkeeping entries, and were part of the sham transaction. In other instances, Gibraltar's cash payments to *138 petitioner of purported coupon interest on Government securities, purportedly "pledged", were in fact refunds to petitioner of all or a substantial part of his payments to Gibraltar of purported note "interest". In transaction 4, CHK was merely a conduit through which Gibraltar transferred $37,500 to petitioner, and $37,500 was not loaned to petitioner by either CHK or Gibraltar. Petitioner's promissory note to CHK for $37,500 was not evidence of an indebtedness of petitioner, or of a loan to him. In fact, the transfer of $37,500 in cash to petitioner, through CHK, on December 23, 1955, represented the following: a refund to petitioner by Gibraltar of the first payment of so-called "interest", on petitioner's promissory note, in the amount of $25,301.11; a refund to petitioner of $5,598.11 which he paid to Faroll on the same date; and a refund of most of the so-called prepayment of "interest" to CHK on petitioner's note to CHK, of $7,723.67. All of petitioner's expenditures on December 23, 1955, above, totaling $38,622.89, were refunded to petitioner by Gibraltar through the payment by CHK of $37,500 and through Gibraltar's payment of "interest" on Treasury notes of $5,625 on March *139 31, 1956. If "refund" to petitioner is not precisely accurate, then in this financial round robin, petitioner immediately repaid the $37,500 to Gibraltar on December 23, 1955, directly and for Gibraltar's benefit. No loan was made to petitioner of that fund. No interest on indebtedness or for the use of money was paid to CHK by petitioner. Petitioner's payment of $7,723.67 to CHK was not a payment of interest on indebtedness. There was no bona fide indebtedness of $37,500 owing by petitioner to CHK or Gibraltar. 1557 Petitioner failed to prove, in rebuttal, that the $7,723.67 was retained by CHK and was not paid to Gibraltar. Since Gibraltar advanced funds to CHK, which included the $37,500, the reasonable inference is that CHK paid the $7,723.67 to Gibraltar. The finding is made that CHK did so, in the absence of contrary evidence; there is no evidence establishing a reasonable basis for concluding that CHK retained the $7,723.67, and a finding to that effect cannot be made. Each transaction, 1, 2, 3, and 4, was lacking in any real and substantive economic benefit to petitioner apart from anticipated tax benefits. In Transaction 4, the arithmetic "net economic gain" of $1,428.34 *140 was not a true economic gain but was merely a credit balance in petitioner's favor (which Gibraltar paid to petitioner) arising from Gibraltar's cash payments to him in the guise of coupon interest on Treasury notes. The bookkeeping balance of $37,500 in petitioner's favor at the end of Transaction 4, on April 1, 1960, was not a bona fide balance owing to petitioner. Rather, it represented Gibraltar's bookkeeping "reserve" and was no more than an integral part of the paper transaction. It was an anticipated balance based upon a "charge" to petitioner under his note of only $712,500, as petitioner's note to Gibraltar did not include the $37,500 "reserve", and "redemption" of the "pledged" notes for $750,000 was anticipated. Gibraltar's payment of $37,500 to petitioner reflected, in fact, a credit to be applied to the account of CHK which received the $37,500 from petitioner and paid it back to Gibraltar in another round robin. The principal purpose of each transaction, including CHK, was the creation of a facade for claiming tax deductions. Apart from tax purposes, each transaction was devoid of substance and commercial reality, and did not involve any real indebtedness within the meaning *141 of section 23(b), 1939 Code, and section 163(a), 1954 Code. In each transaction, petitioner did not pay any interest on indebtedness to Gibraltar, and none was paid to CHK in Transaction 4. As a transaction for the purchase of securities, each one of the four transactions was a sham. Since each transaction was a sham, not recognizable for tax purposes, petitioner did not realize any taxable income therefrom, except $1,428.34, explained below, and his payments were not interest on indebtedness. Each transaction was lacking in economic benefit to petitioner, apart from hopedfor tax benefits. The principal purpose of each transaction was not to realize a profit but was to provide a basis for tax deductions. Petitioner realized taxable income under Transaction 4, even though it was a sham, from Gibraltar's cash payment to him in the net amount of $1,428.34, out of $5,625 on April 1, 1956, because that net amount of $1,428.34 was in excess of petitioner's payments to Gibraltar and of Gibraltar's credits to him as of the end of the transaction on April 1, 1960. The $1,428.34 was income to petitioner in 1960 because it was paid to him out of Gibraltar's funds, it was not a gift, and as of *142 April 1, 1960, it was established by the bookkeeping entries that Gibraltar had paid that amount to petitioner from its own funds. The steps on December 23, 1955, whereby petitioner received $37,500 and gave his promissory note to CHK in that amount were an integral part of transaction 4 with Gibraltar, and those steps followed by CHK did not constitute a separate transaction between petitioner and CHK. In substance and reality, CHK did not "borrow" $37,500 from Gibraltar to "loan" to petitioner, and there was not a bona fide indebtedness for $37,500 owing by petitioner to CHK or by CHK to Gibraltar. Rather CHK was merely a conduit through which Gibraltar transferred $37,500 to petitioner on December 23, 1955. Since Gibraltar, on the same date, received back, directly or indirectly, $38,622.89 (which included the $37,500) there was a round robin of this fund as between petitioner and Gibraltar which represented either an immediate repayment by petitioner, or Gibraltar's refund to him for his expenditures to or on behalf of Gibraltar. No bona fide indebtedness owing by petitioner to CHK or Gibraltar resulted from this monetary round robin, and petitioner's promissory note to CHK was *143 not evidence of any indebtedness due from him. 2. Alternative Claims for Deductions: Petitioner's out-of-pocket expenses in the transactions and the respective years when each one was concluded were: Transaction
Year Ended
Expense
1
1957
$9,322.88
2
1961
3,669.47
3
1961
3,794.38
In transaction 1, 2, and 3, there was no economic substance beyond tax deductions. 1558 None of the transactions had substance, and each one was a paper transaction and a sham as a business transaction entered into for profit. In each transaction, the out-of-pocket expense was not incurred in a transaction entered into for profit, and was not cost incurred because of failure to exercise options or privileges to buy or sell property. The out-of-pocket expense, in each of the 3 transactions, in the above amounts, was not a loss from a transaction entered into for profit, and was not a loss attributable to a failure to exercise an option to buy or sell property. Apart from expected tax deductions and benefits, in each transaction as arranged, purportedly involving certain government securities, and involving so-called "reserves" of Gibraltar and so-called "interest" payments on promissory notes of petitioner in prescribed *144 amounts, a profit could not have been reasonably expected or realized, and each transaction was not entered into for profit. Issue 2: Income of BRNM Law Partnership Rosenthal's taxable income for 1953 from the BRNM law partnership, his distributable share thereof was $25,222.29, and no more. There was not income of that partnership earned after February 23, 1953, and it is the only law partnership involved under the issue presented. Issue 3: Docket Nos. 1392-64, 1393-64, Deductions for Expenditures in 1960, 1961 Rosenthal did not pay any legal fees or other costs "for the production or collection of income; for the management, conservation, or maintenance of property held for the production of income; or in connection with the determination, collection, or refund of any tax" in 1960 and 1961. Rosenthal's expenditures of $5,867.17 in 1960, and $8,906.61 in 1961 were personal and nondeductible expenses. They were not related or attributable to the production or collection of alimony or of income. Issue 4: Statute of Limitations The statute of limitations does not bar the assessment and collection of the increased amounts of deficiencies claimed by respondent for 1955 in dockets numbered *145 77923 and 77925. Opinion Issue 1: Four Transactions in Government Securities: Deductions for Payments of Alleged Interest; or, in the alternative, for Loss A. Deductions Claimed as Interest: The main question under this issue is whether there was in each one of the four transactions in Government securities a bona fide and real indebtedness of Rosenthal to Gibraltar, and also to CHK Company in Transaction 4, evidenced by promissory notes, so that the payments made by Rosenthal pursuant to the notes during the taxable years as "interest" on the purported "loans" constituted interest paid on indebtedness within the meaning of section 23(b), 1939 Code, and section 163(a), 1954 Code. [2]
Prior to the trial of these cases the respondent, in his amended answers in Docket Nos. 77923 and 77925, made claims for increases in the deficiencies for 1955 on the ground that deductions taken in the tax returns for 1955 *146 totaling $7,723.67, for payments to CHK Company, were not payments of interest on indebtedness. Respondent had the burden of proof with respect to the issue pleaded in his amended answers. Rule 32, Rules of Practice of this Court. In the statutory notices of deficiencies for all of the taxable years, respondent disallowed all of the deductions taken for the payments to Gibraltar pursuant to petitioner's promissory notes. Respondent determined that the payments were not payments of interest on indebtedness within the meaning of sections 23(b), 1939 Code, and 163(a), 1954 Code. He determined further that deductions for those payments were not allowable under any Code provision. With respect to the main question which results from respondent's determinations in the deficiency notices, the petitioner had the burden of proof. Rule 32, Rules of Practice of this Court; and Max Barnett, 44 T.C. 261, 276 (1965), affd. 364 F. 2d 742 (C.A. 2, 1966). Petitioner has presented 1559 arguments to the effect that his burden of proof is a limited one. Consideration has been given to those contentions. Our conclusion is that petitioner had the burden of proof in general and with respect to all of the *147 questions involved under the main issue, except with respect to the new question pleaded by respondent in his amended answers, as set forth above. Additional questions are in issue resulting from petitioner's alternative contention that if it is held that the payments made pursuant to his notes were not interest on indebtedness, then his out-of-pocket expenses are deductible as a loss under either section 117(g)(2), or section 1234. The questions resulting from the alternative contentions are set forth hereinafter. It is an established rule of law that "interest on indebtedness", as used in the statute, means "compensation for the use or forbearance of money", Deputy v. DuPont, 308 U.S. 488, 498 (1939). It has been defined, also, as "the amount which one has contracted to pay for the use of borrowed money." Old Colony R.R. Co. v. Commissioner, 284 U.S. 552, 560 (1932). The term "indebtedness", as used in the statute, has been defined as "an unconditional and legally enforceable obligation for the payment of money." Autenreith v. Commissioner, 115 F. 2d 856, 858 (C.A. 3, 1940); Commissioner v. Park, 113 F. 2d 352, 354 (C.A. 3, 1940); Gilman v. Commissioner, 53 F. 2d 47, 50 (C.A. 8, *148 1931). Upon due consideration of all of the evidence, our conclusion and findings are that Rosenthal did not "contract to pay for the use or forbearance of money." The use of money was never a right of Rosenthal in all of the transactions and arrangements, and no loans were made to him. The elaborate transactions can best be described as shams within the rule of Goodstein v. Commissioner, 267 F. 2d 127 (C.A. 1, 1959), affirming 30 T.C. 1178; Lynch v. Commissioner, 273 F. 2d 867 (C.A. 2, 1959), affirming 31 T.C. 990; Knetsch v. United States, 364 U.S. 361 (1960). These cases, on their facts, are indistinguishable in principle from the substantial number of cases which have held that payments of purported "interest" on alleged "loans" were not interest on indebtedness and, therefore, were not deductible. Knetsch v. United States, supra; Sammy Cahn, 41 T.C. 858 (1964), affd. 358 F. 2d 492 (C.A. 9, 1966); Williams v. Commissioner, 323 F. 2d 656 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; Amor F. Pierce, 37 T.C. 1039 (1962), affd. 311 F. 2d 894 (C.A. 9, 1962); Danny Kaye, 33 T.C. 511 (1959), affd. 287 F. 2d 40 (C.A. 9, 1961); Gordon MacRae, 34 T.C. 20 (1960), remanded *149 on another issue, 294 F. 2d 56 (C.A. 9, 1961), certiorari denied 368 U.S. 955; Goodstein v. Commissioner, supra; Sonnabend v. Commissioner, 267 F. 2d 319 (C.A. 1, 1959), affirming a Memorandum Opinion of this Court; Lifschultz v. Commissioner, 393 F. 2d 232 (C.A. 2, 1968), affirming a Memorandum Opinion of this Court; Benenson v. United States, 385 F. 2d 26 (C.A. 2, 1967); Max Barnett, supra, 44 T.C. 261 (1965), affd. 364 F. 2d 742 (C.A. 2, 1966), certiorari denied 385 U.S. 1005; Kapel Goldstein, 44 T.C. 284, affd. 364 F. 2d 734; Minchin v. Commissioner, 335 F. 2d 30 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; Jockmus v. United States, 335 F. 2d 23 (C.A. 2, 1964); Becker v. Commissioner, 277 F. 2d 146 (C.A. 2, 1960), modifying a Memorandum Opinion of this Court; Lynch v. Commissioner, supra; Leslie Julian, 31 T.C. 998 (1959), affd., 273 F. 2d 867 (C.A. 2, 1959); Carl E. Weller, 31 T.C. 33 (1958), affd., 270 F. 2d 294 (C.A. 3, 1959), certiorari denied 364 U.S. 908; W. Stuart Emmons, 31 T.C. 26 (1958), affd., 270 F. 2d 294 (C.A. 3, 1959); Joseph H. Bridges, 39 T.C. 1064 (1963), affd., 325 F. 2d 180 (C.A. 4, 1963); Perry A. Nichols, 37 T.C. 772 (1962), affd., 314 F. 2d 337 *150 (C.A. 5, 1963); United States v. Roderick, 290 F. 2d 823 (C.A. 5, 1961); Gheen v. Commissioner, 331 F. 2d 470 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court; Knowles Electronics, Inc. v. United States, 365 F. 2d 43 (C.A. 7, 1966); Lewis v. Commissioner, 328 F. 2d 634 (C.A. 7, 1560 1964), affirming a Memorandum Opinion of thit Court, certiorari denied 379 U.S. 821; Dooley v. Commissioner, 332 F. 2d 463 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court; Rubin v. United States, 304 F. 2d 766 (C.A. 7, 1962); Rothschild v. United States, 407 F. 2d 404 (C. Cl. 1969); Brown v. United States, 396 F. 2d 459 (Ct. Cl. 1968); Oritt v. United States, 357 F. 2d 692 (Ct. Cl. 1966); Broome v. United States, 170 F. Supp. 613 (Ct. Cl. 1959); Carl Shapiro, 40 T.C. 34 (1963); A. A. Helwig, 37 T.C. 1046 (1962); William R. Lovett, 37 T.C. 317 (1961); Morris R. DeWoskin, 35 T.C. 356 (1960). Except for immaterial variances as to names, amounts, the securities, and the forms of the transactions, the cases under consideration come within the reasoning of the cases cited above and the holdings that certain transactions were a sham. In Knetsch, supra, it was held that amounts claimed *151 as "interest" could not be deducted where the transaction which gave rise to the claimed deduction was a sham. See Morris R. DeWoskin, supra; Gordon MacRae, supra; Rubin v. United States, supra. In these cases considerable attention was given to form, and petitioners rely heavily upon the form of each step taken. However, we do not find any difference in the substance of the transactions in Land Bank bonds, and Treasury bonds and notes in these cases upon making comparisons with the cases cited above. The findings, conclusions, and decisions in the cited cases were arrived at because the substance of each of the respective transactions in issue in each of those cases differed from its form. In these cases, the divergence of substance from form is as great or greater than in the cited cases. We find no significant difference between the facts of these cases and those of Gordon MacRae, supra, after carefully and fully considering the evidence here, and all of petitioners' assertions, contentions, and arguments in their lengthy briefs. All of the cases cited by petitioners have been considered. L. Lee Stanton, 34 T.C. 1, is distinguishable from these cases. In Stanton the Commissioner *152 conceded that the transactions in issue were bona fide and real, and that they created genuine indebtedness. He has not made any of these concessions in these cases. In Stanton this Court concluded that the taxpayer undertook to run the risk of the rise and fall of the market. We cannot make that conclusion here. See Max Barnett, supra, p. 281. It is recognized here, as was done in Knetsch v. United States, supra, affirming 272 F. 2d 200 (C.A. 9, 1959), that one of the principles stated in Gregory v. Helvering, 293 U.S. 465, is that a taxpayer has a right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, if he employs "means which the law permits", and that rule has been considered in these cases. However, the related rule is equally well settled that in instances of the type such as is in issue here "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, supra. That rule of law requires that we first look beyond the form in which the transaction in question was cast. Under the statute involved here, the petitioners may prevail "only if the payments in *153 question were in fact and in substance interest, i.e., consideration paid for the use and forbearance of money. Cf. Deputy v. Du Pont, 308 U.S. 488." See Gordon MacRae, supra, p. 26. The statutory provisions involved here, sections 23(b), 1939 Code, and 163(a), 1954 Code, pertain to a type of allowable deduction. Deductions are matters of legislative grace, and to obtain the benefit of a statute permitting a deduction of a specified type, the taxpayer must prove and establish that his claimed deduction comes within the provisions and specifications of the statute. As has been restated recently in Brown, et al. v. United States, 426 F. 2d 355 (May 15, 1970, Ct. Cls.), where a taxpayer "attempts to use the tax system to obtain a benefit or advantage where the only possibility of any real benefit or advantage comes through the tax mechanism itself", and where "there would be no substantial benefit or advantage through the transaction alone, apart from the operation of the particular tax mechanism employed by the taxpayer," the courts should examine carefully such attempts. "Such attempts may not always be rejected per se, but we think that a universal precondition of acceptance for tax *154 purposes is that the taxpayer 'turn square conrners' and fulfill 1561 every legislative requirement of tax law, correctly construed." Knetsch v. United States, supra, is not favorable to petitioners' claims in these cases but to the contrary supports the respondent's determinations. See Rubin v. United States, supra, p. 770, where the court noted that Knetsch is not inconsistent with the cases cited by the Government. Cases cited by the petitioners, such as the following, are distinguishable from these cases because in them the courts found the transactions to be in substance what they appeared to be in form and to have commercial reality: Maysteel Products, Inc. v. Commissioner, 287 F. 2d 429, reversing 33 T.C. 102; and Fabreeka Products Co. v. Commissioner, 294 F. 2d 876, reversing 34 T.C. 290. See Max Barnett, supra, p. 281, where the same observation was made. On the authority of the decisions of the cases cited above (in the long list set forth at the beginning), the general question is decided for the respondent. In view of the assertions and contentions of the petitioners in their lengthy briefs, it is advisable to discuss the facts, and the substance of the transactions in *155 question, which purported to involve Federal Land Bank bonds and Treasury bonds and notes. Further discussion is necessary because of the diametrically opposite views, of the substance of the purported transactions, of the petitioners and the respondent, respectively, particularly because the petitioners contend that the form and the various steps of each transaction were in substance what they appered to be in form. The ultimate question and the subsidiary questions are questions of fact. In parts of the petitioners' assertions on brief, there are several examples of their failure, whether or not deliberate and obtuse, to recognize important facts and distinctions; and there is a tendency, whether or not intentional, to obfuscate the real facts underlying some of the steps employed in the transaction. Moreover, our task in clearly making the findings has been an exceedingly tedious and time-consuming undertaking because the seemingly simple structure of the transactions and of the provisions in the promissory notes given to Gibraltar were far from simple and uncomplicated. It should be made clear that the many schedules set forth in the findings are the result of this Court's diligent *156 and careful analysis of the relationship of one step to another, and of the necessary comparisons of steps followed by Gibraltar with steps followed by petitioners, particularly with respect to the steps followed by Gibraltar in making payments to Rosenthal, with which, of course, he was entirely cognizant. The obligation of this Court to look through form in order to ascertain substance, so that the realities and substance of the steps employed as well as of the entire transaction would emerge, has not been an easy task to execute. The design and structure of the underlying plan of each transaction, including the promissory note to Gibraltar which in the principal amount included a so-called "reserve", were in many ways ingenious in their employment of the form of certain commercial and financial procedures. Descriptive labels were used, such as "short sale" which were not real at all in substance. There were no "short" sales of bonds and notes, and to describe what was done as a "short sale" was an artifice and subterfuge in itself. In order to understand the ingenuity of the general plan and of the separate steps employed, there must be an understanding of the evidence and of its *157 significance which reflects understanding of the mechanics and procedures of those who are engaged in executing securities transactions. The fact that Cantor, Fitzgerald (C-F) and Gibraltar were closely related, although separate, entities, that both were dealers in securities, and that each one had as its clearance agent in New York, the Chemical Bank and the Irving Trust Company, respectively, which in their other and major activities are actually engaged in the procedures of clearance agents in real securities transactions, created a trompe l'oeil which at first might fool the eye. There was a great deal of eye-foolery in the steps which were employed, so that what was nothing at all appeared to have substance and to be a customary procedure in the business of buying and selling securities, of "delivering" them "against payment", and of "borrowing" securities to make a "short sale" of them. The transactions on their face had the appearance of the use and employment of money in substantial amounts, but relatively little money was employed. Real transactions in the buying and selling of securities involve much paperwork and many bookkeeping entries. In the transactions in dispute, *158 and in the steps 1562 employed, only the paperwork and the bookkeeping entries were real, not the purported use and borrowing of money, and not the purported acquisition of Land Bank bonds and Treasury bonds and notes. That the whole device and framework of each transaction were ingenious is demonstrated by the lengthy Findings of Fact and the many illustrative schedules of figures in the findings, which have been derived from the evidence as the result of a lengthy and tedious examination and analysis of the evidence by this Court, which counsel for the respective parties were not industrious enough to supply. This Court, having worked out the findings, with the schedules, might find it sufficient to dispose of the questions involved simply by referring to the findings as dispositive of the ultimate question for decision, with the observation that petitioners' assertions and contentions are wholly lacking in merit. But it appears to be advisable to discuss and comment on some of the mechanics used in the transactions, so that the "eye-catching trompe l'oeil", or the deceptions, will not persist. Furthermore, since the petitioners have engaged in the exercise on brief of attempting *159 to distinguish these cases from the decided cases in which the transactions which were not recognized for tax purposes were almost the same or closely similar to the transactions in dispute here, we must laboriously repeat here the analyses in the typical authorities which are controlling, even though in doing so we are obliged to largely quote from them. Petitioner, Rosenthal, argues that the four transactions here were not "paper transactions", or sham transactions, and that they were not the type which has been described, in general, as Livingstone-type transactions. See Eli D. Goodstein, 30 T.C. 1178, affd. 267 F. 2d 127, supra. He argues, also, that these transactions were different from those involved (and not recognized for tax purposes) in the cases relied on by respondent and cited above, such as Max Barnett, Lynch, Rubin, Oritt, Nichols, and Lifschultz, (all supra), because each one of the transactions here was of longer duration (4 and 7 years) than were the shortterm transactions in the cited cases, many of which were held to be merely paper transactions, some of which were for only 15 or 25 days, as in Bornstein v. Commissioner, 334 F. 2d 779 (C.A. 1, 1964); and Ippolito v. Commissioner 364 F. 2d 744 *160 (C.A. 2, 1966). Petitioner contends, further, that in each of the transactions under consideration, he entered into it to make an investment with the expectation of making a profit; that he ran a risk of loss which might result from market fluctuations; and that there was a reasonable possibility of making a profit; and that his motive in each instance was to make a profit. Petitioner contends that these transactions were similar to and should come under the reasoning of L. Lee Stanton, supra.He argues, in addition, that there was a reasonable expectation that in each of these transactions his economic interests would be beneficially affected, apart from any tax considerations. All of petitioner's contentions have been fully considered. As his contentions do not present any new arguments which, in general, have not been considered in the many cases involving similar transactions, no useful purpose would be served in stating them in any more detail than as set forth above. Moreover, each case must be considered upon its own particular facts. In each case, the issues for decision largely involve fact questions. Petitioner has observed correctly that in many (or most) of the cases in *161 which similar transactions were in issue the length of time between the beginning and closing of the transaction was one or two years, whereas here the duration of each transaction was about 4 1/2 years, Transaction 1, 4 1/4 years, Transaction 4, and 7 1/2 years, Transactions 2 and 3. But, as has been stated frequently, in considering and deciding the question whether there is an actual indebtedness upon which interest was paid for the use or forbearance of money, the transaction in issue must be considered in its entirety and we may not fragmentize the transaction; neither may we view one factor, without all of the others, as determinative if there is not clear proof that the taxpayer incurred an actual indebtedness. Gordon MacRae, 34 T.C. 20, 26, supra. In MacRae, where the transactions closely resembled those in issue here, only two taxable years were involved, 1952 and 1953. Some of the transactions were closed in later years which were not before this Court. In the transaction purportedly involving Federal Land Bank bonds due October 1, 1957, callable October 1, 1955, the taxpayer's promissory note payable 1563 October 1, 1955, was renewable to October 1, 1957, and if it was *162 extended to that date, the transaction had a duration of 4 1/2 years. With respect to other transactions, we noted at page 24 [page 1533] that they were closed out subsequent to the taxable years, and we did not make findings regarding the dates of the closing of those transactions. It seems evident that in MacRae, this Court did not find it to be a determinative or even a material factor that each transaction was closed three, four, or five years after it was begun, whatever were the facts. Here, with respect to each transaction, the fact that the duration was either 4 or 7 years, or more, does not contribute to, and is not determinative of, the finding and conclusion that there was no indebtedness incurred or owing by Rosenthal, and that the payments pursuant to each purported promissory note were not payments of interest on an existing indebtedness within the meaning of the applicable statute. Petitioner's point and argument about the length of time involved in each transaction has been considered, and comparisons have been made of these cases with the many others previously decided by this Court and other courts, but on the basis of all of the facts in each transaction here we *163 are unable to ascribe any particular or special weight and significance to the fact that a transaction extended over 4 or 7 years. In each instance, that fact is not helpful to petitioner in view of all of the facts of a transaction, and after taking into account an entire transaction. Furthermore, we think it is significant that in the MacRae case, which so closely resembles these cases, this Court did not find it material or of special significance that some of the transactions extended over a period of more than two years. We turn now to petitioner's general argument that the instant transactions should be recognized for tax purposes because petitioner allegedly entered into each one for the purpose and with the hope of realizing a profit from an "investment". It is noted first that those general contentions and arguments have been made largely as assertions, per se, without connecting the bare assertions with the evidence. The presentation of bare assertions, unsupported by facts, cannot be given much weight because such unsupported arguments beg the question in issue. The applicable statute requires that the taxpayer shall prove that he incurred an existing indebtedness and that *164 the payments for which interest deductions are claimed were in fact payments of interest on an existing indebtedness. Petitioner has failed in his arguments to recognize that in the long list of previously decided cases involving claims for deductions of alleged interest on indebtedness, the courts have applied at least two general tests to determine the deductibility of payments which were said to be payments of interest. In Rothschild v. United States, 407 F. 2d 404 (Ct. Cls. 1969), supra, Judge Skelton made a painstaking review of the decided cases in this area which provides guidance and assistance, in general, and particularly in considering petitioner's arguments here. It was noted in Rothschild, supra, pp. 406-407, as follows: One test is commonly called the "business purpose test." According to this, interest is not allowed to be deducted if no economic gain could be realized beyond a tax deduction. Another test, commonly known as the "sham test", is involved in determining whether there is a genuine indebtedness. Here, the courts examine the circumstances surrounding the transaction in order to determine whether the transaction is a sham. If so, then they find that absent *165 any substance to the transaction, there can be no finding of a genuine indebtedness. In Rothschild, pp. 407-408, the court pointed out that in the cases of Goodstein, Lynch, Broome, and Oritt (all supra), the court, in each case, looked through the form of the transaction "in order to determine the true substance", and where the court found that the transaction did not give rise to an actual indebtedness and there was no true obligation to pay interest, the alleged interest payments are not deductible under section 23(b), 1939 Code, or section 163(a), 1954 Code. The court, in Rothschild, also noted that in the cited cases, the court which decided the particular case looked to the substance of the transaction "without any regard for the tax consequences. Its only interest was to determine whether the transaction was a sham." In Rothschild, p. 408, the court observed that in the decided cases where the "business purpose test" was applied, those cases did not involve sham situations, but, instead, were concerned with transactions of substance, and dealt primarily with "the problem of whether or not interest [deduction] is to be allowed to a taxpayer in a transaction where he could realize *166 no economic gain apart from a tax deduction." We resume, now, our considerations of petitioner's arguments. Our first approach 1564 must be to consider whether any or all of the transactions in issue were sham transactions, i.e., whether the so-called "sham test" is to be applied, or the "business purpose test." On this point, the evidence considered as a whole compels us to apply the "sham test". Of course, it is true, as petitioner points out, that M. Eli Livingstone, a Boston broker and dealer, was not involved in any of the instant transactions. See Eli D. Goodstein, 30 T.C. 1178, 1179, supra. Nevertheless, in form, the transactions here were of the same general pattern and type as a so-called Livingstone-type transaction. In these cases, the proper test to be applied is, in our opinion, to look through the form of each transaction in order to determine the true substance. That test has been applied to each transaction; the Findings of Fact represent the application of that test, and we shall now discuss each transaction: In Transaction 1, in form, there was a sale to Rosenthal of $1,000,000 Land Bank bonds on February 11, 1953, according to a confirmation advice of Cantor, Fitzgerald. *167 There were directions to Gibraltar to "receive" the bonds and pay the charges to C-F. Jack Bernstein's testimony was given to explain the mechanics of this transaction due to his inability to produce, in response to respondent's subpoena, the confirmation advices of Irving Trust (or copies thereof) to Gibraltar which Irving Trust customarily issued as Gibraltar's clearance agent in receiving securities against payment for Gibraltar. Bernstein testified, and the record does not indicate that this testimony should not be regarded as correct, that in every transaction for the account of Rosenthal, namely those in issue here, including Transaction 1, two steps were followed on or about the same day; securities were purchased from a dealer and on or about the same day the same securities were sold back to the same or another dealer by Gibraltar, and that Irving Trust handled the receipt and the redelivery of the same securities for Gibraltar's account, charging the account for the securities received, and crediting the account with the proceeds of the sale thereof. Bernstein testified that this procedure was followed in the transaction involving the $1,000,000 Land Bank bonds. No money *168 was borrowed and none was involved. The immediate sale to a dealer covered the charges for the almost simultaneous purchase; the immediate sale nullified the purchase; the purchase and sale on or about the same day made the purchase a "wash-out". On September 5, 1957, less than 30 days before the maturity date of that issue of Land Bank bonds, the transaction was closed out on paper. At that time, Gibraltar and C-F simply reversed the process. Gibraltar made a purchase, evidently in its own name, of $1,000,000 Land Bank bonds of the same issue, due October 1, 1957, and then C-F sold those bonds on the same day. The respective clearance agents, Irving and Chemical, received and redelivered the bonds against payment, and the respective accounts of C-F (with Chemical) and of Gibraltar (with Irving) were debited and credited for a "purchase" from one dealer and a sale to another dealer, and no money was involved. Again, there was a purchase from a dealer of bonds, and an immediate selling back of them to the same or another dealer. This mechanics simply provided the appearance of a sale of bonds for Rosenthal's account and, also, the details for a bookkeeping credit thereto for the proceeds *169 of a purported sale of bonds for Rosenthal's account. In reality, however, the transaction did not involve any real Land Bank bonds; none were held and "pledged" with Gibraltar from February 11, 1953, to September 5, 1957; and no real money was involved. Land Bank bonds were not actually delivered either to Rosenthal or to Gibraltar for his benefit, and neither ever had physical possession of the bonds. No payment was made to C-F or to a dealer in bonds, for the bonds, by either Rosenthal, or C-F, or Gibraltar purportedly purchased for Rosenthal. No funds were advanced by C-F or Gibraltar to Rosenthal to purchase the bonds. Even though Rosenthal sent checks to Gibraltar, 1953-1955, totaling $97,777.56, in the guise of payments of interest, those payments could not constitute payments of interest on indebtedness because no funds were advanced and loaned to Rosenthal, or paid by Gibraltar or C-F to any dealer or anyone on his behalf. Neither Gibraltar nor C-F paid out $961,611.11 for Land Bank bonds; they did not get a loan of funds from a bank to advance to Irving Trust to make payment for bonds, and they did not borrow that sum from Irving Trust. Furthermore, Rosenthal did not make *170 periodic payments from his own funds of the amounts of the purported interest on his initial note to 1565 Gibraltar because in each instance Gibraltar refunded, paid back, or "loaned" him most of each periodic payment in the guise of making payments to him of a so-called "reserve" of $90,388.90, so that by September 15, 1955, Rosenthal had paid Gibraltar $7,388.66 rather than $97,777.56, for which he took deductions on his tax returns. Because there were not any Land Bank bonds, Gibraltar did not receive any coupon interest on bonds; it did not receive bond interest of $17,500 a year for 1953, 1954, and 1955, but nevertheless it credited Rosenthal's book account with that amount for 3 years, $52,500, so as to reduce the principal amount of the note from $1,052,000 to $999,500 which then became the amount of Rosenthal's so-called "renewal" note. The credits of $52,500 also performed the function of wiping out that much of the "reserve" of $90,388.90, which had been included in the principal amount of the first note. Then Gibraltar continued to make credits to Rosenthal's account in 1956 and 1957 purportedly for earned interest on Land Bank bonds totaling $26,250, and Gibraltar even *171 paid that sum to Rosenthal, and those payments to him constituted refunds to him of his cash payments in the guise of interest on his second note to Gibraltar so that his net payments were only $375.56, rather than $26,625.56. Finally, the book account was closed as of September 6, 1957, without any real sale of any actual bonds by a credit to a balance of "principal" due of $999,500, reduced by 5 cents to $999,499.95, of an amount which would have been realized on the market if any real bonds had been sold, namely, $997,937.50, and there was an additional credit (for purported accrued bond interest at September 5, 1957) of $3.79, or a sum of credits of $997,941.29. Those book credits left a balance "owing" by Rosenthal of $1,558.66 which he paid to Gibraltar. The entire transaction in Land Bank bonds was merely a paper transaction which, therefore, did not result in any indebtedness on the part of Rosenthal to Gibraltar. He did not incur an indebtedness of $1,052,000 to Gibraltar or any other party. His checks to Gibraltar, in the guise of interest on his two notes, totaling $124,403.12 (before refunds) therefore did not constitute "compensation for the use or forbearance of money". *172 Also, Gibraltar's charges on the books in Rosenthal's account for purported "interest", totaling $131,934.05 (which were credited for petitioner's cash payments of $124,403.12, plus the credit on September 6, 1957, of $7,530.93 for so-called accrued bond interest) were not charges "for the use of forbearance of money". The transaction was a sham, apart from the tax aspects, and therefore cannot be recognized as the basis for the claimed interest deductions aggregating $131,934.05 during the years 1953-1957. The claimed interest deductions in each of those years are not allowable under section 23(b), 1939 Code, and section 163(a), 1954 Code. Moreover, no real capital gain was realized by Rosenthal. Only on paper was there a capital gain of $42,937.50. Rosenthal did not receive such gain; none was paid to him. Instead, at the end of the paper transaction in 1957, his book account showed a balance of $1,558.66, which he paid to Gibraltar to close the book account. The paper transaction cost petitioner $9,322.88, which represented a fee, which he paid to Gibraltar, for its accounting and paper-work services but not for the "use or forbearance of money". That was a fee for expected tax *173 deductions. The same kind of observations apply to transactions 2, 3, and 4. The mechanics and form employed in each of those transactions were even more obvious than in Transaction 1. On February 26, 1954, $100,000 Treasury bonds were purchased from Faroll. On the same day, the same bonds were sold back to a dealer, Childs. In substance and reality, the transaction did not involve any real Treasury bonds or any real money. The transaction was closed on September 15, 1961, by Gibraltar's bookkeeping credit of $100,000. As the Findings of Fact show, and we need not repeat them, Transaction 2 did not result in any indebtedness owing by petitioner. His checks to Gibraltar, and Gibraltar's charges on its books, therefore, did not constitute either charges or "compensation for the use or forbearance of money". Gibraltar's charges and petitioner's payments in the guise of interest aggregating $21,111.11 were not payments for interest on indebtedness. The claimed interest deductions under Transaction 2 for the years 1954-1958 are not allowable. In Transaction 3, $100,000 Treasury bonds were purchased from the dealer, Faroll, with the closing date of March 1, 1954. On the same date, the same *174 bonds were sold back to another dealer, Devine. The entire transaction was closed out on Gibraltar's books, on paper, on September 1566 14, 1961, by Gibraltar's books, on paper, on September 14, 1961, by Gibraltar's credit of $100,000 to petitioner's account. In reality and substance, Transaction 3 did not involve any real Treasury bonds or any real money, and it did not result in any indebtedness owing by Rosenthal. Thus, Gibraltar's charges for "interest" and petitioner's payments to Gibraltar in the guise of "interest" did not constitute charges and "compensation for the use or forbearance of money". Therefore, the claimed deductions for the years 1954-1958, aggregating $21,088.15, are not allowable because they were not payments of interest on indebtedness. In Transaction 4, in form, $750,000 Treasury notes were purchased from the dealer, Faroll, on December 23, 1955. On the same day, the same securities were sold back to a dealer, Ehlenberger. The transaction was closed on Gibraltar's books on April 1, 1960, by Gibraltar's credit to the account of petitioner of $750,000. In reality and substance, the transaction did not involve any real Treasury notes or any real money. Transaction *175 4 did not result in any indebtedness owing by Rosenthal to Gibraltar. Thus, Gibraltar's charges for "interest" and petitioner's payments to Gibraltar in the guise of "interest" did not constitute charges and "compensation for the use or forbearance of money." Therefore, the claimed deductions for the years 1955-1960, for purported "interest" charges by Gibraltar aggregating $73,374.88 (exclusive of $7,723.67 charged by CHK) are not allowable because they were not payments of interest on indebtedness. In Transaction 4, there was an additional step involving an advance to petitioner of $37,500 by CHK on December 23, 1955. There is a separate question to be decided involving this step. Petitioner paid to CHK, as prepaid "interest" for 4 years and 3 months, on December 23, 1955, $7,723.67, pursuant to a promissory note which he gave to CHK. Respondent had the burden of proving (rather than the petitioner) that there was not any indebtedness owing by petitioner to CHK and that the payment of $7,723.67 was not a payment of "compensation for the use or forbearance of money." Respondent made the claim in his pleadings that no deduction was allowable for $7,723.67; he had not made that determination *176 in his statutory notice of deficiency. Petitioner argues that respondent failed to introduce any evidence about this particular matter, and that he failed in his burden of proof. It is held that respondent carried and discharged his burden of proof. He introduced the testimony of a former bookkeeper employed by Gibraltar, Betty Young, and bookkeeping records of Gibraltar. There are set forth in the Findings of Fact the facts established by respondent's evidence and proof. They need not be repeated in detail. The evidence establishes that on December 23, 1955, Gibraltar advanced funds to CHK, as a "loan" to CHK, and that in a loan account on Gibraltar's books in the name of CHK (a partnership closely related to Cantor, Fitzgerald) there were debit entries aggregating the total sum advanced to CHK, $106,250; and that the debit entries were for the component parts of the total sum which showed the payees of those component amounts, respectively; and that one of the subsidiary debit entries was in the amount of $37,500 payable to Rosenthal. The evidence shows, also, that on December 23, 1955, Rosenthal wrote checks for disbursements totaling $38,622.89, which included a payment to Gibraltar *177 of $25,301.11, in the guise of payment of interest to Gibraltar, as well as a payment to Faroll, which in reality was for the account of Gibraltar with respect to Gibraltar's instructiions to Irving Trust. Rosenthal's disbursements included, too, payment of $7,723.67 to CHK, in the guise of a payment of "interest". Absent evidence to the contrary (which petitioner had the opportunity to introduce in rebuttal to respondent's evidence), the reasonable inference to be made from all of respondent's evidence is that CHK, in turn, paid back to Gibraltar the $7,723.67. Thus, there was merely a financial round robin on December 23, 1955, consisting of a transfer by Gibraltar to Rosenthal of $37,500, through CHK as a conduit, and transfers back to Gibraltar of $38,622.89, directly and indirectly. The transfer of $37,500 to Rosenthal created the appearance of a "loan", and of a basis for a charge for "interest", and of the appearance of prepayment of "interest" of $7,723.67. The payment of $37,500 to Rosenthal was for one day. He paid it back to or for the benefit of Gibraltar on the same day. Therefore, he did not become indebted for that amount, and the momentary advance of cash to him was, *178 again, a paper transaction for the purpose of providing the semblance of a loan and a prepayment of interest 1567 of $7,723.67. Broome v. United States, 170 F. Supp. 613, supra. Moreover, the clear inference from all of the evidence is that the advance of $37,500 to petitioner was part of Transaction 4 with Gibraltar; and that the advance of $37,500, and the transfer back of that amount on the same day was in substance the same as a cash "reserve" to be advanced by Gibraltar, as was done in transactions 1, 2, and 3. The item of $37,500 was closed out on Gibraltar's books in May 1960 by a credit of $37,500 in the account with CHK to the subsidiary charge under the name of Rosenthal. There was another round robin of $37,500 from Gibraltar to Rosenthal, Rosenthal to CHK, and CHK to Gibraltar, which originated in Gibraltar's credit of $750,000 in the account of Rosenthal on its books on April 1, 1960. The item of $37,500 was part of the entire paper transaction. As between Rosenthal and CHK, on December 23, 1955, in substance and reality $37,500 was not loaned to Rosenthal and his note to CHK was not evidence of an indebtedness by Rosenthal, payable to CHK on April 1, 1960. Although *179 there was a transfer of that amount of cash through CHK, as a conduit, to Rosenthal, Rosenthal acted as a conduit, also, in immediately disbursing the $37,500 on the same day back to Gibraltar and for its benefit. The $7,723.67, therefore, was not "compensation for the use or forebearance of money", and a deduction is not allowable in that amount because it was not a payment of interest on indebtedness. Each one of the four transactions here, including the CHK transaction in Transaction 4, is practically identical to the type of transaction in the long line of cases where the "sham test" was applied, Oritt, Broome, Goodstein, MacRae, Rubin, and Nichols, all cited hereinbefore. Cantor, Fitzgerald and Gibraltar adopted, in general, the form of the Livingstone-type arrangements. In affirming this Court in Perry A. Nichols, 37 T.C. 772, supra, the Court of Appeals for the Fifth Circuit, 314 F. 2d 337, supra, said: The trouble with the plan was that it was a complete and total sham, utterly lacking in substance. * * * Although the taxpayers signed notes and paid interest, they could not under any theory be held as indebted under the facts as they appear. Oritt v. United States, 357 F. 2d 692, *180 supra, presents a clear and succinct analysis of a transaction which was closely similar to the form of each one of the transactions here. See, also, Jockmus v. United States, 335 F. 2d 23, supra. The transactions here did not involve any borrowing of funds by Gibraltar or Rosenthal from another party, such as a bank, with delivery of securities to the bank or its agent to secure such bank loan. See, for example, Rothschild v. United States, supra, where there was a loan of $1,500,000 by the Mellon National Bank and Trust Company to which the taxpayer gave his full recourse promissory note, and Treasury notes were sent to the New York correspondent of the lending bank to be held as collateral for the promissory note. The taxpayer prepaid $60,135.42 interest on his note to the lending bank. About seven months later, the bank redeemed the Treasury notes, on their maturity date, August 15, 1956, and applied the proceeds in satisfaction of the loan. There were two other similar transactions. The issue was whether interest deductions were allowable. The Court of Claims held, p. 408, that the transactions were not sham transtions as there was substance to them; money was borrowed and the *181 taxpayer was personally liable on his notes. Securities were purchased, with the borrowed funds, and were pledged to secure the notes. The court held that each transaction "was real and legal in all respects", p. 408, and that the "sham test" should not be applied. The court applied the "business purpose test", and the following explanation was given, p. 408: We turn now to the "business purpose test cases." Obviously, these cases do not involve sham situations, but are concerned with transactions of substance that are legal and binding on the parties. They deal primarily with the problem of whether or not interest is to be allowed to a taxpayer in a transaction where he could realize no economic gain apart from a tax deduction. * * * Some of the cases emphasize the motive of the taxpayer and hold that where there is no business purpose except to gain a tax deduction, the interest is not deductible. Other decisions say that if the transaction is a scheme to avoid taxes, it is a sham even though a legal undertaking, and the interest cannot be deducted. Still other cases say the motives or purposes of the taxpayer are immaterial and the interest deduction will be allowed if there is *182 a genuine indebtedness. Some of the courts hold that the deduction will be disallowed if the transaction does not appreciably 1568 affect the beneficial interest of the taxpayer, apart from taxes; * * *. After reviewing the reasoning in Gregory v. Helvering, 293 U.S. 465, supra; Knetsch v United States, supra; Diggs v. Commissioner, 281 F. 2d 326, certiorari denied 364 U.S. 908; Max Barnett, supra; Lifschultz, supra; and other cases, the court concluded in Rothschild, p. 417, that the claimed interest deduction was not allowable because the transaction could not "appreciably affect his benficial interest except to reduce his tax. There was no way he could have made a profit except for the tax deduction. * * * He meets none of the other tests suggested to sustain a proper interest deduction." In our view, the court's review, Rothschild, of the long line of cases dealing with the interest deduction cases provides a needed clarification of the distinction to be made between a transaction which is a sham, that is merely a paper transaction, and other kinds of transactions where, as part of an over-all plan, there are actual purchases of securities with funds which actually were loaned *183 to purchase securities. The petitioner, in these cases, does not admit that each one of the transactions here, including the one with CHK, was merely a paper transaction and a sham. However, petitioner has failed to overcome the evidence introduced by respondent (over his objections) which clearly establishes that each one of the transactions in issue was a sham. Moreover, petitioner, under his burden of proof, failed to establish that in substance and reality there were actual and real loans of funds and that Government securities were involved. Upon all of the evidence relating to each transaction, the findings are made that all of the transactions were merely paper transactions, therefore shams; that no real money was borrowed, loaned, or involved, and therefore that there were no indebtednesses owing by petitioner; that in each transaction no securities were involved, and that there were not any "short sales", even, of securities. It follows from those findings that no interest deductions are allowable. If it has not been clear to petitioner that where a transaction is a sham, no interest deduction is allowable, the extensive review of a long line of cases in Rothschild may clarify *184 the confused approach in petitioner's brief. "It is clear from the foregoing cases and the statute that where a transaction is a sham, the interest deduction is denied to the taxpayer." Rothschild, supra, p. 417. We are not called upon, therefore, to consider petitioner's arguments, which would be in point if these transactions had not been shams, to the effect that he had purposes other than the hope to reduce his taxes in entering into each transaction, such as a purpose to realize a profit. Neither need we consider another contention, with which we do not agree, however, that in each transaction there was a risk of loss from market fluctuations, apart from the loss which was built into each transaction. Such arguments are of no avail to petitioner because each transaction was a sham. Therefore, no deductions are allowable for the purported "interest" payments. See Knetsch; Lewis v. Commissioner, 328 F. 2d 634, supra; and Nichols, supra. Petitioner mistakenly relies upon L. Lee Stanton, supra, as has been noted above. In addition to our own observation about Stanton, references are now made to Rothschild, p. 412, and Oritt, supra, where the court distinguished Stanton, as we do *185 here. We should note, further, petitioner's contention that he should prevail under the reasoning of Maysteel Products, Inc. v. Commissioner, supra, and Fabreeka Products Co., supra, to which references have been made hereinbefore. Petitioner's citations of those cases are part of his argument, which in effect is, that none of the transactions here was a sham, and that in each one he had a motive and possibility of making a profit (or did allegedly make a profit). In Rothschild, p. 412, the court considered Maysteel and Fabreeka in connection with "the business purpose test" cases, which, of course, do not apply here because these were sham transactions, and noted that in those cases "the taxpayer had a possibility or opportunity to make a profit on the transaction * * *, apart from the tax deduction." Maysteel and Fabreeka are distinguishable from these transactions, which were shams, and do not apply. The courts said the motives of the taxpayers were immaterial and allowed the tax deductions on the grounds that the taxpayers on buying the bonds had all the rights of ownership, including the possibility of making a profit * * * or the chance of losing money if their market declined." *186 (p. 413, Rothschild; italics added.) In the transactions here, Rosenthal did not in substance and in fact buy any securities; none were in fact involved. 1569 Petitioner contends that evidence about Gibraltar's procedures in all of the transactions is immaterial and inadmissible, and continuing objections to the receipt of such subject matter into evidence were made during the trial. He argues that the admission of such evidence relating to Gibraltar's dealings with others, called "third parties", such as the dealers in Government securities and the clearance agents, is prejudicial as well as immaterial. He argues that he did not participate in or know of Gibraltar's procedures, that he was not consulted about and did not ratify them. He objects to any findings of fact about the activities of Gibraltar and of any "third parties" involved in Gibraltar's procedures, in which he did not participate. He also argues that he made actual purchases of all of the Government securities referred to in his promissory notes to Gibraltar; that his promissory notes to Gibraltar were valid and enforceable obligations under the laws of California and New York; that he had title to the securities which, *187 in the notes, were said to be "pledged" with Gibraltar; and that by the terms of his promissory notes, Gibraltar was obligated to "return" the "pledged" securities or collateral of like kind. Petitioner asserts that neither he, nor anyone acting on his behalf, ever was informed beforehand about what Gibraltar did with the "pledged" securities, and that he, and no one for him, ever consented or afterward ratified Gibraltar's procedures and usages of the "collateral." He relies upon the fact that throughout each transaction Gibraltar sent statements to him regarding the status of his accounts, all of which indicated to petitioner that in each transaction Gibraltar held the government securities for him. He contends that what Gibraltar did should not affect petitioner's "right to the deductions." Petitioner's arguments stress the forms of the transactions and are focused on the fact that he executed documents which purported to be promissory notes. Other taxpayers have advanced the same arguments unsuccessfully and there is not any evidence in these cases, and there was nothing in the transactions themselves, which distinguish these cases from those where the same arguments were made *188 but were not of any avail. See Lynch v. Commissioner, 273 F. 2d 867, 872, supra; and Nichols v. Commissioner, 314 F. 2d 337, 338 affirming 37 T.C. 772, supra. In Nichols, p. 790, this Court rejected the same contention that the taxpayers' notes "were a valid indebtedness under Florida law," and were evidence of valid indebtedness. We said that the transactions were a sham and that "a sham remains a sham whether or not under seal." In affirming this Court, the Court of Appeals for the Fifth Circuit, Nichols, supra, p. 338, was even more forthright. In the Nichols case, Eli Livingstone dealt with the taxpayers, and a corporation, Corporate Finance, the president of which, Harry Cushing, was a former law associate of Livingstone, was the "third Party" which was used by Livingstone. The taxpayers signed and delivered "promissory notes under seal" payable to Corporate Finance. This Court referred to the notes in its findings, p. 777, as "documents purporting to be promissory notes under seal." The Court of Appeals stated the following: * * * The trouble with the plan was that it was a complete and total sham, utterly lacking in substance. The sine qua non of the plan was the purchase of *189 securities which were, in turn, to secure the debt. They were purchased, but simultaneously sold. Although taxpayers signed notes and paid interest, they could not under any theory be held as indebted under the facts as they appear. * * * Taxpayers contend that these cases are distinguishable because they acted in good faith, intending that the transactions be bona fide, * * *. The fact is that the corporation which acted for and at the instance of Livingstone as the necessary third party required to perpetrate the fraud represented to taxpayers in writing, after the short sale, in effect that it had Treasury Notes bearing specified numbers in its possession for the account of taxpayers. This representation was as false and fraudulent as the balance of the scheme. Nevertheless we are concerned with what was done, not why it was done. United States v. General Geophysical Co., 5 Cir., 1962, 296 F. 2d 86, cert. den., 369 U.S. 849, 82 S. Ct. 932, 8 L. Ed. 2d 8. The intent of the taxpayers and their good faith is not involved. There was no substance to the transaction. It was a sham from beginning to end. The same can be said here, because the 4 transactions here were closely similar *190 to the transactions in Nichols. In these transactions Gerald Cantor and Cantor, Fitzgerald acted in very much the same way as Livingstone did in the Nichols transactions, and 1570 Gibraltar and CHK were used, and could be used, by Cantor to carry out the transactions just as Corporate Finance was used in the Nichols transactions. It is immaterial whether Rosenthal believed, or was told, that each one of his transactions involved an actual, real, and bona fide purchase of Government securities, which were to be and were held for his account by Gibraltar; that he was told, or believed, that he had incurred real indebtednesses for such alleged purchases; that he was let to believe by Gibraltar that such purchases of securities had actually been made for him, and that the alleged securities were being held for him; or that he believed that the documents he signed actually were bona fide and real promissory notes which were evidence of actual and real indebtedness. It should be remembered that all of the purported promissory notes payable to Gibraltar were provided and filled in by Gibraltar, on its own printed forms, and were simply given to Rosenthal to sign. The promissory notes were *191 a chief and integral part of each plan, transaction, or scheme. They were not promissory notes of an unrelated and disinterested lending institution, such as a bank, which had no connection with Gerald Cantor or Cantor, Fitzgerald. We are able to be equally forthright, as was the Court of Appeals for the Fifth Circuit, upon the basis of all of the evidence in these cases, and it can be said with the same force here, that Gibraltar (and CHK in one instance) acted for and at the instance of Gerald Cantor and Cantor, Fitzgerald, "as the necessary third party required to perpetrate the fraud represented to" Rosenthal, to the effect that in each transaction, plan, or scheme, the Government securities described in each purported promissory note payable to Gibraltar had been purchased, were held, paid coupon interest, and finally were "sold" to produce capital gain, whereas none of such representations to Rosenthal were true. Such representations to Rosenthal were "as false and fraudulent as the balance of" each scheme and alleged transaction. But the intent of Rosenthal and his good faith are not involved. The ultimate questions here, whether deductions are allowable for the purported "interest" *192 payments under the applicable interest deduction provision of the Code, must be decided upon the evidence showing what was done, and not why it was done. There was no substance to each transaction, including the one with CHK, and all of the transactions were shams from beginning to end. The rule has been stated in Lynch v. Commissioner, 273 F. 2d 867, 872, supra, where the Court of Appeals for the Second Circuit held that no effect could be given to the taxpayers' contentions that they "did not know of the round-robin nature of the transaction and believed they were incurring a debt to Gail." The court said: Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers. Beyond this, it would strain credulity to the breaking point to suppose that taxpayers had no inkling that something highly unusual was going on. (Italics added) There is a large quantity of proof in the record in these cases about "the objective facts" in all of the transactions here. It covers and explains the steps followed by Gibraltar (and CHK) in all of these paper transactions. That *193 evidence was received over petitioner's continuing objections on the ground of materiality and admissibility. On brief, petitioner argues that all of the evidence about the procedures, mechanics, and steps of so-called "third parties", Gibraltar, dealers, and clearance agents, should not be considered or given any weight because it is immaterial, prejudicial, and inadmissible. In support thereof, petitioner cites Niederkrome v. Commissioner, 266 F. 2d 238 (C.A. 9, 1959); Oregon and C.R. and Company v. Grubissich, 206 F. 577 (C.A. 9, 1913); and United States v. Feinberg, 140 F. 2d 592 (C.A. 2, 1944), but his reliance on those cases is misplaced as they do not apply here because on their particular facts they are distinguishable. Petitioner admits that respondent's evidence, which includes a great many documents, shows facts, procedures, and records which, per se, are true and show the procedures and steps which were followed by Gibraltar, clearance agents, dealers, and others. He stipulated with respondent that the exhibits which respondent intended to and did offer into evidence were in themselves true, but he strongly objected to the receipt thereof into evidence on the ground of *194 materiality. Therefore, his objections are not directed at the authenticity of respondent's documentary and other evidence but, only to the materiality. Our opinion at the trial was, and it still is, that respondent's evidence is relevant, material, and 1571 admissible. That evidence was received into evidence because it is material in establishing the objective facts, the facts about what was done by Gibraltar, Cantor, Fitzgerald, CHK, Irving Trust, Devine, Childs, Ehlenberger, and all of the parties who participated in the intra mural procedures and mechanics employed and utilized by Gibraltar, CHK, and Cantor, Fitzgerald. The provisions of section 23(b), 1939 Code, and section 163(a), 1954 Code, do not depend upon intent. Rather, they specify and require that there must be an existing indebtedness in order that a deduction can be allowed as a payment of interest on indebtedness. The respondent disallowed deductions for the claimed "interest" payments. His determinations were prima facie correct and petitioner had the burden of proving, (except in the instance of the payment in 1953 to CHK of purported "interest" with respect to which respondent had the burden of proof due to his *195 affirmative allegation in his pleadings) that the payments in issue were in fact payments for the use or forbearance of money, hence interest on actual indebtedness. Max Barnett, supra, p. 276. In spite of petitioner's burden of proof, respondent subpoenaed and offered the evidence relating to Gibraltar's procedures and mechanics for the purpose of proving the objective facts about whether there were or were not securities purchased and held for petitioner; whether there were or were not actual, real, and bona fide indebtedness owing by petitioner to Gibraltar (and to CHK); whether there was or was not substance to each transaction, as opposed to form; and whether each transaction was or was not merely a paper transaction and a sham from beginning to end. Respondent, therefore, offered evidence in support of his determinations. Petitioner failed to refute respondent's evidence, and he did not show that it was incorrect, immaterial, or inadmissible. Petitioner argues that he has a "right" to the claimed deductions for interest but he does not have any prima facie "right" to the claimed deductions, and there is no statutory presumption with respect to such alleged "right". Rather, he *196 had the burden of proving and establishing that the payments to Gibraltar were in reality and substance payments for the use or forbearance of money; that there were in substance and reality indebtednesses owing by him to Gibraltar and CHK. He failed to meet his burden of proof. If we were to approve petitioner's contention that evidence relating to the substance of the transactions is not admissible and material; that is, evidence about what Gibraltar actually did or did not do in the alleged lending of funds to petitioner, and in the purported buying of securities for his account, the condition prescribed in sections 23(b) and 163(a), that there must be an existing indebtedness, would be defeated and nullified. After the Court of Appeals for the Ninth Circuit decided the Grubissich and Niederkrome cases, it decided MacRae v. Commissioner, 294 F. 2d 56, supra, in which it cited with approval the ruling in Lynch relating to the relevancy of the objective facts, quoted above, in connection with the same question as is present here. Hence, it is clear that the cases relied upon by petitioner are not applicable to the transactions here in issue. In Perry A. Nichols, supra, this Court *197 applied the rule of Lynch that the objective realities are controlling of the claim for interest deductions, and under closely similar facts we held, as we do in these cases, that regardless of what petitioner may have intended, believed, or expected, there can be no interest deductions under the statute, and the "good faith" of petitioner is irrelevant. In Goodstein v. Commissioner, supra, the court observed, about similar transactions and facts, that although the transactions [between the taxpayer and Seaboard] seemed to have created a "legal relationship between the taxpayer and Seaboard", "it was not one of borrower and lender", but was "the exchange of promises of future performances between the taxpayer and Seaboard." In these cases, the purported promissory notes to Gibraltar, executed by petitioner, must be considered within the entire transaction, in each instance. Even though in form each promissory note was in conformity with legal requirements, nevertheless since in reality no funds were loaned to petitioner, and no securities were purchased, the promissory notes in themselves were without substance as evidence of existing indebtedness, and in and of themselves the promissory *198 notes did not create an existing relationship of borrower and lender. There was not real consideration for each purported promissory note. Income from the transactions: Our findings and conclusions are that each transaction was a sham; no Government securities were in fact purchased by or for Rosenthal and held for him, or "pledged" to secure his notes; some "sales" for petitioner's account to Gibraltar, at the end, were made solely 1572 by bookkeeping entries; no coupon interest from any Government securities was in reality received by or due to petitioner; and no income from coupon interest or capital gain was realized by petitioner. Respondent has agreed that under Rule 50 there will be eliminated from taxable income the capital gains and coupon interest reported on the returns filed by petitioner (for himself and for his former spouse). However, there is one strange exception to this general matter: In transaction 4, which ended April 1, 1960, Gibraltar paid from its own funds the net amount of $1,428.34. That item was not a gift by Gibraltar, and under the particular facts about the advance of $37,500 through CHK, as set forth in the findings, petitioner realized $1,428.34 taxable *199 income. In the Rule 50 recomputation, that amount shall be included, or left in, petitioner's 1960 taxable income. The findings and ultimate findings explain this item and no further comment is necessary, except to note that this item was a net cash receipts item, received by petitioner in 1956 (but not includable in income until 1960 when the entire transaction (4) ended). It is only a coincidence, in figures, that there was a "net economic gain" to petitioner in transaction 4 in the identical amount, $1,428.34, and our holding above on a different basis and for different reasons that petitioner realized income of $1,428.34 does not mean that the above amount constituted taxable income because there was a "net economic gain" in the same amount, (see p. 68, supra). Instead, our holding about this particular item results from the simpler fact that petitioner reported income on a cash basis. As is set forth on page 62, supra, petitioner used $1,122.89 of his own funds in making several disbursements on December 23, 1955; and it is stated on p. 65, supra, that on April 1, 1956, Gibraltar made a cash payment to him (in the guise of Treasury note coupon interest) which was $2,551.23 more *200 than petitioner paid to Gibraltar in the guise of a payment of "interest" on his promissory note; so that petitioner got back his $1,122.89, and he also received $1,428.34 from Gibraltar which was not a refund of any money previously paid out by petitioner. It is also shown on page 65, supra, that after April 1, 1956, the checks which Gibraltar and Rosenthal exchanged were always in the same amount, $5,625; and it is shown on page 66, supra, that the last item of $5,625 charged to petitioner was off-set by a bookkeeping credit in the same amount. Therefore, it is clear from the facts about the exchanges of checks between Gibraltar and petitioner that on April 1, 1956, petitioner realized taxable income, because it was cash income, of $1,428.34. That item would be income for 1956 but for the established rule, in this type of scheme, that the year in which taxable income, if any, is realized is the year in which the "transaction" is closed. See the comment in Lynch v. Commissioner, supra, p. 872. It is simply an odd fact that even though transaction 4 was a sham, and even though in general petitioner did not realize any coupon-interest-income from the Treasury notes (which he reported *201 as income on the tax returns), nevertheless, Gibraltar managed to make a cash payment to petitioner out of its own funds in 1956, in a running account with petitioner, of $1,428.34 which was taxable income to petitioner. That amount was taxable income in 1956. If under the peculiar circumstances here, that amount should be left in taxable income for 1956, we leave it to the parties to so agree under Rule 50. Or they may agree under Rule 50 to follow the rule that 1960 is the correct year for which to "pick up" that item because transaction 4 ended in 1960. Whether the item properly is to be picked up in taxable income in 1956 or 1960 is de minimis in this case, in any event, and we leave this item to the parties to agree upon under Rule 50. We now turn to the matter of whether Rosenthal, an experienced lawyer, who seems to be acquainted with tax matters (see MacRae v. Commissioner, 294 F. 2d 56, 57, supra, where he is shown as one of the taxpayers' attorneys), can be believed to have been totally unaware of Gerald Cantor's actual doings. For example, in Perry A. Nichols, 37 T.C. 772, 789-790, supra, this Court expressed a doubt (on the basis of the record in Nichols, of course) about *202 the assertion of complete innocence of the taxpayers there. We are not inclined to give Rosenthal credit for total innocence about the transactions involving Gibraltar and CHK. The evidence is that Gerald Cantor arranged every transaction in issue here, and that Rosenthal was acquainted with Cantor. In each transaction, the due date of Rosenthal's promissory note was the same, or 1573 close to, the maturity date of the particular Government securities which purportedly were "pledged" to secure his promissory note, so that the credit to him for the terminating "sale" by him of the "pledged" securities was bound to be for or close to the par value thereof. Rosenthal has admitted that he discussed with Gerald Cantor the rate of "interest" to be charged by Gibraltar in each of his promissory notes (see page 7-(a), supra). The plan of each transaction was such that the end-result could be determined with complete or nearly complete accuracy at the time each transaction was commenced. That clearly was so in transactions 2, 3, and 4. Furthermore, the arrangement whereby Gibraltar and Rosenthal exchanged checks for "interest" in each transaction, so that Rosenthal received back almost all *203 of his payments of note "interest" to Gibraltar, was so unusual by ordinary, business standards, that it is a strain upon credulity to be asked to believe that Rosenthal was totally unaware of the unusual aspects of all of the transactions. In transaction 1, he purportedly paid note-interest totaling $131,934.05, which was the sum of his tax deductions, but he actually parted with only $7,764.22, in cash, after receiving cash and credits from Gibraltar. The same pattern was present in the other three transactions; transaction 2, note "interest" paid, $21,111.11 (also deducted), and net cash paid by Rosenthal, after refunds, $3,751.65; transaction 3, note "interest" paid and deducted $21,088.15, and net cash paid by petitioner after refunds, $3,876.56; transaction 4, "interest" on notes paid and deducted $81,098.55, and no net cash paid by petitioner after refunds, but a receipt from Gibraltar (taxable income, supra), of $1,428.34. We think a realistic view of the circumstances here, on the basis of the entire evidence here, is and must be that Rosenthal had reason to know that the 4 transactions were not what they were purported to be, even though he did not have any actual knowledge *204 of Gerald Cantor's actual and true maneuvers and Gibraltar's actual mechanics and procedures, and "it would strain credulity to the breaking point to suppose that taxpayers [Rosenthal] had no inkling that something highly unusual was going on." Lynch v. Commissioner, supra, p. 1188. In Perry A. Nichols, supra, p. 790, in considering a similar claim of innocence by the taxpayers, it was observed that there is a difference between genuine reliance upon another person's assurances and indifference about the other person's procedures. Assuming that Rosenthal did not have any actual knowledge of gerald Cantor's and Gibraltar's procedures throughout each transaction, his acceptance of the form of each transaction and Cantor's assurances were realistically, a means of isolating himself from the realities of each transaction, whatever they might be. Rosenthal, during the years 1953, 1954, and 1955, signed promissory notes payable to Gibraltar, and a note to CHK, in the total face amount of $2,012,000, in the four transactions which purported to involve the outright "purchase" of Government securities in the total face amount of $1,950,000 which, upon maturity, would be redeemed for the face *205 amount of $1,950,000, or $62,000 less than the principal amount of his promissory notes. The Government securities purportedly were "purchased" for a total "cost" of $1,855,138.09. Rosenthal executed promissory notes ($2,012,000) in a total amount which was $156,861.91 more than the purported "cost" of the securities allegedly purchased, as follows: Transaction
PromissoryNotes
"Cost" ofSecurities
1
$1,052,000.00
$ 961,611.11
2
105,000.00
87,640.54
3
105,000.00
87,788.33
4
712,500.00
718,098.11
37,500.00 (CHK)
Total
$2,012,000.00
$1,855,138.09 The coupon interest purportedly to be paid on the Government securities which allegedly were "purchased" was less, in each instance, than the "interest" Rosenthal was to pay on his several promissory notes (and for some of the time no coupon interest was to be involved because of detached coupons). There is no evidence that Rosenthal acted in any respect as "purchaser" who intended to, or would, or could, "sell" the Govenment securities prior to the maturity dates of his promissory notes, and before the maturity dates of the Government securities, if market prices went above 100 (or par); and the evidence as a whole shows that there was an intention to continue *206 each transaction until the due date of each promissory note of Rosenthal, and no intention of calling upon Gibraltar to make a delivery to Rosenthal of any of the purportedly purchased Government securities. Under all of the circumstances, in each transaction, Rosenthal must be considered to have been at least indifferent, if not an 1574 outright willing participant in Gerald Cantor's and Gibraltar's shams. There is a lengthy argument of petitioner relating to the possibility of "arbitrary discrimination" against himself by the respondent in his determinations whereby he disallowed the claimed deductions for payments that were made ostensibly as payments of "interest". Petitioner refers to the rules that tax laws will not be administered so as to discriminate in favor of, or adversely to, some taxpayers, and that the tax statutes must be administered so as to afford a mationally uniform application. He cites Helvering v. Taylor, 293 U.S. 507, 514, where it was noted that if the respondent makes an arbitrary determination, then it should be set aside. These arguments of petitioner are directed at this Court's denial of motions to take depositions, prior to the trial of these cases, *207 of the highest administrative officials of the Internal Revenue Service, including the then Commissioner of Internal Revenue, the then Chief Counsel and Associate Chief Counsel, and the Custodian of Records, in order to determine facts relating to the treatment by the Internal Revenue Service of taxpayers who were "situated similarly" to the petitioner. The arguments are directed, also, to the action taken by this Court in granting respondent's motion to quash certain subpoenas duces tecum which petitioner obtained and served on the above-described officials of the Internal Revenue Service. Those subpoenas, among other things, broadly asked for every document, record, and file of the Internal Revenue Service "of all taxpayers who ever paid interest to a lender on a loan secured by United States Government Notes or Bonds, the deduction of which was questioned by the Internal Revenue Service." An earlier order of the United States Tax Court quashing earlier subpoenas duces tecum was upheld in MacRae v. Riddell, 350 F. 2d 291 (C.A. 9, 1965), affirming, 234 F. Supp. 105, cert. den. in Melcher v. Riddell, 382 U.S. 977 (1966). It has been petitioner's position, impliedly at least, that *208 the respondent's determinations disallowing the claimed deductions for "interest" in these cases were arbitrary and discriminatory determinations, which denied to him equal treatment by the respondent, such as had been given to other taxpayers, and he has argued that it was error for the Tax Court to grant respondent's motion to quash the subpoenas duces tecum, and to deny petitioner's motions to take depositions of the above-described officials of the Internal Revenue Service. Consideration was given to all of those matters, and it has been given to petitioner's arguments on brief relating to them. It is noted that the now very long list of cases decided before now, involving the same determinations of the respondent, disalllowing deductions to other taxpayers, for purported "interest" payments by other taxpayers, who became engaged in Living-stone-type transactions, and in transactions involving Gibraltar, and other companies which performed the same or similar functions as Gibraltar, attest to the fact that the respondent did not act arbitrarily in making the determinations in issue here, and that many other taxpayers who weree in the same or similar "situations" as the petitioner *209 was in here received the same "treatment" as did the petitioner, from which these cases arose. It has been said often that each tax case must stand upon its own facts. Similar arguments by other taxpayers, to the effect that "the doctrine of equality of treatment" requires the allowance to them of certain claimed deductions, have been rejected by many courts, as well as similar contentions that they have received "prejudicial discrimination". The courts have regarded such contentions as lacking in merit, and have rejected them. Cf., Weller v. Commissioner, 270 F. 2d 294 (C.A. 3, 1959), supra; Knetsch v. United States, 348 F. 2d 932, 940-941; Gerstell v. Commissioner, 319 F. 2d 131 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court; Minchin v. Commissioner, 335 F. 2d 30 (C.A. 2, 1964); and Dixon v. United States, 381 U.S. 68 (1965); Carpenter v. Commissioner, 322 F. 2d 733 (C.A. 3, 1963); and Goodstein v. Commissioner, 267 F. 2d 127 (C.A. 1, 1959), supra. We think there is no merit to petitioner's contentions about prejudicial discrimination. Also, it is our opinion that the receipt in evidence in these cases of evidence about Gibraltar's and Gerald Cantor's procedures in *210 each of the four transactions in issue, the so-called "third party" evidence offered by the respondent, was not error and that such evidence is material, relevant, and admissible. There are some additional contentions to be considered before reaching petitioner's alternative contentions: 1575 Upon all of the evidence, it is clear that petitioner's primary and only purpose in entering into each transaction was to obtain "interest" deductions and tax savings; and that Gibraltar was utilized to provide the facade of a seemingly valid debtorcreditor relationship. A taxpayer is entitled to arrange hes undertakings so as to reduce, or even avoid, taxes provided that he does so by means which the law permits. But even though the motive of tax avoidance is to excluded from consideration, the courts may and must look through the forms of transactions to determine whether the substance thereof comes within or outside of the intent of the applicable statute, so that artifice will not be exalted above reality so as to "deprive the statutory provision in question of all serious purpose". Gregory v. Helvering, 293 U.S. 465, 470 (1935); Knetsch v. United States, 364 U.S. 361 (1960), supra; and dissenting *211 opinion, Judge Learned Hand, Gilbert v. Commissioner, 248 F. 2d 399 (C.A. 2, 1957). Apart from expected tax deductions and tax benefits, no economic gain and no economic benefit to petitioner could have been expected by him at the time he entered into each one of the four transactions. In the first three transactions, apart from tax considerations, petitioner's beneficial interests were not affected, and were not increased, and he paid out more than he received. In the fourth transaction, apart from expected tax benefits petitioner received from Gibraltar $1,428.34 in cash, which was more than he paid out, as has been explained. Even if that amount might be regarded as "gain" from the transaction, rather than simply a "bonus" resulting from the exchanges of checks between petitioner and Gibraltar in their running account with each other, which is what the $1,428.34 was, in fact, it is noted that a "gain" of $1,428.34 spread over the 5 1/4 years of Transaction 4 would amount to a gain of $272.06 a year, which is not exactly evidence of a reasonable expectation of profit on a purported investment of $750,000 (the sum of the notes to Gibraltar and CHK over a period of 5 1/4 years). The *212 increment of income realized in Transaction 4 was de minimis and only emphasizes the conclusion that petitioner's purpose in entering into Transaction 4 was the same as his purpose in entering into the other three transactions, namely, to reduce taxes. See Williams v. Commissioner, 323 F. 2d 656 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court, where (as in Transaction 4) the taxpayer purportedly borrowed money from two separate, but related, entities purportedly to "purchase" $1,000,000 United States Treasury notes, and it was held that both transactions were shams to be disregarded for tax purposes. See, also, Rubin v. United States, 304 F. 2d 766, 770, supra, where the court held that the fact that a profit was made on a transaction did not distinguish the case from MacRae, supra, since either a gain or a loss "was incidental to the chimerical character of the transaction." Each one of the transactions was a paper transaction and a sham, apart from the tax purpose and each transaction cannot be recognized for tax purposes. There was not an existing indebtedness, in any of the transactions, owing by petitioner within the meaning and intendment of sections 23(b), 1939 *213 Code, and 163(a), 1954 Code. It is held that no deductions are allowable for interest paid on indebtedness; respondent's determinations in the deficiency notices, and in his amended pleadings for 1953, are sustained. B. Alternative Claims for Deductions of Out-of-Pocket Expenses in Transactions 1, 2, and 3: Petitioner contends that if this Court holds that deductions are not allowable for "interest" on indebtedness, for the payments made to Gibraltar and CHK, then in the alternative the petitioners are entitled to deductions for the out-of-pocket expenses, or costs, as losses sustained in transactions entered into for profit, under section 23(e)(2), 1939 Code, and section 165(c)(2), 1954 Code; or as losses resulting from failure to exercise options to buy or sell property, under section 117(g)(2), 1939 Code, and section 1234, 1954 Code. The alternative contentions relate to Transactions 1, 2, and 3. In those transactions it has been found and held that the out-of-pocket expense, or cost, was as follows: 1.
$9,322.88
2.
3,669.47
3.
3,794.38
It is held that deductions are not allowable for the net expenses in the above amounts under either sections 23(e)(2) and 165(c)(2), 1939 and 1954 Codes; *214 or under sections 117(g)(2) and 1234, 1939 and 1954 Codes. (a) It has been found and held, and the facts show, that each transaction, apart from tax purposes, was a paper transaction 1576 and a sham. The facts show that in each instance there was no reasonable possibility of realizing a real profit or gain apart from the anticipated deductions for payments of "interest"; and that unless the claimed deductions for "interest" could be obtained, there was not any realistic possibility of an economic benefit from each transaction. In Transaction 1, the amount of petitioner's purported "indebtedness", $1,052,000, as set forth in his original promissory note was "loaded", by including in the principal amount of that note a "reserve" of $90,388.90 above the purported "cost" of the Land Bank bonds of $961,611.11. The bonds were redeemable at 100, or $1,000,000. According to petitioner's promissory notes, he was to pay as "interest" on his notes the sum of $131,934.05, where as coupon interest on the Land Bank bonds would amount to only $79,673.61, or $52,260.44 less than the alleged "interest" to be paid on the promissory notes. Therefore, the transaction had a built-in "obligation" of petitioner *215 to allegedly pay a note of $1,052,000, plus an "interest" expense in the net amount of $52,260, or a total of $1,104.260. It would have been necessary to realize upon a "sale" of the alleged bonds considerably more than their redeemable value of $1,000,000. Even on the basis of the transaction as it was carried out, in form, there was a net economic loss of $9,322.94. From February 2, 1953, to September 3, 1957, the low bid prices on the market for the bonds did not exceed 99-26/32. The facts are clear that, apart from anticipated tax deductions and benefits, the possibility of a profit or economic benefit from Transaction 1 was illusory and none could have been realized. The same analysis applies to Transactions 2 and 3. In both 2 and 3, the principal amount of each promissory note to Gibraltar was $105,000, which amount was "loaded" for a "reserve" of $17,359.46 in Transaction 2, and a "reserve" of $17,211.67 in Transaction 3. The allegedly "purchased" Treasury bonds were purportedly "purchased" with the interest coupons detached for 6 years, so that no bond interest was to be received. Petitioner's promissory notes to Gibraltar bore 2 5/8 percent interest, respectively, and petitioner *216 was to pay Gibraltar, as note "interest", $21,111.11 in Transaction 2, and $21,088.15 in Transaction 3. At the time of the beginning of each one of these transactions, the market price of the Treasury bonds was above 100; it was 103-9/12 on February 25, 1954, Transaction 2, and 103-10/32, or close to that, on February 26, 1954, Transaction 3. In each transaction, the purported purchase of the bonds with the interest coupons for 6 years detached was an arrangement designed to "acquire" the bonds at a cost below the market, with the then market price discounted for detached bond coupons, so as to have a "cost" basis which would be lower than the redemption value of the bonds at 100, at maturity, and so as to provide gains, on paper, from these transactions. Although on paper there was a "capital gain" at the end of each transaction, there was in fact a net economic loss of $3,669.47, in Transaction 2, and a net economic loss of $3,794.30, in Transaction 3. Petitioner received from Gibraltar $82,18 at the end of each transaction, and he did not receive the purported capital gains of $13,187.50, and $13,062.50, respectively. The payments by petitioner to Gibraltar, in the guise of "interest" *217 on his promissory notes, $21,111.11, and $21,088.15, respectively, exceeded the so-called "reserve" of Gibraltar and the so-called coupon interest on the bonds for 1954 and 1955 for which years bond coupons were "attached" to the bonds. In Transactions 2 and 3, the possibility of realizing a profit and an economic gain was illusory and could not have been reasonably expected according to the arrangements of Cantor, Fitzgerald and Gibraltar. It has been held that under such facts and circumstances as were involved in the three transactions, the particular transaction was not, apart from tax considerations, entered into for profit within the meaning of sections 23(e)(2) and 165(c)(2) of the Codes, and that no loss deductions are allowable for net out-of-pocket expense. Lewis v. Commissioner, supra; MacRae v. Commissioner, supra, pp. 59-60. It has been held that a paper or sham transaction cannot be regarded, for the purposes of the applicable Code sections, as one entered into for profit. Each one of the four transactions in issue here was lacking in economic substance beyond the tax deductions. Section 165(c)(2), and its predecessor section 23(e)(2), limit "loss" deductions allowable *218 to an individual taxpayer under section 165(a) which are not incurred in a trade or business, to "losses incurred in any transaction entered into for profit, though not connected with a trade or business." 1577 The facts show that the only "profit" petitioner could reasonably have expected to result from each of the four transactions was to consist of the tax benefits. The "profit" to be realized was to result from fictitious "interest" deductions created by each fictitious transaction. We have concluded that no interest on existing indebtedness was paid; no interest deductions are allowable; each transaction was a failure as a basis for interest deductions. It is only a matter of saying the same thing all over again with respect to the applicability of another provision of the Code, section 165(c)(2). Each transaction was only a paper transaction and was a sham; each was a financial round robin; no securities were purchased; no indebtedness was created; no securities were sold; it all was a fiction; "phantom interest on phantom notes", J. George Gold, 41 T.C. 419, 427. In Carl Shapiro, 40 T.C. 34, 39-40, this Court said, in effect, that a transaction entered into for the purpose of *219 avoiding taxes hardly qualifies as a transaction which satisfies other Code provisions relating to real and bona fide transactions. In these transactions, here, we cannot conclude from petitioner's testimony, or the testmony of his witness, Professor John P. Shelton, that petitioner had any other purpose in entering into each transaction than to obtain tax deductions for purported interest payments. Since Rosenthal did not intend to purchase, and did not purchase, any Government securities in any one of the four transactions, it cannot be said that there was a transaction entered into for profit within the meaning of section 165(c) (2), or section 23(e)(2), of the respective Codes of 1954 and 1939. Those Code provisions refer to a transaction which has substance and in which there is a true motive of deriving a profit. Eli D. Goodstein, 30 T.C. 1178, 1192-1193, supra. The facts in the instant transactions, all four of them, do not distinguish them from those in previously decided cases where claimed deductions for losses under section 23(e)(2) or section 165(c)(2) have been denied. See Lewis v. Commissioner, supra, p. 639. The same succinct description set forth there is suitable *220 here: Gerald Cantor's plan, in each transaction, was supposed to reduce Rosenthal's tax liability. The motivating factor which caused Rosenthal to enter into each transaction was to secure large tax deductions for payments of "interest." Each transaction was without any business origin. In each transaction, Rosenthal incurred and paid an out-of-pocket expense which represented a "fee" for the services of Cantor, Fitzgerald, Gibraltar, and CHK in providing the appearance of a transaction involving the "purchase and sale" of securities. But that fee, or out-of-pocket expense, did not arise in connection with a real and bona fide transaction of the petitioner entered into for profit, or connected with his profit-seeking activities in a transaction having substance. In the second Knetsch case, in Court of Claims, Knetsch v. United States, 348 F. 2d 932 (1965), supra, at page 936, the court pointed out that section 165(c)(2) limits the allowable loss deduction, for losses outside the taxpayer's business, to losses incurred in "transactions entered into for profit"; and the court said: The Supreme Court has said that the determinative question is whether the taxpayer's purpose in entering *221 into the transaction was primarily for profit. Helvering v. National Grocery Co., 304 U.S. 282 289, * * * (1938). There are two crucial words contained in this test: purpose and profit. The court proceeded to consider the meaning of "profit" (p. 937) in section 165(c)(2), and referred to Goldsborough v. Burnet, 46 F. 2d 432, 433 (C.A. 4, 1931). "The word 'profit', for the purpose of this section, has been defined as 'the advantage or gain resulting from the investment of capital, or the acquisition of money beyond the amount expended: a pecuniary gain.' * * *". The court went on to state: However, we think that section 165(c) (2) was not designed to be a catch-all provision allowing taxpayers to deduct any out-of-pocket expenditures. The Third Circuit has limited the deduction for losses to transactions which were designed to achieve and intended to secure the production of taxable income. [citing Weir v. Commissioner * * * Under this test, the motive to effect a tax reduction cannot produce a transaction entered into for profit in the statutory sense since the profit measured by tax savings that would be produced if the transaction was successful, would not be taxable income. * * *222 * Therefore, the statutory word "profit" cannot embrace profit seeking activity in which the only economic gain derived therefrom results from a tax reduction. In other words, there can be no deductible loss allowed under section 165(c)(2) if the transaction which gave rise to the loss has been determined to have been 1578 "without economic substance" or a "sham." In the second Knetsch case, the Court of Claims with great care, in considering the various aspects of comparative transactions in which taxpayers either had obtained or had not obtained deductions for losses and expenses, noted further that in order to succeed in obtaining a deduction under section 165(c)(2), the transaction involved must be one in which the "contractual rights" of the taxpayer were not "shams" (p. 939). "[In] order for the realized loss to be recognized under section 165(c)(2), the permissive profit motive previously discussed is required." Where "the objective facts, which can be used as indicators of the taxpayers' profit intention, show that they never intended to realize a profit on the transaction separate and apart from the tax benefits they hoped to derive therefrom," then "the loss taxpayers realized *223 is not recognized as a loss incurred in a transaction entered for profit within the meaning of section 165(c)(2)." In these cases, in the four transactions in question, the objective facts show that Rosenthal never intended to realize a profit separate and apart from the tax deductions and tax benefits he hoped to derive therefrom. Under the facts in each transaction, it is held that the loss petitioner realized is not recognized as a loss incurred in a transaction entered into for profit within the meaning of section 23(e)(2) and section 165(c)(2). The loss deduction under the above Code provisions claimed with respect to Transactions 1, 2, and 3 is denied. (b) The next question is whether loss deductions are allowable under section 117 (g)(2), 1939 Code, and section 1234, 1954 Code. In order to receive a loss deduction under either section 117(g)(2) or section 1234, the provisions of section 23(e)(2), or section 165(c)(2), respectively, (a loss from a transaction entered into for profit) must also be satisfied. See Brown v. United States, 396 F. 2d 459, 465 (Ct. Cl. 1968), supra. Section 1234, 1954 Code, which re-enacted section 117(g)(2), 1939 Code, provides for the recognition *224 of capital gain or loss under specific circumstances, if a taxpayer fails to exercise an option. However, the existence of a loss does not establish its deductibility. "In the case of an individual, a recognized loss is deductible only if it is within the explicit limitations of section 165(c). See: Morris R. DeWoskin, 35 T.C. 356 (1960)." Petitioner makes a second alternative claim that his out-of-pocket expenses are deductible as losses attributable to his failure to exercise options or privileges to buy or sell property. In general, section 1234, 1954 Code, and section 117(g)(2), 1939 Code, provide for capital gain or loss treatment for gain attributable to the sale of a privilege or option to buy or sell property, and for loss attributable to failure to exercise a privilege or option to buy or sell property. Petitioner's alternative claim for loss deductions under section 1234 relate to Transactions 1, 2, and 3, which purportedly involved, respectively, Land Bank bonds due October 1, 1957, and U.S. Treasury bonds due September 15, 1961. In Transaction 1, two promissory notes payable to Gibraltar were executed by petitioner, the second note having been executed on October 1, 1955, *225 payable on October 1, 1957, the same date as the maturity of Land Bank bonds (if any had been involved, in fact). It was provided in the second promissory (renewal) note that petitioner could not obtain return of the purportedly "pledged" bonds (from Gibraltar) at any time prior to about September 1, 1957. That is to say, petitioner could not call upon Gibraltar to deliver back to him the allegedly pledged bonds, upon his payment of the promissory note, until 30 days before the "pledged" collateral would be redeemed, on October 1, 1957. The due date of the promissory note of petitioner was the same as the redemption date of the Land Bank bonds, October 1, 1957. (See page 17-(a), supra, Findings of Fact.) The clause in petitioner's second note to Gibraltar relating to such "recovery" of the "pledged" collateral represents the ground for petitioner's claim for a loss deduction under section 1234. Under the rule that the issue for decision must be considered on the basis of all of the facts in the entire transaction, rather than on the basis of separate steps and fragments of the transaction, the provisions of petitioner's promissory note must be considered within the facts of the entire *226 transaction and, therefore, realistically, and therefore, in connection with the fact that the Land Bank bonds were to be redeemed at 100, or par, on October 1, 1957. The clause in the promissory note dealing with the possible "return" of the "pledged" bonds to petitioner did not have any real significance, or benefit, because there would not be 1579 any practical advantage to petitioner to exercise such right under his promissory note; the clause was another unreal detail and another detail of eye-foolery. The amount of the promissory note was $999,500; the low bid, market quotation for the bonds on September 3, 1957, was 99-26/100; and no practical advantage could have been realized by petitioner if he might have seen fit to exercise the right to have the "pledged" bonds returned to him under the relevant clause in his promissory note. Since that is obvious, we need not tediously spell out this observation. Moreover, Jack Bernstein, formerly the manager of Gibraltar, testified that the particular clause in Gibraltar's forms of promissory notes, such as petitioner executed, was worded in that way so as to discourage and make impractical a "prepayment" of the promissory note to Gibraltar *227 before its due date. In other words, the clause was an academic one which did not have any substance and practical meaning. In Transaction 1, therefore, petitioner did not in substance and in fact have any option or privilege "to buy or sell property" within the meaning of section 1234 of the Code; and such alleged "privilege or option" was another phantom part of the entire sham transaction. Section 1234 does not apply, under the objective facts, and for that simple reason a loss deduction for petitioner's out-of-pocket cost in Transaction 1 cannot be allowed. In Transactions 2 and 3, petitioner's promissory notes were due on September 15, 1961, which was also the redemption date of the purportedly "pledged" Treasury bonds, the "collateral" securing each note; and in each promissory note there was a penalty, or premium, of 1 1/2 percent to be paid by Rosenthal if he should elect to "prepay" the principal amount of the promissory note at any time up to March 15, 1961, or up to 6 months prior to the due date of the promissory note; also up to 6 months prior to the redemption date of the "pledged" Treasury bonds. The penalty or premium was 1 1/2 percent of $105,000 from the date of a *228 "prepayment" of the promissory note until the due date of the promissory note, September 15, 1961. (See page 34, Findings of Fact.) Such "return" of the "pledged" collateral could not be obtained by petitioner, under the particular clause in his note, after March 15, 1961. It is noted, also, that the principal amount of each promissory note in Transactions 2 and 3 was $105,000 and that at maturity, the Treasury bonds were to be redeemed at 100 for $100,000. It is noted, further, that the low bid, market quotations for the purportedly pledged Treasury bonds was usually below 100 during the period of Transactions 2 and 3, and never reached 105. Upon the basis of the objective facts in Transactions 2 and 3, the clause in each promissory note, dealing with the conditions under which petitioner could "call upon" Gibraltar to "return" to him the 'pledged" collateral, was not in substance and fact an option or privilege "to buy or sell property" within the meaning of section 1234; the clause did not have any substance or practical significance; the clause was academic; it was designated by Gibraltar to discourage, or prevent, a prepayment before the due date of the promissory note (according *229 to Bernstein's testimony); it was without substance, and it was an illusory and phantom "right", a sham which was merely a detail in each sham transaction. Therefore, as in Transaction 1, the provisions of section 1234 do not apply to Transactions 2 and 3; and for that simple reason, based upon the objective facts, loss deductions for petitioner's out-of-pocket costs in those transactions are not allowable under section 1234. The foregoing should be dispositive of petitioner's alternative claims for loss deductions under section 1234 for his out-of-pocket costs. However, there are other reasons for denying those claims for loss deductions. See Brown v. United States. 396 F. 2d 459, 465-467, supra (Ct. Cl. 1968). In Brown, the court referred to the regulation of the respondent which applies to section 1234, namely section 1.1234-1(f) of the Regulations. It clearly provides that "Losses to which section 1234 applies are subject to the limitation on losses under section 165(c)" of the Code, which deals with the allowable deduction to an individual for a loss sustained in a "transaction entered into for profit." We believe that the reasoning of the Court of Claims in Brown, supra, is *230 correct, and that it applies here to Transactions 1, 2, and 3. It has been found and held that Transactions 1, 2, and 3 were not transactions entered into for profit within the intendment and meaning of section 165(c)(2). Therefore, the claimed loss deductions are not allowable under section 1234. The facts in each of the transactions 1, 2, and 3 establish that petitioner could not have had a reasonable expectation that the Land Bank 1580 bonds in Transaction 1, and the Treasury bonds in Transactions 2 and 3, would be salable at prices sufficiently above their face values, respectively, so as to result in a profit to him in excess of his expenditures incurred when each transaction was initiated. As in Brown, supra, at page 466, all of the facts and circumstances in Transactions 1, 2, and 3 convince us that Rosenthal "did not expect to recover the interest paid, much less to obtain a profit" in each transaction. For the purposes of section 1234, the ultimate question, with respect to each transaction, is whether the losses of petitioner consisting of his out-of-pocket costs are deductible under section 165(c)(2) (or section 23(e)(2). We already have held that each one of the transactions *231 did not meet the statutory requirements of section 165(c)(2) (and section 23(e)(2), and that conclusion disposes of petitioner's claims under section 1234 (and section 117 (g)(2)). Again quoting Brown, supra, page 467, and applying its reasoning to the facts of each of the Transactions 1, 2, and 3, it is concluded, as follows: The absence of any economic substance is the underlying rationale in these cases for denying the claimed deductions for interest under section 163(a), 1954 Code, (and section 23(b), 1939 Code), with respect to Transactions 1, 2, 3, and 4, and for denying the claimed loss deductions under section 165(c)(2) in the first three transactions. Those same factual considerations have no more economic reality when the out-of-pocket expenses are characterized as a "capital loss" in these Cantor, Fitzgerald-type transactions, in the absence of proof that each entire transaction was entered into for profit. See, also, Lewis v. Commissioner, supra; Gerstell v. Commissioner, 319 F. 2d 131 (C.A. 3, 1963), cert. den. 375 U.S. 941, affirming a Memorandum Opinion of this Court; and Morris DeWoskin, supra. Respondent has made a valid and sound argument that the questions under *232 the alternative claims of petitioner must be determined upon consideration of "the origin of the liability out of which the expense accrues," or "the kind of transaction out of which the obligation arose," citing Deputy v. Dupont, supra; Kornhauser v. United States, 276 U.S. 145 (1928); United States v. Gilmore, 372 U.S. 39 (1963); and Lykes v. Commissioner, 343 U.S. 118 (1952). We agree with his argument. Petitioner, in each of the four transactions, and in Transactions 1, 2, and 3 in particular, entered into sham transactions which were devoid of any economic substance and reality apart from tax considerations. Such was the source of his out-of-pocket expense in each instance. It is consistent with the findings that each was a sham transaction to deny the alternative claims for loss deductions of the out-of-pocket costs. Those costs were no more than a fee, in each instance, for the services of Cantor, Fitzgerald, Gibraltar, and CHK, respectively, for which deductions are not allowable under sections 165(c)(2) and 1234. It is held that the claimed loss deductions for out-of-pocket expenses are not allowable. Issue 2: Docket No. 67848, 1953 Income of BRNM Law Partnership The determination *233 to be made is the dollar amount of the earnings of BRNM law partnership prior to February 23, 1953, when the operations of that partnership business were concluded. The respondent determined that only $36,215.16, out of $72,011.63, was the amount of the earnings up to February 23. The contention of Rosenthal and Norton is that $72,011.63 was earned by the BRNM partnership prior to February 23 even though that entire amount had not been paid to and collected by the BRNM partnership before February 23, 1953. The respondent's determinations in the statutory deficiency notice included the determinations that of the $72,011.63 net earnings for the fiscal year November 1, 1952, to October 31, 1953, the sum of $35,796.47 was "earned" after February 23, 1953, and that after that date the "partners" were only Rosenthal and Norton, so that one-half of the post-February 23 earnings was the income of Rosenthal, $17,898.24, and one-half was the income of Norton, $17,898.23. The parties are agreed that the net earnings for the 12-month period November 1, 1952, to October 31, 1953, were $72,011.63. The questions to be decided are (1) whether the entire amount of $72,011.63 was earned, although not *234 collected, prior to February 23, 1953; and, if not, what part of the $72,011.63 was earned after February 23 by Rosenthal and Norton as the remaining members of the old BRNM partnership. The questions presented are questions of fact with respect to which Rosenthal, in this case, and Norton, in a separate case 1581 now pending before the Court, had the burden of proof. Upon consideration of the evidence, our findings and conclusions are that the entire $72,011.63 represented net income earned prior to the cut-off date, February 23, 1953. It is concluded, further, that in making collections, and receiving payments, of accounts receivable of the old BRNM partnership after February 23, 1953, Rosenthal and Norton were acting only as representatives of the old partnership and as custodians of its funds, on hand and to be collected, and that they were not engaged after February 23, 1953, in conducting a business for themselves as the two remaining partners of the old BRNM partnership. In arriving at the latter conclusion, a distinction has been made between the procedures of Rosenthal and Norton in winding up, after February, the affairs of the BRNM partnership, and their conduct of their *235 own separate business as the members of their new law partnership, "Rosenthal and Norton". We are satisfied that no part of the $72,011.63 represented net earnings of a new partnership consisting only of Rosenthal and Norton, and that no part of the $72,011.63 represented income earned after February 23. It is concluded that respondent's determinations were not correct. It is held that the entire $72,011.63 was earned by the BRNM partnership before February 23, although part was collected after that date by Rosenthal and Norton, who acted, in effect, as custodians and conservators of the earnings of the old partnership. It is held, further, that the respective shares of Rosenthal and Norton were, respectively, 35 percent, $25,222.29, and 25 percent, $17,989.44, and that respondent erred in increasing Rosenthal's share by $4,134.81 and Norton's share by $9,876.59. Petitioner produced the ledger accounts of the BRNM partnership; the accounting records maintained after February 23 for the special account; a trial balance sheet for the BRNM accounts and the accounting records of the special account; and the testimony of Robert Brent, an independent Certified Public Accountant and an attorney. *236 Brent examined the two sets of accounting records, one made before and the other made after February 23, 1953. He located notations in the accounting records which showed that the legal fees and other items of income which were collected after February 23, 1953, were for services performed prior to that date. The collections of fees after February 23, 1953, were about $36,000, and the disbursements were about $11,220.61 making the net amount of those collections $24,789.39. We are satisfied with Brent's analysis, we accept his testimony as being correct, and conclude that the gross and net amount of the collections after the above date were income earned by the old partnership prior to February 23, 1953. Issue 3: Docket Nos. 1392-64, 1393-64, 1960 and 1961: Deductions Claimed, Legal Expenses A final decree of divorce was granted to Jerome and Ruth Rosenthal on April 3, 1964. The divorce proceedings were commenced in April 1959. There was not any issue in the divorce proceedings about the right to a divorce by either party. Rosenthal incurred and paid various expenses and legal fees, including court and miscellaneous costs, in 1960 and 1961, for which deductions were taken on separate *237 tax returns filed for himself and Ruth Rosenthal for those years. The expenditures in issue are in the total amount of $5,867.17, paid in 1960, and $8,906.61, paid in 1961. One half of each sum was deducted on the separate returns; $2,933.59 for 1960, and $4,453.31 for 1961 on Rosenthal's tax returns; and $2,933.58 for 1960, and $4,453.30 for 1961 on the returns filed in the name of Ruth Rosenthal. The petitions and amended petitions raise two questions, which were argued on brief by petitioner: (1) For 1960, whether $1,000 (out of the total sum $5,867.17) was an expense paid and incurred for the production or collection of income, namely alimony for Ruth Rosenthal, and, therefore, is deductible under section 212(1), 1954 Code. (2) Whether $4,867.16 for 1960, and $8,906.61 for 1961, were expenses which were incurred and paid solely in connection with the determination and collection of income taxes and were, therefore, expenses for the production of income which are deductible under section 212(3) of the Code. Petitioner contends that the expenses of $4,867.16 and $8,906.61 were for legal and accounting services related to a determination of their respective income tax liabilities, *238 and that it is immaterial that such alleged services were rendered, and the costs incurred, during the pendency of divorce proceedings. He cites Meyer J. Fleischman, 45 T.C. 439 (1966); 1582 Carpenter v. United States, 338 F. 2d 366 (Ct. Cl. 1964); sections 1.212-1 and 1.262-1(b)(7) of the Income Tax Regulations; Ruth K. Wild, 42 T.C. 706 (1964); and Hazel Porter, 388 F. 2d 670 (C.A. 6, 1968), affirming a Memorandum Opinion of this Court. Respondent contends that petitioner failed to meet his burden of proof, in general; that all of the legal fees, costs, and expenses, $5,867.17 for 1960 (including the $1,000), and $8,906.61 for 1961, were personal expenses which are not deductible under section 262 of the Code; that petitioner failed to prove that $1,000 (for 1960) is deductible under section 212(1) of the Code; that he failed to prove that $4,867.17 and $8,906.61 are deductible under section 212(3); and that he failed to establish that the above amounts were payments made in connection with "the determination, collection, or refund of any tax." Respondent also cites Meyer J. Fleischman; he relies upon United States v. Gilmore, 372 U.S. 39, and United States v. Patrick, 372 U.S. 53; *239 and he contends that the facts here are distinguishable from the facts in Ruth K. Wild. Upon consideration of the evidence (and lack of proof), and the applicable cases and Regulations it is held that petitioner failed to establish that any of the claimed deductions are allowable under section 212 or any other section of the Code. 1. Claimed deduction of $1,000, 1960, for fees of Ruth Rosenthal's attorneys: Crowley and Rhoden, attorneys in Los Angeles, represented Ruth Rosenthal in the divorce proceeding. The separate income tax returns for 1960 filed for Jerome and Ruth Rosenthal, respectively, show that no "alimony" was paid to Ruth in 1960. There is no contention that any alimony was paid or was payable to her in 1960. Petitioner's evidence under this question consisted of his own testimony; he did not offer the testimony of Ruth's attorneys, although it appears that he could have subpoenaed them to appear and give testimony since they are located within the area of the City of Los Angeles. Ruth Rosenthal did not appear at the trial of these cases and there is no testimony or evidence in her behalf in the record; none was offered. Rosenthal testified that there was payment to Ruth's *240 attorneys, Crowley and Rhoden, in 1960 pursuant to a court order in the amount of $6,717; that $1,000 thereof was "intended pursuant to the court order * * * [for] services in connection with the procurement of alimony for Mrs. Rosenthal"; and that he did not receive a bill from the attorneys, although he really could not remember whether he had or had not received their bill. In his testimony, Rosenthal took the position that he was not concerned about whether or not he received a bill from the attorneys because he made the payment pursuant to a court order. However, he did not produce in this Court the order of the California Superior Court in this matter. He admitted that the court order directed him to pay a larger amount than $1,000 to Ruth's attorneys. He was asked during his testimony who had determined that $1,000, out of the larger amount, represented a fee for services in connection with obtaining alimony for Ruth. Rosenthal replied that either he or an accountant in his office had made an allocation of $1,000, and he did not explain how the figure of $1,000 was determined. Rosenthal also testified that the $1,000 was paid out of the "community property" of himself and his *241 wife. He did not attempt to offer any more specific evidence on this matter than the foregoing. Petitioner put an exhibit into evidence (No. 56), a schedule of the items and amounts for which he claims deductions under this issue. In that schedule, the payment in 1960 to Crowley and Rhoden of $6,717 and of the part deducted, $1,000, are described only as "Extra legal costs," and there is no mention of "Alimony". There is no evidence about the matter of "alimony" for Ruth at any time or in any amount. In 1960, the Rosenthals were separated but they legally were spouses. Whether or not there eventually was a court order which included a provision for alimony for Ruth is not shown by the record in these cases; there is no evidence that the court order in 1960, to which Rosenthal referred in his testimony, dealt specifically with the matter of alimony; and there is no evidence about the services of the law firm of Crowley and Rhoden. Petitioner did not explain in any way the basis upon which he attributed $1,000, out of $6,717, to legal services of Ruth's attorneys in connection with the general matter of alimony for Ruth. There is no doubt at all about petitioner's failure of proof with *242 respect to the payment 1583 of $1,000 for legal fees of Ruth's lawyers. Petitioner had the opportunity to supplement his vague testimony by obtaining and submitting specific evidence on the matter. This Court offered a few suggestions to petitioner, in the course of his testimony, indicating that petitioner would be allowed additional time to obtain and submit specific evidence which would throw more light upon the claimed deduction of $1,000, during a recess in his testimony, so that he could make the effort to sustain his burden of proof, but the Court's suggestions and offer were not accepted by petitioner. Cross examination did not elicit any enlightening testimony on the point. Under some circumstances, where the sworn testimony of a taxpayer is clear and is not weakened by cross examination or contrary evidence produced by his adversary, it is error if a court does not give proper weight and consideration to a taxpayer's sworn testimony. However, in this instance that rule does not apply because Rosenthal's testimony was clearly inadequate to sustain his burden of proof under this question. Furthermore, he did not avail himself of the Court's suggestions and offer to allow him *243 more time within which to obtain and introduce clear evidence in corroboration of his very general and selfserving testimony. It is evident from petitioner's testimony that he, or someone in his office, made a rather arbitrary determination that $1,000 was connected in some way with the services of Ruth's attorneys in the matter of petitioning or arguing about future alimony for Ruth. Exhibit 56 describes the item of $1,000, and all of the expenses in issue, as "Fees & Costs Incurred in Connection with His Divorce". No weight can be given to petitioner's self-serving testimony, about this item, which fell far short of providing any explanation about why any deduction was claimed for 1960 as a legal fee, to obtain "alimony" for Ruth, in the amount of $1,000 or any other amount. Clearly, there is failure of proof and the claimed deduction under section 212(1) must be denied. The petitioner was so advised by this Court during the trial. (See transcript pages 666-669. At p. 669, petitioner recognized his problem about his burden of proof.) On brief, petitioner has failed to make any adequate argument in support of his claim for a deduction under section 212, and he has not shown that section *244 71 of the Code is involved. Of course, having failed to establish the facts which would provide a basis for a deduction under section 212, petitioner's fact problem was present in his claim. Also, he has not shown that the reasoning in Ruth K. Wild, supra, applies here. In the Wild case, this Court made a finding that Ruth Wild had taxable income in the taxable year, 1960, consisting of alimony payments of $9,850. In these cases, there is no evidence about Ruth's receipt in 1960 of any alimony income of any kind, such as alimony pendente lite. On the separate returns for 1960, prepared in petitioner's office for filing in the respective names of Jerome and Ruth Rosenthal, onehalf of Jerome's taxable income was reported on Ruth's return (but without any allocation thereof to alimony or separate support expense); ard it appears that the income reported on the return filed for Ruth was reported on the basis of the California community property interest. The questions at issue are not clearly framed, in any event. The amended petitions allege that respondent erred in disallowing a deduction of $1,000 for 1960 as an expense incurred in the production or collection of amounts includable *245 in income under section 71, and that the deduction was for attorneys' fees attributable to the production and collection "of alimony" from Jerome Rosenthal. No facts were alleged as establishing, first, that any "alimony" was collected from petitioner in 1960, and there is no evidence that any of the provisions of section 71, relating to alimony and separate maintenance payments, applied to any income of Ruth for 1960. There is no evidence that there was either a written separation agreement or a decree of separate maintenance whereby Ruth received any payments for separate maintenance. Section 212(1) of the Code refers to expenses paid in the taxable year "for the production or collection of income"; and section 1.262-1(b)(7), Income Tax Regulations, refers to an exception to a general rule about personal, nondeductible expenses, which relates to an attorney's fee, paid in connection with a legal or written separation agreement, which is "properly attributable to" the collection of amounts includable in gross income under section 71. Petitioner had the burden of proving, first, that section 71 applied. He failed to establish that foundation for the claimed deduction. Furthermore, *246 under this question one-half, or $500, of the alleged attorneys' fee is claimed as a deduction by the then husband, Jerome Rosenthal, but he has not stated 1584 which provision of section 212, if any, might apply to his claim for a deduction of $500. See Ruth K. Wild, supra, at page 710. In Wild, the taxpayer claiming the deduction was a divorced wife. See, also, the dissenting opinion at p. 712, Wild, of Judge Pierce, wherein it was noted that there is a distinction between an expense incurred in order to establish the right to alimony, and one incurred to collect a fixed obligation, namely alimony after the right thereto has been established, and that an expense to establish a right to alimony is a "personal or family right". Since there is failure of proof about the material facts, failure to clearly raise the questions at issue in the amended petitions, and failure to properly and adequately argue the questions of fact and law there is no point in attempting to analyze and discuss this question. In general, respondent contends that besides failure of proof, the expense of $1,000 was a personal, family, and nondeductible expenditure under section 262, and that Wild does not apply. *247 We agree with respondent. The claimed deduction of $1,000 is not allowable due to failure of proof; i. e., the claimed deduction of $500, each, is denied with respect to the separate returns for 1960 filed for Rosenthal and Ruth Rosenthal, respectively. The parties filed at the trial a list of proposed exhibits; the list bears the caption, "Stipulation". On page 11 of the list, paragraph 7, there were listed, as proposed exhibits relating to the issue involving legal expenses (Issue 3 here), five documents described as copies of the "Complaint for Divorce by Ruth Rosenthal"; "Answer filed by Jerome B. Rosenthal"; "Cross-Complaint filed by Jerome B. Rosenthal"; "Interlocutory Decree of divorce and appointment of a Receiver"; and "Final Decree of divorce". None of the above-described documents was offered in evidence. 2. Claimed deductions for 1960 and 1961 for expenditures allegedly related to the determination and collection of income taxes: The expenditures for which deductions are claimed by Rosenthal and Ruth Rosenthal are as follows: 1960
1961
Extra accounting service
$ 50.00
0
Court costs
4,817.17
$1,974.20
Messenger service
0
55.65
Misc. Bond-Stay of Exec
0
376.76
Legal fees, Horwin
0
6,000.00
Legal fees, Caruso
0
500.00
$4,867.17
$8,906.61
Petitioners *248 had the burden of proving that the above items of expense, paid respectively in 1960 and 1961, were "ordinary and necessary expenses" paid "in connection with the determination, collection, or refund of any tax", within setcion 212(3), and that none of the expenses was a personal, nondeductible expense under section 262, namely, a personal, living, or family expense, as respondent contends. Section 1.262-1(b)(7) of the Regulations provides that, in general, attorneys' fees and other costs paid in connection with a divorce, separation, or decree for support are not deductible by either the husband or wife. However, the Regulation allows, as an exception, deductions under section 212 of expenses which "are properly attributable to the production or collection of amounts includible in gross income under section 71". Section 1.212-1 of the Regulations allows deductions for legal, accounting, and related costs incurred and paid in connection with the determination and collection of taxes. It has been held that an otherwise allowable deduction under section 212(3) is not precluded merely because such deductible expenses were incurred in connection with a divorce; cf., Fleischman, supra, p. 441; *249 and Carpenter v. United States, supra. The first inquiry must be directed to the evidence and to what facts, if any, have been established by the evidence. Petitioner had the burden of proving, first, that the expenditures come within the provisions of section 212(3); i.e., that they were ordinary and necessary expenses paid and incurred "in connection with the determination, collection, or refund of any tax." The pleadings in the amended petitions only use the words contained in section 212(3); they refer to "income tax"; and there are not any allegations of facts in petitioners' pleadings about their contentions with respect to how and why the total sums of $4,867.17 and $8,906.61 were related to "advice from attorneys relating to the determination, collection and payment of both Petitioners' income tax." The pleadings of the petitioners are so broad and general, and so lacking in any allegation of facts, as are required by this Court's Rules of Practice, Rule 7(c)(B)(5), that the issue was not properly pleaded, in the first place. The petition must contain "clear and concise lettered statements of the facts upon which petitioner relies as sustaining the assignments of error." 1585 *250 There are set forth above the descriptions and amounts of the expenditures for which deductions are claimed for 1960 and 1961 under section 212(3), which items are set forth on Exhibit 56 entitled "Schedule of Professional Fees & Costs [of Jerome B. r/osenthal] Incurred in Connection with His Divorce For Years 1960-1961." Petitioner gave some testimony and he relies solely upon his testimony, to which reference will be made. The items of expense consist of extra accounting services, $50; messenger service, $55.65; miscellaneous, stay of execution, and bond, $376.76; and court costs $4,817.17 in 1960, and $1,974.20 in 1961, a total of $6,791.37. The expenses for legal fees, in 1961, are $6,000 to Horwin, and $500 to Caruso, neither of whom gave testimony, and their bills for charges were not offered into evidence to corroborate petitioner's testimony. No separate evidence to corroborate petitioner's testimony was offered with respect to court costs and the other expenses. Respondent, on brief, poses the general question, "How do these multifarious costs relate to legal advice in connection with the determination, collection and payment of taxes?" His question involves the allegations *251 in the amended petitions that Rosenthal "paid a total of $4,867.17 and $8,906.61, respectively, in connection with advice from attorneys relating to the determination, collection and payment of both Petitioners' income tax." Respondent contends that petitioner failed, under his burden of proof, to prove that respondent's determinations were in error; that since petitioner failed to call Leonard Horwin and Paul Caruso to give testimony (at least to corroborate petitioner's general testimony); and since he failed to obtain from them billings or other records to substantiate petitioner's claims for the deductions, it can be concluded only that if such testimony and other evidence had been introduced, it would have been unfavorable to petitioner's claims and contentions. Respondent cites W.A. Shaw, 27 T.C. 561 (1956), affd. 252 F. 2d 681; Stoumen v. Commissioner, 208 F. 2d 903 (1953); and Interstate Circuit v. United States, 306 U.S. 208, 225-226 (1939). We do not reach any legal question here unless facts can be found from the evidence to support petitioner's allegation that respondent erred in disallowing the deductions, and unless facts can be found from the evidence which would or *252 could be regarded as related to petitioner's contention that the expenses are deductible under section 212 (3), Since no such findings can be made from the record here, no questions of law can be reached as we may not make any assumptions about material facts. Respondent's disallowances of the claimed deductions are prima facie correct and it was petitioner's burden to prove the existence of material facts from which consideration might be given to the question of whether respondent's determinations were in error. Petitioner cannot succeed upon the basis of his bare assertion that his expenditures "for legal services were for tax matters", which is his assertion on brief. We now turn to petitioner's testimony: It is our best understanding of Rosenthal's testimony that in 1960 and 1961, when the divorce proceedings were pending, one of the problems between Rosenthal and Ruth was about whether Ruth would be charged, under some agreement to be worked out between the spouses, for certain income taxes, and if so, how much or what proportion, and how much thereof would be Rosenthal's share. Rosental testified that there was at the time (in 1960 or 1961) an income tax liability of about $40,000 *253 which, as between the taxpayers (Rosenthal and Ruth), and the Internal Revenue Service was "admittedly" due and owing to the Government. Presumably, Rosenthal, or he and,ruth, had made that admission to the Internal Revenue Service, but as between Rosenthal and Ruth there was a dispute about "who owed them", the $40,000. Then, there was another problem, between Rosenthal and Ruth, about their respective shares of the income tax liabilities and tax deficiencies which would eventually result from judicial determinations of the issues in these cases in this Court. There was another problem, as between Rosenthal and Ruth, about "the propriety of the tax planning utilized by the husband [Rosenthal] for which the community [community property of the spouses] had paid previous taxes". (Transcript, p. 673, testimony of Rosenthal.) The final decree of the divorce of Rosenthal and Ruth was entered, it appears, on April 3, 1964, and it is assumed that the interlocutory decree of divorce was entered one year earlier on or about April 3, 1963, under the applicable California statute. California has a community property law applicable to spouses, but under certain facts, if they exist, it is possible *254 for a married individual to own his or her own separate property which is not within the category of community property. It sometimes is 1586 said, for brevity, that certain property is part of the "community", meaning part of the community property of the spouses. It appears from Rosenthal's testimony (Transcript, p. 675) that in 1960 and 1961, or in 1961, he was engaged in working out, with his attorneys, and with Ruth, through her attorneys, the preliminary matters which would be incorporated in an eventual property settlement agreement between himself and Ruth, to be filed in court, and an agreement to provide alimony for Ruth. Rosenthal, in his testimony relating to the claimed deductions now under consideration, did not go into such matters, as a foundation, but he alluded to them. His references to such matters were quite vague. It appears that another problem, between himself and Ruth, was "whether certain property should be considered [community] property", or just "property", as opposed to "'income", such as alimony, "or should be considered to be alimony in character, therefore not property, and therefore deductible when paid if paid by the husband. In that phase of the *255 action [divorce action], the wife [Ruth] had contended that the right to receive income and the income when received, although it was to the partnership, law partnership, was community property or sounded as in property theory, and the husband [Rosenthal] contended that the right to receive income within the partnership for the reasons I have stated was not property but rather income and was already considered in the payment of deductible alimony." (Transcript, pp. 675-676.) Rosenthal testified that his lawyer, Leonard Horwin, is not engaged exclusively in practicing tax law and that he rendered services to Rosenthal which were not related to tax matters, and that Horwin's charges to Rosenthal amounted to more than $6,000. From that testimony it is understood that the $6,000 in issue here represented petitioner's allocation of $6,000, out of some larger amount of Horwin's charges, to Horwin's charges for services in the tax problems between Rosenthal and his wife. However, petitioner, in his testimony did not explain the basis upon which he had arrived at the figure of $6,000 for which he claimed a deduction under section 212 (3). Rosenthal's testimony about the legal fee of Horwin *256 was intended to be the same for legal fee paid Caruso, as they were considered together in the questions propounded to Rosenthal by his counsel. At least, his testimony does not specifically explain Caruso's services or an allocation of $500 applicable to Caruso's charges. With respect to the other items, extra accounting services, court costs, messenger service, and miscellaneous, it appears from the questions by counsel and Rosenthal's testimony that deductions are claimed as expenses of preserving or conserving income-producing property, under seection 212(1), and that "either all of it or half of it" (Tr. 677) is allocable to that purpose "if the other half is allocable to the tax determination phase." Rosenthal's testimony was quite vague, and it was without such foundation as would provide a clear connection of each item of expense to the requirements of section 212(3), or section 212(1), in the alternative. Rosenthal did not undertake to explain the status in 1960 and 1961 of a property and income settlement agreement with his then wife, Ruth, if any had been agreed upon; whether in 1960 and 1961 such agreements were only under discussion and negotiation by the respective lawyers *257 representing each party; what type of alimony agreement was being considered, or had been agreed to, and the means to be used to pay alimony; and just what the tax problems were in working out both a property settlement agreement and an alimony agreement, as between the spouses. He did not connect any of the expenses in issue, or any part of any item, with any problem (if any) between a tax collecting agency of a government, such as the Internal Revenue Service, or a State of California tax department. Therefore, we do not have, in the pleadings or the evidence, any reference to an expenditure for tax advice, or a cost of tax advice or anything else, which was connected in 1960 and 1961 with the preparation of any tax return, or the determination of a tax liability to a government (state or federal), which would come within the phrase "determination, collection, or refund of any tax," such as would be the case in a tax problem between the Rosenthals (or Jerome or Ruth, individually) with the Internal Revenue Service or the State of California. Rosenthal's brief and sketchy testimony, not connected with any documentary evidence except the schedule of items making up the amounts of the *258 claimed deductions (exhibit 56), gives the impression that the items of legal fees and of other expenses were related solely to negotiations between Rosenthal and Ruth Rosenthal, in their 1587 divorce proceeding, about allocating expenses for taxes to one or the other, or between them, as part of their agreement dealing with some settlement of their respective interests in their marital community property, and dealing with their plan or arrangements for the payment of alimony by Rosenthal to Ruth, or their plan to settle a provision for alimony through payments of cash or property, or both. Evidently, since there was not an issue in the divorce proceeding about whether or not one, or both, were entitled to a divorce (which the parties had agreed about in the affirmative), it appears that the divorce proceeding was concerned with determinations or issues involving a property, an income, and an alimony settlement. With respect to such matters, there is almost nothing in the record here; and we take the precaution of noting here that we have not taken any so-called "judicial notice" of any reported case in any California court or other court, dealing with the proceedings in the divorce *259 of the Rosenthals, if there is any reported court case, or cases. What findings can be made under this issue about the items of expense? Respondent has agreed that Rosenthal made payments in the amounts involved in the claimed deductions, and that petitioner's expenditures were for court costs, legal fees, and the other categories. On the other hand, we cannot make any finding, from the evidence, that any amount was a payment for an ordinary and necessary expense "for the production or collection of income", within section 212(1), or "for the management, conservation, or maintenance of property held for the production of income", within section 212(2). On those matters there is without doubt failure of proof. The holding that there is failure of proof by petitioner determines that no deduction is allowable for one-half of, or all of, court costs and the other items exclusive of the expenditure of $6,500 in 1961 for fees charged by each lawyer, Horwin and Caruso. All of the deduction claimed for each payment for legal services is claimed under section 212(3), according to our understanding. But if parts of those legal fees are claimed as deductions under either subsection (1) or (2) *260 of section 212, then our finding and holding is that no deduction is allowable under those Code sections due to failure of proof. We now turn to consideration of the claims as claimed deductions under section 212(3), as ordinary and necessary expenses paid or incurred in connection with the determination, collection, or refund of any tax. On the basis of petitioner's testimony, the only evidence here, the findings and conclusions are that the legal fees paid to Horwin and to Caruso were for legal sevices connected with the divorce of petitioner, and that all of the other expenditures also were connected with the divorce proceedings; and that with respect to "tax advice" given by each lawyer to petitioner, the petitioner failed to prove and establish just what such "tax advice" was about, assuming arguendo that he received "tax advice" from each lawyer. Absent evidence dealing with the nature and kind of the alleged "tax advice", we cannot made a finding that such tax advice was connected with "the determination, collection, or refund of any tax." A deduction under section 212(3) is limited to an expenditure which comes within the wording of subsection (3). Apart from the question whether *261 the claimed deductions are not allowable under the rule of United States v. Gilmore, 372 U.S. 39, supra, and United States v. Partrick, 372 U.S. 53, supra, it is noted that section 212(3) does not cover and include every kind of expense of "tax advice." Rather that Code section is limited to what it specifically says. The "collection, or refund" of a tax ordinarily is a matter between the taxpayer and the taxing authority. The "determination" of a tax ordinarily involves questions about whether any tax is due, at all, to a taxing authority, and the amount thereof, if a tax is involved. The word "determination" has a broader meaning than "collection, or refund", but even in its broader scope, the determination of a tax ordinarily involves the taxpayer and the taxing authority as the parties to the problem. See United States v. Davis, 370 U.S. 75. Vague as the evidence is about just what the disputes and issues were between Rosenthal and Ruth in their divorce proceedings, it appears from Rosenthal's testimony that there was a problem, involving both the community property interests of the spouses, and their respective interests in Rosenthal's law partnership and the income therefrom, *262 about taxes, in general, but the record here does not show what that problem was or how it was related to some property and alimony agreements to be agreed upon as part of the divorce 1588 proceeding. Rosenthal's "tax planning", for the past or future, seems to have been involved. We cannot attempt to guess what the tax problems were in the negotiations of the Rosenthals about settling their property interests and the alimony arrangements. But we can suggest that the expense of "tax advice" to Rosenthal by his lawyers about tax problems in the settlement of property interests pursuant to a divorce does not come within section 212(3). Ruth Rosenthal had her own lawyers in the divorce and divorce negotiations. She did not appear and did not testify at the trial of these cases. Horwin and Caruso were not her lawyers. The determination of, and the collection or refund of any tax imposed upon her by taxing authority would be the problem of Ruth and her own attorneys, and the expense of tax advice to her would be her expense, not Rosenthal's expense. The deductions in issue here, claimed under any or all of the subsections of section 212, relate only to Rosenthal's taxes, if any taxes were *263 involved within the meaning of section 212. In our efforts to analyze and narrow the questions under this issue, it should be observed that a line should be drawn between "the determination, collection, or refund" of any tax imposed upon Rosenthal either before or after whatever settlement was made, as part of the divorce, of his property, law partnership, and income interests. There is no evidence relating to such interests, before or after a divorce agreement, and there is no evidence connecting "tax advice"of either Horwin or Caruso with the tax liabilty of Rosenthal for any particular taxable year. Petitioner has not contended that the "tax advice" of his lawyers related, for example, to 1960 or 1961, or to any taxable year before or after those years. Was the cost of the alleged "tax advice" of Horwin or Caruso a capital expense? If that expense was an expense of determining what property in the community property, or what the value was of such property, would be allocated to Rosenthal, in the divorce agreements, then the expense, and expenses, would be capital expense, not deductible under section 212. As is stated in par. 25 A. 04, Ch. 25 A, page 5, Vol. 4 A, Mertens, Law of *264 Federal Income Taxation, Congress, in enacting the provisions of section 212, did not intend to expand the class of nonbusiness, deductible items of expense to include capital expenditures; they remained nondeductible. "The rule is now well-established that the origin and character of a claim with respect to which an expense was incurred rather than its potential effect upon the financial fortunes of the taxpayer are the controlling basic tests of whether an expense is deductible under Section 212 of the 1954 Code [citations of Gilmore and Patrick included]." See United States v. Gilmore, supra; and United States v. Patrick, supra.
It is concluded that neither Rosenthal nor Ruth Rosenthal is entitled to the claimed deductions for 1960 and 1961 (one-half of the items of expense being claimed as a deduction of each taxpayer) under section 212(3), or in the alternative under section 212(1) or 212(2). Petitioners failed, under their burden of proof, to establish that any or all of the items for which deductions are claimed come within any provision of section 212. See George L. Schultz, 50 T.C. 688, 700 (1968), where this Court stated: The record herein is devoid of any evidence as to *265 the details of the legal services rendered. * * * But, clearly, services of a personal nondeductible nature such as the preparation of petitioner's will ( Estate of Helen S. Pennell, 4 B.T.A. 1039 (1926)) were also involved. The record herein furnishes no basis for an allocation. Such being the case, we cannot determine to what extent the services included estate planning of the type which might give rise to a deductible expense under section 212. Nancy Reynolds Bagley, 8 T.C. 130 (1947). Nor do we have a sufficient basis to justify delving into the apparently unsettled question of the scope of section 212(3). Compare Carpenter v. United States, 338 F. 2d 366 (Ct. Cl. 1964), with Kaufmann v. United States, 227 F. Supp. 807 (W.D. Mo. 1963). Under all the circumstances, we hold that the petitioner has failed to carry his burden of proof. Therefore, we sustain respondent on this issue. In the absence of evidence to the contrary, the findings and conclusions are made that all of the expenditures in issue for 1960 and 1961, for which deductions were claimed by Rosenthal and Ruth Rosenthal, respectively, on their separate tax returns, were personal expenses which are not deductible under *266 section 262 of the Code. Petitioners failed to prove that any part of the expenditures come within the exception to the general rule provided in section 1.262-1(b)(7) of the Regulations; and they 1589 failed to prove that any part or all of the several items of expenditures come within any provision of section 212. Respondent's determinations are sustained. See Mertens, Law of Federal Income Taxation, Vol. 4A; Chapter 25A, pages 24-26, par. 25A.09a, and par. 25A.10, and the cited cases. General Matters 1. Docket No. 1392-64, Ruth Rosenthal, Petitioner: For 1960, a separate income tax return was filed for petitioner's then wife, Ruth B. Rosenthal. The respondent made a determination in the statutory deficiency notice under section 6651(a) that she was liable for a 25 percent addition to tax in the amount of $866.38. Section 6651(a)(1) relates to the imposition of a penalty where there was a failure to file a return. Respondent's imposition of the penalty was made, in this instance, for a technical reason which no longer is material. The separate return in the name of Ruth Rosenthal, as petitioner's spouse, was prepared in petitioner's office under his direction and control. The items *267 of income and deductions, and all of the items on that tax return, related only to Jerome Rosenthal; no item related to Ruth Rosenthal as an individual, and no income earned by her or derived from her separate property was reported or involved. After the trial of these cases, and recently, this Court by an order and memorandum sur order called attention of the parties to respondent's apparently inconsistent position in imposing the penalty upon Ruth Rosenthal with respect to the tax return that was filed, but at the same time recognizing the return with respect to all of its contents; determining tax deficiencies on the basis of the return; and accepting the return as a duly and timely filed tax return. The parties were separated when the return was filed, and became divorced on April 3, 1964. In response to this Court's order and memorandum, and in consideration of the particular and unusual circumstances, the respondent, for the purpose of this case only, has receded from and abandoned his determination of the penalty of $866.38. Effect will be given to this concession under Rule 50. Issue 4: Docket Nos. 77923, 77925, 1955: Respondent's Claim for Increases in the Deficiencies; Statute *268 of Limitations: More than 4 years prior to the trial of these cases respondent filed, and the Court granted the motions to file, amended answers in which respondent asked for increased deficiencies for 1955 of $2,780.52, Docket No. 77923, and $2,780.52, Docket No. 77925, pursuant to the provisions of section 6214(a), 1954 Code. The claims for increased deficiencies for 1955 were based on the disallowance of purported "interest" payments by petitioner to CHK on December 23, 1955, in connection with what respondent contends was part of the fourth transaction involving $750,000 Treasury Notes. The statutory notices issued on September 16, 1958, for the taxable year 1955 gave the Court jurisdiction in Docket Nos. 77923 and 77925 for the year 1955. Separate income tax returns were filed for 1955 on which the claimed deduction for the "interest" payment of $7,723.67 to CHK was divided equally on the two returns; but in the deficiency notices, respondent did not disallow the claimed deductions. Respondent's amended answers requesting the increased deficiencies were filed on February 12, 1963, which was more than 4 years before the trial of these cases. The pertinent part of section 6214 *269 provide as follows: Sec. 6214. Determinations by Tax Court. (a) Jurisdictions as to Increase of Deficiency, Additional Amounts, or Additions to the Tax. - The Tax Court shall have jurisidiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any additional amount, or addition to the tax should be assessed, if claim therefor is asserted by the Secretary or his delegate at or before the hearing or a rehearing. Since respondent's claims for the increased deficiencies were made more than 4 years before the hearing, it is clear that, based on the plain meaning of section 6214(a), this Court has jurisdiction to make a determination with respect to the claimed increased deficiencies. The statute of limitations does not bar the assessment and collection of the increased deficiencies for 1955, in the amounts of $2,780.52 in Docket No. 77923, and $2,780.52 in Docket No. 77925. Under Issue 1, the Court has found and held that the purported "interest" payment to CHK on December 23, 1955, at $7,723.67 was not interest on indebtedness and *270 that no deduction is allowable as a payment of interest. Having sustained the respondent's determinations in his amended 1590 answers, it follows that the increases in the deficiencies are sustained. They are not barred by the statute of limitations. Recomputations of the deficiencies are required. Decisions will be entered under Rule 50. Footnotes
1. The cases consolidated with Docket No. 67848, Jerome B. Rosenthal and Ruth Rosenthal (1953) are: Docket No. 77923, Ruth Rosenthal (1955); Docket No. 77925, Jerome B. Rosenthal (1955); Docket No. 77924, Jerome B. Rosenthal and Ruth B. Rosenthal (1956); Docket No. 93832, Jerome B. Rosenthal and Ruth B. Rosenthal (1957); Docket No. 1986-62, Jerome B. Rosenthal and Ruth Rosenthal (1958); Docket No. 1392-64, Ruth B. Rosenthal (1960, 1961); Docket No. 1393-64, Jerome B. Rosenthal (1960, 1961).↩
*. Morton Rosen and Robert Forst appeared in the trial and on the briefs in these cases, but recently withdrew as counsel. The petitioner, Jerome B. Rosenthal, is the sole remaining counsel in these cases.↩
*. G credited R.05 making G's total paid to R $90,388.90.↩
*. At or about maturity The following is a list of the bid prices on the market, for Land Bank bonds due October 1, 1957, during the period February 2, 1953, to September 3, 1957. Prices are stated with franctions having a denominator of "32" but the denominator is omitted. A fraction of 12, for example, means 12/32. Since the bonds were due October 1, 1957, and were redeemable at par, the bid prices tended to approach 100 as the time before the due date became shorter: *10 UNITED STATES
FEDERAL LAND BANK BONDS
*10 1 3/4% - OCTOBER 1,
1957/55
*10 LOW BID PRICES
Year
Date
Low Bid Price
1953
Feb. 2
95-12
Mar. 2
95-12
Apr. 30
95-8
May 29
94-26
June 8
94-16
July 1
94-26
Aug. 28
94-30
Sept. 9
94-26
Oct. 1
95-18
Nov. 25
96-6
Dec. 1
96-8
1954
Jan. 4
97-4
Feb. 1
98-26
Mar. 1
99-6
Apr. 1
99-12
May 27
99-4
June 1
99-4
July 1
99-16
Aug. 2
99-26
Sept. 24
99-20
Oct. 26
99-16
Nov. 15
99-12
Dec. 29
99-0
1955
Jan. 18
98-18
Feb. 25
98-8
Mar. 1
98-4
Apr. 28
98-0
May 2
98-0
June 27
98-2
July 29
97-28
Aug. 30
96-14
Sept. 6
97-10
Oct. 4
97-16
Nov. 30
97-20
Dec. 23
97-16
1956
Jan. 3
97-16
Feb. 27
98-2
Mar. 29
97-20
Apr. 17
97-16
May 1
97-18
June 1
97-24
July 27
98-10
Aug. 28
98-1
Sept. 6
97-30
Oct. 1
98-4
Nov. 29
98-10
Dec. 17
98-8
1957
Jan. 2
98-10
Feb. 1
98-23
Mar. 1
99-0
Apr. 1
99-1
May 1
99-6
June 3
99-10
July 1
99-14
Aug. 1
99-21
Sept. 3
99-26
Transactions 2 and 3: $200,000 Treasury Bonds due September 15, 1961 In February 1954, two transactions, each purportedly involving $100,000 U.S. Treasury bonds due September 15, 1961, were arranged for the account of Rosenthal, which are referred to here as Transactions 2 and 3. Each transaction was closed on Gibraltar's books on about September 15, 1961, by a credit to the account of the par value of the bonds, $100,000. The U.S. Treasury bonds were 2 3/4 percent bonds; the interest was payable on March 15 and September 15. Each transaction allegedly involved bonds with only the coupons for 1954 and 1955 "attached," and the coupons for the remaining 6 years, 1956-1961, "detached." Accordingly, the form of the arrangement was that 1535 "the bonds" did not yield interest for the last 6 years. Delivery of United States bonds with coupons detached is unusual since all coupons must be attached to the bonds in order to make a valid delivery, and the bonds were "resold" and "redelivered" by Irving with all of the coupons "attached" as of February 26, 1954. The mechanics employed by Gibraltar were the same in each transaction. In each instance there was a "purchase" of bonds, with delivery against payment to Irving Trust Co., Gibraltar's clearance agent; and there was an almost simultaneous "sale" to another dealer to which Gibraltar redelivered the bonds and received payment, so that the bonds came "In" to Irving, and went "Out" from Irving at nearly the same time. No funds were borrowed by Rosenthal, or by Gibraltar for his account. The nearly simultaneous resale to another dealer provided a credit to Gibraltar's account with Irving which off-set Irving's debit to the account. The resale covered the purchase and made those initial steps a wash-out. The resale of the bonds to another dealer cancelled the purchase. The "resale," in each instance, gave the appearance of a "short sale," in form, but in substance there was not a real short sale. The initial and monentary "purchase" of the bonds gave the transaction, in each instance, the appearance in form, of a purchase of the bonds for Rosenthal. The transactions were arranged for Rosenthal by Gerald Cantor, president of C-F, as were all of the 4 transactions here. Neither Gibraltar nor Rosenthal received physical possession of the Treasury bonds. Irving Trust handled each "In" and "Out" step. Rosenthal executed promissory notes to Gibraltar. In the notes, there were restrictions against the possible "prepayment," before maturity of the principal of each note, as was true in the notes to Gibraltar in Transactions 1 and 4. The restrictions were in the notes to insure the continuation of each transaction on Gibraltar's books until the maturity date of the government securities which purportedly were involved. The due dates of petitioner's notes to Gibraltar were the same, or almost the same, as the maturity dates of the Government securities allegedly involved. Irving Trust's services as Gibraltar's clearance agent in each transaction meant that no money was borrowed by Gibraltar for petitioner to fund each transaction. Irving made debits and off-setting credits on its books to Gibraltar's reciprocal account on its books so that (except possibly for small balances) no money went from Gibraltar to Irving. That was true in each of the 4 transactions. The term "equivalent securities" means securities of the same issue in the same principal amount, having different serial numbers than another lot of the same securities. When Irving "redelivered" securities in all of the "In" and "Out" transactions (in the 4 transactions here), it may have redelivered to a dealer "equivalent" securities. In transactions 2 and 3, as in 1 and 4, since no government securities were actually held for Rosenthal's account, interest on the Government securities was not earned and was not in fact received by Gibraltar or petitioner. The respective amounts of interest which would have been earned, otherwise, by the Government securities, if actually held, which Gibraltar credited to Rosenthal's accounts, or purportedly paid to him (which he reported in his income on his tax returns) represented either bookkeeping credits or refunds of cash to petitioner out of his purported payments of "interest" on his promissory notes to Gibraltar. When Irving credited Gibraltar's account for the resale of the Treasury bonds to Childs (Transaction 2) and to Devine (Transaction 3) the amounts of the credits, were larger than the debits for Faroll's charges. That is accounted for by the fact that Faroll's charges were for bonds with some of the coupons "detached", whereas the respective resales to Childs and Devine were of bonds with all of the coupons "attached", as Gibraltar purchased the "detached" coupons in each instance and later Irving attached them to bonds redelivered to Childs or Devine. In each of Transactions 2 and 3, petitioner had net out-of-pocket costs and he did not in fact and substance realize any gain; $3,669.47 in Number 2, and $3,794.30 in Number 3. Forms were observed by Gibraltar. It sent to petitioner its printed notices of interest due on his promissory notes, and its printed credit slips advising him of the receipt of his payments. Petitioner signed letters of instructions prepared for his signature. Each of the transactions was a paper transaction, and a sham. The following are the facts in each transaction: 1536 Transaction 2: $100,000 U.S. Treasury Bonds 1. On February 25, 1954, settlement date February 26, $100,000 United States Treasury bonds, 2 3/4 percent interest due September 15, 1961, with the interest coupons payable on March 15, 1956, detached, and also with the subsequent interest coupons detached, were purchased through Joseph Faroll & Co., a dealer in New York City, to be delivered to Irving Trust Co., for the account of Gibraltar, for the account of Rosenthal. The coupon interest on the Treasury bonds was payable on March 15 and September 15, $1,375 on each date, $2,750 annually. The charge for the bonds, with coupons detached, was 86-26/32. The total charge was $87,640.54, including accrued bond interest of $828.04 to February 25, as follows: Purchase price, 86-26/32
$86,812.50
Dealer's commission
0
Accrued bond interest to Feb. 25
828.04
Total purchase price
$87,640.54
The bonds were located in New York City. Rosenthal did not make any payment on account of the above charge. 2. On February 26, Faroll delivered the bonds to Irving Trust, clearance agent for Gibraltar, for the account of Gibraltar, against payment of $87,640.54. Irving debited Gibraltar's account for $87,643.04, which included a clearance fee of $2,50. 3. Gibraltar sold the bonds to C.F. Childs and instructed Irving on February 26 to redeliver them to Childs against payment. The bonds were sold to Childs with all of the coupons attached. Childs bought them from Gibraltar at the market price for bonds with all of the coupons attached, 103-9/32, $103,281.25. The closing date was about February 26 or March 1. The interest accrued to the date of sale was $850.83, and Childs paid a total sum of $104,132.08, which Irving credited to Gibraltar's account on March 1. The credit was $16,489.04 more than the debit of $87,643.04. Gibraltar paid, or was charged by Irving separately from the debit for the payment to Faroll, for the detached coupons. That charge evidently was $16,468.75 (the difference between $103,281.25 and $86,812.50 charged by Faroll at 86-26/32). Since the market price for the Treasury bonds was over 100 on February 25, 1954, and was 103-9/32, or close to that price, the price charged by Faroll, 86-26/32 was a discounted price on acount of the detached coupons, the discount being about 16-15/32. Since this transaction involved a promissory note of petitioner to Gibraltar to mature on September 15, 1961, (the same as the maturity date of the Treasury bonds), a profit could be realized on bonds redeemable at par only by fixing in advance a "cost" at a discounted price, such as 86-26/32 (which was done), and a discounted price could be fixed in advance on the basis of "buying" the bonds from Faroll with 12 coupons detached (which was done). This transaction was arranged in advance on a basis which would give the appearance later, on September 14, 1961, of a capital gain of $13,187.50, which was the capital gain as of September 14, 1961. The mechanics used in the purported "purchase" of the bonds for petitioner's account was an "In" and "Out" transaction in which Gibraltar sold them to Childs at about the same time as they were purchased from Faroll. The almost simultaneous sale to Childs nullified the purchase from Faroll in a wash-out. For bookkeeping purposes, the sale to Childs provided the funds to cover the purchase from Faroll, and no money was borrowed by Gibraltar or Rosenthal to fund a purchase of bonds. Also, there was not a real "short sale," although the mechanics resembled one. 4. Rosenthal executed a note dated February 26, 1954, payable to Gibraltar September 15, 1961, the due date of the Treasury bonds, in the amount of $105,000, which represented the sum of the purported "cost" of the bonds, $87,640.54 (Faroll) plus a socalled "reserve" of $17,359.46, to be paid by Gibraltar to Rosenthal. The note carried 2 5/8 interest to be paid in installments, quarterly, to October 15, 1958, only, and no "interest" was to be paid after October 15, 1958. The total amount of the "interest" installments typed in the note was $21,111.11; about $4,222.24 a year was to be paid to Gibraltar. Since Gibraltar was to pay $17,359.46 to Rosenthal, his net payments to Gibraltar were to be the difference of $3,751.65. As is shown in schedules hereafter, petitioner and Gibraltar made the reciprocal cash payments to each other, periodically. They "exchanged" checks, and in fact and substance Gibraltar's payments were refunds to petitioner of most of his payments of "interest" on his note. The note stated that $100,000 Treasury bonds, 2 3/4 percent, due September 15, 1961, with the coupons detached for March 15, 1956, and subsequent coupons were "pledged" as collateral with Gibraltar. 1537 The note provisions included the following: That the "reserve" of $17,359.46 "withheld" by Gibraltar was to secure the payments of "interest", and that Gibraltar would "release and pay" petitioner the reserve in equal installments on the dates when the note "interest" was due, if paid, After 1954, petitioner's "interest" installments were $1,055.56, and Gibraltar's "reserve" installments were $867.97, so that petitioner's net installments from his own funds were $187.59, or $750.36 a year. The note provided that Gibraltar could borrow and re-pledge, use, or transfer the collateral (the Treasury bonds) for any purpose, and to use the collateral to cover delivery of any securities of similar kind. The note provided for a penalty for prepayment of the principal amount; petitioner could obtain the return of the collateral, or collateral of like kind, upon full payment of the principal on the due date of the note, September 15, 1961, with interest. The "right of prepayment granted" could be exercised on 30 days notice up to March 15, 1961, but only upon payment of 1 1/2 percent per year (the penalty) on $105,000, principal, from the date of prepayment until Sept. 15, 1961. Since the "collateral" consisted, purportedly of government bonds to be redeemed for $100,000 on Sept. 15, 1961, the "prepayment" right had little significance in this instance. The principal amount of the note was $105,000, or $5,000 more than the principal amount of the Treasury bonds, and it would not have been economical for petitioner to have obtained "the return" of the bonds (even if they had been held by Gibraltar) at the cost of the premium, or penalty, for prepayment. Also, the market prices of the bonds never went higher than 103-26/32 on and after March 31, 1954. Moreover, the purpose of the penalty was to help to avoid prepayment of the note before its due date. The note provided that interest on the "pledged" bonds would be applied to reduce the principal of the note, but the signer of the note would not be entitled to any refund of note "interest." Gibraltar did not borrow or pay to petitioner the principal amount of the note, $105,000, and no part thereof was paid, in substance to him. As noted above, Gibraltar's payments of the so-called reserve to petitioner were, in substance, refunds to him of his installment payments of "interest" on his note. 5. As of February 26, 1954, Gibraltar opened on its books a "secured" account in petitioner's name with a debit of $105,000 with the entry that Gibraltar had "bought or received" $100,000 Treasury bonds which were "held" "long." The debit reflected no more than the receipt of petitioner's note. In fact and susbtance, the debit entry did not reflect an actual loan to petitioner of $105,000. 6. The following schedules list the reciprocal payments made by petitioner and Gibraltar during 1954-1958 as note "interest", and as releases of the "reserve", respectively: G credited R.05 balance increasing its payments from $3,471.88 to $3,471.93.
* 10 PAYMENTS OF
ROSENTHAL (R) TO
GIBRALTAR (G); PAYMENTS
OF GIBRALTAR TO
ROSENTHAL; AND NET SUM
PAID BY ROSENTHAL
*10 1954
Check Dates
Net Paid by
Rosenthal
2/26/54
R to G
$4,222.22
2/28/54
G to R
3,471.89
Net paid to R
$ 750.33
1955
1/19/55
R to G
1,055.56
1/22/55
G to R
867.97
Net paid by R
187,59
4/ 8/55
R to G
1,055.56
4/17/55
G to R
867.97
Net paid by R
187.59
7/15/55
R to G
1,055.56
7/18/55
G to R
867.97
Net paid by R
187.59
10/ 7/55
R to G
1,055.56
10/10/55
G to R
867.97
Net paid by R
187.59
Summary - 1955
Total paid Rosenthal to Gibraltar
$4,222.24
Total paid Gibraltar to Rosenthal
3,471.88
Net paid Rosenthal to Gibraltar
$ 750.36
Summary - 1954
Total paid Rosenthal to Gibraltar
$4,222.22
Total paid Gibraltar to Rosenthal
3,471.89
Net paid Rosenthal to Gibraltar
$ 750.33
1956
1/10/56
R to G
$1,055.56
1/14/ 1956
1/10/56
R to G
$1,055.56
1/14/56
G to R
867.97
Net paid by R
$ 187.59
3/31/56
R to G
1,055.56
4/15/56
G to R
867.97
Net paid by R
187.59
7/ 9/56
R to G
1,055.56
7/15/56
G to R
867.97
Net paid by R
187.59
10/15/56
R to G
1,055.56
10/19/56
G to R
867.97
Net paid by R
187.59 1538 Summary - 1956
Total paid Rosenthal to Gibraltar
$4,222.24
Total paid Gibraltar to Rosenthal
3,471.88
Net paid Rosenthal to Gibraltar
$ 750.36
* 10 1957
Check Dates
Net Paid by
Rosenthal
1/14/57
R to G
$1,055.56
1/18/57
G to R
867.97
Net paid by R
$ 187.59
4/ 8/57
R toG
1,055.56
4/12/57
G to R
867.97
Net paid by R
187.59
7/15/57
R to G
1,055.56
7/22/57
G to R
867.97
Net paid by R
187.59
10/14/57
R to G
1,055.56
10/16/57
G to R
867.97
Net paid by R
187.59
Summary - 1957
Total paid Rosenthal to Gibraltar
$4,222.24
Total paid Gibraltar to Rosenthal
3,471.88
Net paid Rosenthal to Gibraltar
$ 750.36
* 10 1958
1/13/58
R to G
$1,055.56
1/17/58
G to R
867.97
Net paid by R
$ 187.59
4/ 7/58
R to G
1,055.56
4/10/58
G to R
867.97
Net paid by R
187.59
7/23/58
R to G
1,055.56
7/29/58
G to R
867.97
Net paid by R
187.59
10/13/58
R to G
1,055.49
10/14/58
G to R
867.97
Net paid by R
187.52
Adjustment G to R
.05
↩
Summary - 1958
Total paid Rosenthal to Gibraltar
$4,222.17
Total paid Gibraltar to Rosenthal
* 3,471.93
Net paid Rosenthal to Gibraltar
$ 750.24
Summary - 1954-1958
Total paid Rosenthal to Gibraltar
$21,111.11
Total paid Gibraltar to Rosenthal
17,359.46
Net paid by Rosenthal, own funds
$ 3,751.65
*. Gibraltar's payments totaled $17,211.59, or 8 cents less than $17,211.67.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. * * * (b) INTEREST. - All interest paid or accrued within the taxable year on indebtedness, * * * SEC. 163. INTEREST. (a) GENERAL RULE. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩